# 13-4404

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

LARRY STRYKER,

Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

Petition for Review of a Final Order of
the U.S. Securities and Exchange Commission

BRIEF OF THE PETITIONER
LARRY STRYKER

STEPHEN M. KOHN
Lead Counsel
MICHAEL D. KOHN
DAVID K. COLAPINTO
Kohn, Kohn & Colapinto, LLP
3233 P Street, N.W.
Washington, D.C. 20007
(202) 342-6980
(202) 342-6984 (fax)
sk@kkc.com

KARIM H. KAMAL
Law Office of Karim H. Kamal
10 East 40th Street, Suite 3110
New York, NY 10016
(212) 586-0510
khklaw@gmail.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ........................................................... iii

REQUEST FOR ORAL ARGUMENT ......................................... 1

STATEMENT OF JURSIDICTION .............................................. 1

ISSUES PRESENTED FOR REVIEW ……………….………………….2

STATEMENT OF THE CASE ...................................................... 2

SUMMARY OF THE ARGUMENT ............................................. 7

STATEMENT OF FACTS ............................................................ 13

I.  Legislative History of SEC Whistleblower Award Law ......................... 13

II.  The Dodd-Frank Act's Definition of "Original Information" ............... 19

III. The Statutory Structure of the Act Places No Time Limits on
    "Original Information Beyond the Requirement that the
    Information be "Original" ...................................................... 20

IV.  The Commission's Rule Significantly Departs From the Statutory
    Language, and Imposes New Requirements ........................................ 24

ARGUMENT ..................................................................... 25

I.  Standard of Review ................................................................ 25

II.  The Plain Language of the Dodd-Frank Act Requires the
    Commission to Pay Rewards to Whistleblowers Who Provided
    "Original Information" to the Commission Before July 21, 2010 ........ 27

III. Congress Deliberately Chose Not to Exclude Information
    Provided Before July 21, 2010 .............................................. 30

i

IV.  The Broader Statutory Scheme Supports the Eligibility of
     Pre-Enactment Information ................................................................. 33

V.   The Commission Impermissibly Considered the Amount of
     Assets in the Investor Protection Fund ................................................ 36

VI.  The Traditional Tools of Statutory Interpretation
     Demonstrate that the SEC's Rule is Contrary to the
     Clear Intent of Congress ..................................................................... 42

VII. The Only Timing Requirement Governing Award
     Eligibility is a Procedural Rule that Applications
     Be Submitted within 90 Days of the SEC's
     Publication of a Notice of a Covered Action ........................................ 50

VIII. The SEC's Regulations are Unreasonable and Cannot be
      Applied to Mr. Stryker ....................................................................... 52

CONCLUSION ............................................................................................ 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Andrus v. Glover Const. Co.*, 446 U.S. 608 (1980) ................................ 42, 43

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) ............................ 12, 42

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988) .......... 54, 55

*Chevron v. Natural Resources Defense
Council*, 467 U.S. 837 (1984) ........... 7, 10, 13, 22, 25, 26, 27, 28, 29, 52, 53

*City of New York v. Beretta U.S.A. Corp.*,
524 F.3d 384 (2d Cir. 2008) ...................................................... 12, 30, 31, 43

*Colette v. Franklin*, 439 U.S. 379 (1979) .................................................. 9, 28

*Comm'r v. Clark*, 489 U.S. 726 (1989) ................................................... 30, 43

*Cont'l Cas. Co. v. United States*, 314 U.S. 527 (1942) ................................ 43

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) ............................................ 31

*Financial Planning v. S.E.C.*, 482 F.3d 481, 488 (D.C. Cir. 2007) ............. 31

*Gorman v. Commissioner*, 302 U.S. 82 (1937) ........................................ 9, 28

*Hardy v. New York City Health & Hosp. Corp.*,
164 F.3d 789 (2d Cir. 1999) .................................................................. 31, 43

*Jacobs v. N.Y. Founding Hosp.*, 577 F.3d 93 (2d Cir. 2009) ...................... 43

*Murphy v. Empire of America*, 746 F.3d 931, 935 (2d Cir. 1984) ............. 33

*Nashville Milk Co. v. Carnation Co.,* 355 U.S. 373 (1958) ........................ 43

*New York ex rel. Office of Children and
Family Services v. U.S. HHS Admin.*,
556 F.3d 90 (2d Cir 2009) ...................................... 10, 26, 27, 28, 29, 52, 53

*U.S. v. DiCristina*, 726 F.3d 92 (2d Cir. 2013) ............................... 10, 28, 36

**STATUTES**

Administrative Procedure Act

5 U.S.C. §500, *et seq.* ................................................................... 7
5 U.S.C. §706 ................................................................... 1, 16, 25

Dodd-Frank Wall Street Reform and Consumer Protection Act
("Dodd-Frank Act"), 15 U.S.C. 78a, *et seq.*

Section 21F, 15 U.S.C. §78u-6 ................................................. 1, 19
Section 21F(a), 15 U.S.C. §78u-6(a) ............................... 11, 29, 52
Section 21F(a)(1), 15 U.S.C. §78u-6(a)(1)...................... 21, 35, 55
Section 21F(a)(2), 15 U.S.C. §78u-6(a)(2).................................. 17
Section 21F(a)(3)
  15 U.S.C. §78u-6(a)(3) ....................... 1, 5, 9, 11, 19, 20, 30, 49, 52
Section 21F(a)(3), 15 U.S.C. §78u-6(a)(3).................................. 20
Section 21F(a)(4), 15 U.S.C. §78u-6(a)(4)...................... 36, 51, 55
Section 21F(b), 15 U.S.C. §78u-6(b)............................... 1, 13, 34
Section 21F(b)(1)
  15 U.S.C. §78u-6(b)(1)................. 11, 17, 20, 22, 27, 33, 34, 44, 51, 52, 55
Section 21F(c), 15 U.S.C. §78u-6(c) ......................................... 49
Section 21F(c)(1), 15 U.S.C. §78u-6(c)(1).............................. 22, 23
Section 21F(c)(1)(B)(i)(IV), 15 U.S.C. §78u-6(c)(1)(B)(i)(IV)................. 22
Section 21F(c)(1)(B)(ii), 15 U.S.C. §78u-6(c)(1)(B)(ii) ............... 22, 37, 42
Section 21F(c)(2), 15 U.S.C. §78u-6(c)(2)............... 9, 11, 23, 30, 31, 49
Section 21F(c)(2)(D), 15 U.S.C. §78u-6(c)(2)(D)............... 21, 31, 32, 47, 48
Section 21F(d), 15 U.S.C. § 78u-6(d)....................................... 45
Section 21F(f), 15 U.S.C. §78u-6(f).......................... 1, 17, 25, 45
Section 21F(g), 15 U.S.C. §78u-6(g)........................... 8, 17, 37
Section 21F(g)(2), 15 U.S.C. §78u-6(g)(2) .............................. 17
Section 21F(g)(3), 15 U.S.C. §78u-6(g)(3) .............................. 8, 41
Section 21F(g)(5), 15 U.S.C. § 78u-6(g)(5) .............................. 45

Section 21F(h)(1)(B)(iii), 15 U.S.C. §78u-6(h)(1)(B)(iii)..................... 44, 45
Section 21F(j), 15 U.S.C. §78u-6(j) ................................................. 21
Section 924(a), 15 U.S.C. § 78u-7(a) ............................................. 45
Section 924(b), 15 U.S.C. §78u-7(b)............................. 23, 45, 46, 47, 48, 49
Section 924(c), 15 U.S.C. §78u-7(c) ........................................ 21, 23, 45, 46

Public Law No. 100-704, 15 U.S.C. § 78u-1(e)(2009) ......................... 13, 14

Public Law 111-203 (Dodd-Frank Act)

Dodd-Frank Act § 922(c), *amending* 18 U.S.C. § 1514(b) ......................... 45
Dodd-Frank Act § 922(d)(2)........................................................ 45

**RULES**

Commission Rules under the Dodd-Frank Act, 17 C.F.R. Part 240

17 C.F.R. §240.21F-1 ............................................................... 24
17 C.F.R. §240.21F-3(a) ............................................................ 56
17 C.F.R. §240.21F-4(b) .......................................................... 5, 24
17 C.F.R. §240.21F-4(b)(1) ...................................................... 5, 10
17 C.F.R. §240.21F-4(b)(1)(iv) ........ 2, 3, 4, 11, 25, 27, 30, 33, 50, 52, 56, 57
17 C.F.R. §240.21F-10(a)........................................................ 3, 4, 50, 56

**LEGISLATIVE MATERIALS**

Committee on Banking, Housing, and Urban Affairs
"The Restoring American Financial Stability Act of 2010
Report together with Minority Views"
S. Rep. 111-176 (April 30, 2010) .................. 8, 16, 18, 33, 38, 39, 49, 50, 51

Dodd-Frank Act Senate "Discussion Draft"..................................... 15, 17, 32

H.R. 3817 ........................................................................ 14, 15, 17, 32

H.R. 4173........................................................................ 14, 32

**ADMINISTRATIVE MATERIALS**

SEC Annual Report on the Dodd-Frank Act
Fiscal Year 2011 .......................................................... 8, 9, 17, 18, 39, 40, 53

SEC Annual Report on the Dodd-Frank Act
Fiscal Year 2012 ...................................................................... 8, 9, 39, 40, 53

SEC Annual Report on the Dodd-Frank Act
Fiscal Year 2013 ...................................................................... 8, 9, 39, 40, 53

SEC Office of Audits, Office of Inspector General
"Assessment of the SEC's Bounty Program"
(Report No. 474) ........................................................................ 15, 16, 38, 39

**MISCELLANEOUS**

Department of Justice Fraud Statistics
http://www.justice.gov/civil/docs_forms/
C-FRAUDS_FCA_Statistics.pdf ................................................................ 40

## REQUEST FOR ORAL ARGUMENT

This Court would benefit from oral argument. This is the first case in which a Court of Appeals will review the meaning of the term "original information" in the Dodd-Frank Act's whistleblower award provisions, 15 U.S.C. § 78u-6(a)(3).

## STATEMENT OF JURISDICTION

Pursuant to § 21F(b) of the Securities Exchange Act, 15 U.S.C. § 78u-6(b), the U.S. Securities and Exchange Commission ("Commission" or "SEC") had original subject matter jurisdiction over Petitioner's request for an award under the whistleblower provisions of the Dodd-Frank Act. ("Act").[1] This Court has subject matter jurisdiction over this appeal of the Commission's denial of a whistleblower award pursuant to § 21F(f) of the Securities Exchange Act, 15 U.S.C. § 78u-6(f). The appeal must be filed within 30 days of a final order denying an award and is subject to review in accordance with 5 U.S.C. § 706. *Id.*

On January 11, 2011 the petitioner, Mr. Larry Stryker, "timely filed a whistleblower award claim pursuant to Section 21F of the Securities Exchange Act." Commission Order Denying Whistleblower Award Claim ("Final Order"), pp. 1, 3. A copy of this Final Order is attached to the Addendum at page 2. On October 30, 2013 the Commission issued its final order denying Mr. Stryker's

---

[1] A copy of the Dodd-Frank Act's whistleblower award provision, 15 U.S.C. § 78u-6, is attached to the Addendum at page 22.

1

application for an award. *Id*. Mr. Stryker filed a timely petition for review in this Court on November 24, 2013.  Joint Appendix, p. 40.

## ISSUES PRESENTED FOR REVIEW

I.  Whether subsection (iv) of the Securities and Exchange Commission's ("Commission" or "SEC") Final Rule defining "original information" under the Dodd-Frank Act's whistleblower provisions, 17 C.F.R. § 240.21F-4(b)(1)(iv), violates the plain meaning of the Dodd-Frank Act.

II.  Whether the Commission's Final Rule defining "original information," that added a new disqualification to the definition of "original information" not included in the explicit Congressional definition of "original information," was arbitrary, capricious, not in accordance with law, and an abuse of discretion.

III.  Whether the Commission's decision that Mr. Stryker did not qualify for a whistleblower award based on his failure to submit "original information" as required under the Commission's rule was unreasonable, an abuse of discretion, arbitrary, capricious and not in accordance with law.

## STATEMENT OF THE CASE

This is an appeal of an October 30, 2013 Order Denying Whistleblower Award Claim ("Final Order") issued by the Securities and Exchange Commission ("SEC"0.  Addendum, p. 2.  The Commission denied the application for a reward

filed by the petitioner, Mr. Larry Stryker based on Mr. Stryker's failure to provide "original information" to the Commission as required under the rules of the SEC, 17 C.F.R. §240.21F-4(b)(1)(iv).

"Beginning in 2004 and continuing through July 2009" petitioner Larry Stryker "submitted information" to the SEC's Division of Enforcement "regarding wrongdoing" committed by Alexander Stelmak and Advanced Technologies Group, LTD. Final Order, p. 1. On or about March 5, 2009 the SEC "opened an investigation" of the Advanced Technologies Group and Mr. Stelmak. *Id.*, p. 2. The SEC interviewed Mr. Stryker about his allegations in April 2009. *Id.*, p. 1. Thereafter, on June 23, 2010 the SEC "filed an enforcement action" against Advanced Technologies Group and Mr. Stelmak, charging these entities with violating Section 5 of the Securities Exchange Act of 1933. *Id.*, p. 2.

In October-November 2010 the Commission—as well as Advanced Technologies/Stelmak and others implicated in the violations—approved a settlement of its enforcement action. The U.S. District Court for the Southern District of New York approved this settlement on January 12, 2011. *Id.*, pp. 2-3. Pursuant to the consent order approved by the District Court, Advanced Technologies and Stelmak were held jointly and/or independently liable for disgorgement, interest and civil penalties in the amount of $24,007,984.35. *Id.*, p. 3.

On August 12, 2011, pursuant to 17 C.F.R. § 240.21F-10(a),[2] the SEC's

Office of the Whistleblower published a "Notice of Covered Action" regarding the

Advanced Technologies/Stelmak enforcement action. *Id.* p. 3.[3] This publication

was given a Whistleblower Office docket number of 2011-4. *Id.*, p. 1.

Mr. Stryker timely applied to the Commission for a reward under the Dodd-

Frank Act. *Id.*, p. 1. On November 5, 2012 the SEC's Claims Review Staff issued a

"preliminary determination" denying Mr. Stryker's application. Preliminary

Determination, Addendum, p. 1.  The Preliminary Determination stated as follows:

> The information provided by Claimant [Stryker] prior to July 21, 2010
> . . . is not "original information" within the meaning of Section
> 21F(a)(1) of the Exchange Act and Rule 21F-4(b)(1)(iv) thereunder
> because it was not provided to the Commission for the first time after
> July 21, 2010.

> *Id.*

---

[2] A copy of the Commission's whistleblower regulations are attached to the
Addendum at page 26.

[3] SEC Rule 17 C.F.R. § 240.21F-10(a) states as follows: "Whenever a Commission
action results in monetary sanctions totaling more than $1,000,000, the Office of
the Whistleblower will cause to be published on the Commission's website a
'Notice of Covered Action.' Such Notice will be published subsequent to the entry
of a final judgment or order that alone, or collectively with other judgments or
orders previously entered in the Commission action, exceeds $1,000,000; or, in the
absence of such judgment or order subsequent to the deposit of monetary sanctions
exceeding $1,000,000 into a disgorgement or other fund pursuant to Section 308(b)
of the Sarbanes-Oxley Act of 2002."  In this case it is not disputed that the
Commission obtained a sanction totaling more than $1 million dollars.

This denial, in turn, was based on the definition of "original information" promulgated by the Commission. 17 C.F.R. § 240.21F-4(b). Significantly, the Commission's final rule added a disqualification *not* included in the statutory definition of "original action," namely that a whistleblower's information must be provided for the first time after July 21, 2010. *Compare* SEC Rule 21F-4(b)(1) *with* 15 U.S.C. § 78u-6(a)(3). *See* Addendum, p. 42 for a side-by-side comparison between these two definitions. Under the Commission's final rule, therefore, if a whistleblower provided information to the SEC before the passage of the Dodd-Frank Act, the information provided would not constitute "original information" and could not subsequently be used as a basis for qualifying for a reward if a successful enforcement action was prosecuted against the wrongdoer after the Dodd-Frank Act became law.

Mr. Stryker responded to the SEC's Preliminary Determination, pointing out that the definition of "original information" set forth in the SEC's final rule, which established a disqualification based on the date for which information was provided to the Commission, was not included in the statutory definition of "original information." Final Order, p. 7. Mr. Stryker argued that the Commission's rule defining "original information" was "contrary to the statute insofar as it requires that information be submitted to the Commission for the first

time after Dodd-Frank's effective date." Final Order, p. 8. On February 25, 2013 Mr. Stryker filed a timely appeal of the Claims Review Staff's Preliminary Determination to the Commission. Final Order, p. 7. Mr. Stryker asserted in his appeal that the SEC's final rule defining "original information" was "contrary to the statute." *Id.*

On October 30, 2013, the Commission issued a Final Order affirming its preliminary determination, and denying Mr. Stryker's claim for an award. Addendum, p. 2.  In its Final Order the Commission concedes that the Final Rule's definition of "original information" was *not* the same as the definition of "original information" crafted by Congress, and further conceded that their definition "adds" a disqualification not included in the statutory definition. *Id*. However, the Commission justified this additional disqualification on the basis of a purported statutory analysis of the Act. *Id.*, pp. 8-13.  Significantly, however, the SEC's Final Order did not include any discussion whatsoever regarding the plain meaning of Congress' definition of "original information."  *Id.* Additionally, the SEC's Final Order failed to discuss the import of Congress's mandate that its definition of "original information" "shall apply" to all whistleblower cases, and furthermore that its definition "means" precisely what it says.  *Id.*

Based on the Commission's altered definition of "original information" the SEC denied the award on the basis that none of Mr. Stryker's submitted

information constituted "original information." Final Order, p. 12, Addendum, p. 13 ("we believe that the whistleblower statutory provisions do not authorize awards for information originally provided prior to Dodd-Frank's enactment").

Although purporting to conduct a *Chevron* based analysis of the Act, the SEC's Final Order jumped over the first part of the *Chevron* test, and simply ignored the plain meaning of "original information" contained in the statute.

Mr. Stryker filed a timely appeal to this Court. Joint Appendix p. 40. He requests that this Court find that the SEC's Final Rule concerning the definition of "original information" is arbitrary, capricious, unlawful, and an abuse of discretion, or is otherwise in violation of the Administrative Procedure Act, 5 U.S.C. § 500, *et seq*. Accordingly, the Final Order should be vacated and remanded to the Commission with instructions to apply Congress' definition of "original information—without additional limitations imposed by the Commission—to its review of Mr. Stryker's section 21F whistleblower award claim.[4]

## SUMMARY OF THE ARGUMENT

In 2010, Congress enacted the Whistleblower Incentive and Protection program as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). The explicit purpose of this program was explained in

---

[4] Mr. Stryker is not appealing the denial of discovery discussed on pages 14-19 of the Final Order. Addendum, pp. 15-20.

Senate Report S. Rep. 111-176, pp. 111-12: "[T]he intent of the Committee is to reward the whistleblower prior or at the same time as paying such victims, recognizing that were it not for the whistleblower's actions, there would have been no discovery of the harm to the investors and no collection of any sanctions for their benefit. . . . The Committee intends that this program to be used *actively* with *ample* rewards to promote the integrity of the financial markets." Reprinted at Addendum, p. 43. (emph. added).

Consistent with this intent, Congress also established a mechanism to insure whistleblowers were paid awards immediately upon the enactment of the Dodd-Frank Act, and allocated over $450 million into a special Investor Protection Fund ("Fund") for the purpose of paying awards. 15 U.S.C. § 78u-6(g); SEC Annual Report on the Dodd-Frank Act, Fiscal Year 2011, p. 9. *See* Addendum, p. 51. Congress also established a specific mechanism for this Fund to be replenished.[5] Congress ensured that money was available to immediately commence paying awards upon passage of the Act.[6]

---

[5] Once the Fund falls to a level below $300 million dollars, the SEC is required to transfer new money obtained from additional monies collected in penalties, sanctions and disgorgement from future enforcement actions into the Fund. 15 U.S.C. § 78u-6(g)(3).

[6] Significantly, as of the close of FY 2013 the SEC had paid a combined total of $14,877,704.80 in awards since July 21, 2010. Given this paucity of payments, the SEC has not had to replenish the Fund. Thus all monies obtained by the Commission in sanctions, penalties and disgorgement since the enactment of the

Consistent with the intent of Congress, the plain text of the Dodd-Frank Act is unambiguously clear that *any* whistleblower who provides "original information" to the SEC leading to sanctions of more than $1,000,000 is entitled to an award, unless s/he falls into one of several explicitly enumerated categories. 15 U.S.C. § 78u-6(c)(2).

In particular, Congress carefully defined the "original information" requirement, creating a three-pronged definition, as follows:

> The term "original information" ***means*** information that—
> (A) is derived from the independent knowledge or analysis of a whistleblower;
> (B) is not known to the Commission from any other source, unless the whistleblower is the original source of the information; and
> (C) is not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless the whistleblower is a source of the information.

15 U.S.C. § 78u-6(a)(3) (emph. added).

Not only did Congress provide a formal and explicit definition of "original information," it did so by employing the critical term of art "means." When Congress uses the term "means" in a definition, that definition is the is the "exclusive definition." *Gorman v. Comm'r*, 302 U.S. 82, 86 (1937); *Colette v. Franklin*, 439 U.S. 379, 392, n. 10 (1979) ("As a rule, a definition which declares what a term 'means' . . . excludes *any meaning that is not stated*.") (internal

---

Dodd-Frank Act could be (and were) allocated by the SEC for other purposes. SEC Annual Reports, Addendum pp. 51-55.

9

citations and quotations omitted) (emph. added); *accord U.S. v. DiCristina*, 726 F.3d 92, 99 (2d Cir. 2013)  The use of "means" is therefore a recognized method by which Congress can limit the ability of an agency to alter its definition through rule-making, as well as to signal its intent to a reviewing court.

Put in terms of *Chevron*, the Commission's interpretation fails at *Chevron* step 1 because the statute forecloses it—Congress directly spoke to the meaning of "original information," and precisely defined its boundaries. *See, e.g.*, *New York ex rel. Office of Children and Family Services v. U.S. HHS Admin.*, 556 F.3d 90, 97 (2d Cir 2009) ("If the intent of Congress is clear, that is the end of the matter") (quotations and internal citations omitted).

In promulgating its own definition of "original information"—upon which its Final Order is based—the Commission ignored the plain meaning of "original information," failed to hew to Congress' intent, and ignored the case law discussing the significance of Congress' decision to use the term "means" within a definition. Instead, the Commission simply added a fourth requirement to the statutory definition, namely that the information be "[p]rovided to the Commission for the first time after July 21, 2010." 17 C.F.R. § 240.21F-4(b)(1).[7] This

---

[7] While Congress used the term "means" in setting forth its definition of "original information," the Commission simply dropped that term from its definition without explanation. *See*  Comparison Between the Statutory Definition of "Original Information" and the Definition of "Original Information" Approved the by SEC," Addendum, p. 42.

additional requirement has no basis in the statutory language, or in the legislative history of the Act, and therefore exceeds the Commission's rule-making authority.[8]

Congress directly indicated that it was *not* its intent to permit the SEC to create the fourth requirement in at least five ways. First, its explicit definition of original information did not include any limitation as to the date of submission. 15 U.S.C. § 78u-6(a)(3). Second, Congress stated that the SEC "*shall* pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement," again without limitation as to the date of submission. 15 U.S.C. § 78u-6(b)(1) (emph. added). Third, Congress explicitly enumerated the circumstances under which the SEC could deny an award to a whistleblower who submitted original information, again without reference to the date of submission. 15 U.S.C. § 78u-6(c)(2). Fourth, the rule is contrary to the statutory structure—crafted by Congress—that requires the SEC to pay rewards whenever a whistleblower's "original information" results in a "covered judicial or administrative action." 15 U.S.C. § 78u-6(b)(1). Finally, in setting forth its clear and precise definition of "original information," Congress explicitly instructed that the SEC "shall apply" that Congressional definition. 15 U.S.C. § 78u-6(a).

---

[8] In addition to imposing an additional requirement not found in the statute, Commission Rule 17 C.F.R. §240.21F-4(b)(1)(iv) excludes an additional category of individuals from eligibility to receive an award, making it doubly invalid.

Even if this Court were to conclude that Congress' clear definition of the term "original information" is not conclusive evidence of the meaning of that term, other "traditional tools of statutory construction" also support the finding that Congress did not intend to limit "original information" to information provided for the first time after July 21, 2010. Among the most important is the basic principle that Congress is presumed to act intentionally and purposefully when it crafts statutory language. Thus, the inclusion or exclusion of certain language is also purposeful and intended, and must be given effect accordingly. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994). Because Congress enumerated an explicit list of factors as its definition of "original information," and enumerated an explicit list of exclusions from eligibility to receive an award, Congress intended these lists to be exhaustive. *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008) ("statutory exceptions" must be "construed narrowly").

The plain text, structure, and legislative history of the Act are all unambiguously clear that any whistleblower who submits original information that leads to sanctions of at least $1,000,000 is eligible to receive an award, unless he falls into one of several explicitly enumerated categories. The date that a whistleblower initially submits "original" information to the SEC is not part of the statutory definition of original information, and it has no bearing whatsoever on whether he is eligible to receive an award. The triggering event authorizing the

12

grant of an award is based on the date upon which the Commission concludes its enforcement action in a "covered judicial or administrative action" and collects "sanctions" of $1 million dollars or more from a person(s) who violates the Securities Exchange Act. 15 U.S.C. § 78u-6(b).

Under the framework articulated by the Supreme Court in *Chevron*, the SEC's decision to impose additional requirements above and beyond Congress' clear and conclusive definition of "original information" exceeds its rule-making authority, and requires this Court to vacate the Commission's Final Order and remand this case to the Commission so that Mr. Stryker's claim can be adjudicated in accordance with the statutory definition of "original information."

## STATEMENT OF FACTS

## I.    LEGISLATIVE HISTORY OF SEC WHISTLEBLOWER AWARD LAW

In 1988 Congress enacted its first reward law based on a whistleblower's disclosure of information to the Securities and Exchange Commission. Pub. L. No. 100-704, 15 U.S.C. § 78u-1(e)(2009). This law permitted the Commission to pay rewards to whistleblowers who disclosed information regarding illegal "insider trading." The decision to pay an award was left to the "sole discretion of the SEC," and was not subject to judicial review. *Id.*

In the wake of the financial crisis commencing in 2008-09, Congress initiated debate over a comprehensive reform of the Securities Exchange Act,

13

including substantial revisions of its whistleblower reward provisions. These debates eventually culminated in the Dodd-Frank Act.

The original version of the Act—which was proposed by the Commission, and introduced into the House of Representatives on October 15, 2009—created a new section of the Securities Exchange Act: Section 21F. *See* § 203 of the Investor Protection Act of 2009 (H.R. 3817). Addendum, p. 57. This provision enhanced the scope of the whistleblower rewards provision to authorize payments to whistleblowers who reported violations of the Securities Exchange Act unrelated to insider trading. The legislation also contained a number of provisions giving guidance to the Commission concerning how to exercise its discretion when evaluating an award application.

However, consistent with the then-existing award provision (Pub. L. No 100-704) the proposal continued to vest the SEC with the "sole discretion" to make award payments, and did not permit judicial review.[9] Addendum, p. 57. All of the provisions in the Act that gave guidance to the Commission as to whether or not to grant an award—including provisions related to the timing of information provided to the Commission by a whistleblower—were discretionary in nature. *See* § 203 of

---

[9] The "sole discretion" of the Commission to make award determinations, not subject to judicial review, remained in the final law passed by the House of Representatives. H.R. 4173, § 7203, creating the new Section 21F(a) and (e) of the Securities Exchange Act. Addendum, p. 60.

the Investor Protection Act of 2009 (H.R. 3817).[10]

On March 29, 2010 the SEC's Office of Inspector General issued a detailed report on the existing SEC rewards program, and made recommendations concerning the whistleblower award program in the pending House and Senate versions of the Dodd-Frank Act. *See* Office of Audits, Office of Inspector General, "Assessment of the SEC's Bounty Program," (Report No. 474). Addendum, p. 47. The Inspector General found that the Commission, in exercising its discretion over a 20-year period of time, had made "very few payments" to whistleblowers pursuant the "insider trading" awards law, and that the program was "not fundamentally well-designed to be successful." *Id.* at iii. The Inspector General described the rewards program as having "minimal" success, and pointed out that the Commission had paid awards to only five claimants, totaling a mere $159,537. *Id.*, at 4-5.

The Inspector General also noted that the SEC Chairman had testified before Congress as to the benefits of whistleblower-provided information, stating that "whistleblowers tend to do a lot of the work for the Commission" and often bring

---

[10] The original Senate version of the Dodd-Frank Act, set forth as a "discussion draft" by Senator Dodd on November 10, 2009, also gave the Commission "sole discretion" to make awards, but did subject the Commission's determination to judicial review in U.S. District Court. Discussion Draft, Section 21F(f) ("Any determination made under this section, including whether, to whom, or in what amount to make awards, shall be in the sole discretion of the Commission"). Addendum, p. 63.

cases to the Commission that are "pretty fully baked." *Id*., at 2, quoting from

Chairman Schapiro's testimony before the House Committee on Appropriations in

March 2009.

After the Inspector General's report was released, the House and Senate

versions of the Dodd-Frank Act were reviewed in Conference. Senate members

proposed eliminating the Commission's discretion to deny awards, making awards

fitting the Act's criteria mandatory, and permitting judicial review pursuant to the

Administrative Procedure Act, 5 U.S.C. § 706. In its Committee Report, the Senate

Committee specifically pointed to the Inspector General's findings, and the

"meager" amount of rewards paid under the Commission's then-existing

discretionary program, as justifying a non-discretionary award provision.

Committee on Banking, Housing, and Urban Affairs, "The Restoring American

Financial Stability Act of 2010, Report together with Minority Views," p. 111, S.

Rep. 111-176 (April 30, 2010). Addendum, p. 43.

The Senate Banking Committee, in this report, stated that it was the intent of

Congress to reverse the stingy nature of the Commission's reward payment history,

and create a law that would pay "ample rewards" to whistleblowers: "The

Committee *intends* for this program to be used *actively* with *ample* rewards to

promote the integrity of the financial markets." *Id.,* at 112 (emph. added).

Congress thereafter adopted the Senate version of the Dodd-Frank Act's

16

whistleblower award program, making mandatory the granting of rewards that met

certain criteria [Section 21F(b)(1), 15 U.S.C. § 78u-6(b)(1) ("the Commission . . .

shall pay an award . . . .)].[11] Congress also completely eliminated the language in

the final House version of the Act which gave the Commission the "sole

discretion" to make award determinations, and bifurcated the right to judicial

review. The Commission's determination as to the amount of a reward (which

under the law must be no less than 10% or more than 30% of the collected

proceeds) was left to the  discretion of the Commission. However, any decision to

*deny* a reward was appealable to the Courts of Appeal pursuant to the

Administrative Procedure Act. Section 21F(f), 15 U.S.C. § 78u-6(f).

 To ensure that the Commission could promptly start paying awards to

qualified whistleblowers, Congress also established a specific fund—known as the

"Investor Protection Fund"—from which whistleblower awards would be paid. 15

U.S.C. §§ 78u-6(a)(2) and (g). Payments from this fund were earmarked only for

payments to whistleblowers and for very limited uses by the SEC Inspector

General. 15 U.S.C. § 78u-6(g)(2). In 2010, upon enactment of the Dodd-Frank Act,

Congress deposited $451,909,854.07 into the fund. *See* Report of the Staff, SEC,

"Annual Report on the Dodd-Frank Whistleblower Program, Fiscal Year 2011," p.

---

[11] The original House and Senate version of this provision stated that the Commission "may" pay a reward. The final Act changed the word "may" to "shall." *See* H.R. 3817, section 21F(a), Addendum 57; Senate "Discussion Draft," section 21F(b), Addendum, p. 63.

9 (November 2011), http://www.sec.gov/about/offices/owb/whistleblower-annual-report-2011.pdf (Addendum, p. 51).

The Senate Report also contained a specific discussion as to the meaning of "original information," which was completely consistent with the final statutory language defining that term.  S. Rep. 111-176 at 111.[12] In its discussion on "original information," the Senate Report also commented on the *timing* of the awards. Although an award must be based on "original information," the payment of the reward is not tied, directly or indirectly, to when the "original information" was transmitted. Instead, the Senate Report specified that

> *whenever* a whistleblower or whistleblowers tip leads the SEC to *collect* sanctions and penalties that are determined to be distributed to the victims of the fraud, the *intent of the Committee is to reward the whistleblower* prior or at the same time as paying such victims, recognizing that were it not for the whistleblower's actions, there would have been no discovery of the harm to the investors and no collection of any sanctions for their benefit.

*Id.*, at 111-112 (emph. added).

Thus, if funds are collected, the whistleblower is to be paid. This was not viewed simply as a means to incentivize other whistleblowers—which would clearly be accomplished based on the publicity surrounding an award payment— but also in recognition of the fairness of rewarding those whose "original information" resulted in the collection of funds. *Id.*

---

[12] The Senate's provisions regarding "original information" are those that were ultimately adopted by Congress. Compare S. Rep. 111-176, p. 111 with 15 U.S.C. § 78u-6(a)(3).

## II.   THE DODD'FRANK ACTS'S DEFINITION OF "ORIGINAL INFORMATION"

The Dodd-Frank Act's whistleblower awards provision, 15 U.S.C. § 78u-6, sets forth a careful and well-structured regime that precisely defines the parameters of award eligibility, as well as the specific steps necessary to claim an award. Additionally, the Act also enumerated several specific disqualifications that, if met, require the Commission to deny a reward.

In order to qualify for a reward the whistleblower must provide the Commission with "original information." Congress was extremely careful in defining the meaning of "original information," and ensured that neither the Commission nor the Courts could use the otherwise potentially ambiguous concepts of "original" and "information" to improperly deny a reward. To prevent such improper denials, Congress clearly defined the term, and stated that this definition "means" precisely what it says, no more and no less.

The statute defines "original information" as follows:

(a) DEFINITIONS.—In this section the following definitions **_shall_** apply . . . .
(3) ORIGINAL INFORMATION.—The term "original information" **_means_** information that—
(A) is derived from the independent knowledge or analysis of a whistleblower;
(B) is not known to the Commission from any other source, unless the whistleblower is the original source of the information; and
(C) is not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or

19

investigation, or from the news media, unless the whistleblower is a
source of the information.

15 U.S.C. § 78u-6(a)(3) (emph. added).

This definition does not contain, directly or indirectly, any limitation as to

the date or timing, with the notable exception that the whistleblower must be the

*first* to provide the information. 15 U.S.C. § 78u-6(a)(3)(B). This first-to-file rule

ensures that the law does not reward persons who delay providing information.

Congress clearly recognized that it is in the public interest for persons with

knowledge of securities fraud to provide that information as promptly as possible to

the Commission.

### III.   THE STATUTORY STRUCTURE OF THE ACT PLACES NO TIME LIMITS ON "ORIGINAL INFORMATION" BEYOND THE REQUIREMENT THAT THE INFORMATION BE "ORIGINAL"

Congress established two requirements for qualifying for a whistleblower

award. First, the whistleblower must provide to the Commission "original

information" as defined in subsection (a)(3). Second, the Commission must collect

monetary sanctions exceeding $1,000,000.00 from a "covered judicial or

administrative action" as defined in subsection (a)(1). Once these two requirements

are met, the Commission "*shall pay an award.*" 15 U.S.C. § 78u-6(b)(1).

As explained above, Congress clearly defined "original information" without

limitation as to date. Congress also carefully defined the provision's second

requirement. Specifically, monies obtained by the Commission as a result of the whistleblower's "original information" must be recovered in a "covered judicial or administrative action" or a "related action." Congress also carefully defined both of these terms. This concept of a "covered action" was specifically defined by Congress as "any judicial or administrative action brought by the Commission under the securities laws that result in monetary sanctions exceeding $ 1,000,000." 15 U.S.C. § 78u-6(a)(1).

The key to qualifying for a reward was neither the date upon which the underlying violation occurred nor the date in which a whistleblower commenced providing information to the SEC. In fact, Congress explicitly prohibited the Commission from looking at the date of the underlying violation as a factor in determining eligibility. 15 U.S.C. § 78u-7(c). The key factor was the date upon which the Commission obtained sanctions of $1,000,000.00 or more from a "covered" proceeding.

Congress gave the Commission limited "authority to issue such rules and regulations as may be necessary or appropriate to *implement* the provisions of this section *consistent* with the purposes of this section." 15 U.S.C. § 78u-6(j) (emph. added). This authority is further defined in the Act, and includes the discretion to determine the "form" that would be used for applying for rewards. 15 U.S.C. § 78u-6(c)(2)(D). The heart of the Commission's authority over the awards program,

21

however, is the authority to determine the amount of rewards "*subject to subsection (c)*" of the Act. 15 U.S.C. § 78u-6(b)(1).[13]

Subsection (c) of the Act provides rules that govern the Commission's award-granting authority. Under the first part of subsection (c) the Commission was granted discretion to determine the size of the award within the range—10 to 30 per cent—required by statute. Nonetheless, Congress specified certain criteria that must be considered by the Commission. 15 U.S.C. § 78u-6(c)(1). Although Congress specified three such factors that the Commission must weigh in considering how large of an award a whistleblower was entitled to, it also granted the Commission authority to establish "additional relevant factors" in fixing the range for an award. 15 U.S.C. § 78u-6(c)(1)(B)(i)(IV).  But Congress was also very clear that the Commission *could not* take into consideration the amount of money in the Investor Protection Fund. 15 U.S.C. § 78u-6(c)(1)(B)(ii).

The Commission could not, and did not, utilize its rulemaking authority under subsection (c)(1) to deny Mr. Stryker's award. The provision only controls

---

[13] Appellant further contends that, construing the provisions of the Act delegating the Commission rule-making authority with respect to the whistleblower award program, it is clear Congress did not intend to authorize the Commission authority to fundamentally alter the scope of the award program, as the rule at issue here does. Put another way, Congress did not intend the Commission to speak with the "force of law" as to who is eligible for an award, and the Commission's definition of "original information" should not be accorded *Chevron* deference.

the range of a reward (i.e., whether to grant an award of 10%, 30% or a number somewhere in between), not the eligibility of a claim.

The Commission's authority to completely deny a reward is set forth in subsection (c)(2). There, similarly to subsection (c)(1), Congress enumerated specific factors that the Commission is required to consider in determining whether an award claim is disqualified. 15 U.S.C. § 78u-6(c)(2).   The Commission's Final Order did not rely on this part of the Act to deny Mr. Stryker's claim. Mr. Stryker does not fit into any of the explicit categories that would exclude a whistleblower from qualifying for a reward. Also, pursuant to 15 U.S.C. § 78u-7(b) and (c), the Commission could not argue that Stryker failed to "submit information" in the "form" required by the Commission.

Significantly, none of the subsection (c) criteria—whether concerning award size or disqualification—reference the date upon which a whistleblower initially provided the Commission with "original information." Indeed, none have any bearing upon a date-limitation at all, and for good reason: The Act's definition of "original information" clearly required that the whistleblower had to be the *first* to provide the Commission with the information, but did not otherwise establish any time limits or constraints on providing the information.

## IV. THE COMMISSION'S RULE SIGNIFICANTLY DEPARTS FROM THE STATUTORY LANGUAGE AND IMPOSES NEW REQUIREMENTS

Approximately one year after the Act's enactment, the Commission issued final rules governing its implementation of the Dodd-Frank Act, *codified at* 17 C.F.R. § 21F-1, *et seq.,* Addendum p. 4. In those rules they departed from the Congressional language in three material ways, and, most importantly, added an additional requirement for a whistleblower's information to qualify as "original information." In its Final Order, the Commission relied on its rule-making to deny the petitioner's claim for a monetary award. In particular, the Commission found petitioner's information did not to meet the new requirement imposed by the Commission's rules, because petitioner first provided information prior to July 21, 2010. Addendum, pp. 1, 13.

The Commission's rule defines "Original Information" as follows:

(i) Derived from your independent knowledge or independent analysis;
(ii) Not already known to the Commission from any other source, unless you are the original source of the information;
(iii) Not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless you are a source of the information; **and**
**(iv) Provided to the Commission for the first time after July 21, 2010 (the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act).**

17 C.F.R. § 240.21F-4(b) (emph. added).

24

The rule differs from the statute in three important ways.

First, Congress insisted that it's definition of "original information," "shall apply" to all Commission reviews of award cases. The Commission simply ignored this mandate, and did not apply the Congressional definition to the definition of "original information" it approved in the Final Rule.

Second, Congress used the term of art "means" in setting forth its definition of "original information." The Commission simply dropped that term from its definition, and failed to explain why it could, within the context of *Chevron's* "plain language" rule, simply write that term or art out of the Final Rule.

Third, the Commission added an entirely new requirement to the definition of "original information." This fourth requirement, codified at 17 C.F.R. § 240.21F-4(b)(1)(iv), mandated that the information provided to the Commission be provided after July 21, 2010. This requirement has no support in the statutory language, structure, or legislative history of the Dodd-Frank Act.

## ARGUMENT

### I. STANDARD OF REVIEW

Section 21F(f) of the Securities Exchange Act mandates that this Court review the SEC's decision to deny a reward pursuant to the Administrative Procedure Act, 5 U.S.C. § 706. *See* 15 U.S.C. § 78u-6(f). Under the familiar two-step framework of *Chevron*, a reviewing Court first examines whether Congress has "directly

addressed the precise question at issue." *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984). If so, an agency's rule or regulation is invalid and is owed no deference where it is inconsistent with the "unambiguously expressed intent of Congress." *Id.*, at 843. To determine Congressional intent, courts first look to the plain language of the statute and employ "traditional tools of statutory construction." *Id.*, at 843 n. 3.

This Court explained the two-step analysis required under *Chevron* as follows:

> To resolve the statutory construction issue . . . we turn to the two-part framework established by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 842-43. At step one, we consider whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress. To ascertain Congress's intent, we begin with the statutory text because if its language is unambiguous, no further inquiry is necessary. Only if we determine that Congress has not directly addressed the precise question at issue will we turn to canons of construction and, if that is unsuccessful, to legislative history to see if those interpretive clues permit us to identify Congress's clear intent.

> If, despite these efforts, we still cannot conclude that Congress had directly addressed the precise question at issue, we will proceed to *Chevron* step two, which instructs us to defer to an agency's interpretation of the statute it administers, so long as it is reasonable.

*New York ex rel. Office of Children and Family Services v. U.S. HHS Admin.*, 556 F.3d 90, 97 (2d Cir 2009) (quotations and internal citations omitted).

## II. THE PLAIN LANGUAGE OF THE DODD-FRANK ACT REQUIRES THE COMMISSION TO PAY REWARDS TO WHISTLEBLOWERS WHO PROVIDED "ORIGINAL INFORMATION" TO THE COMMISSION BEFORE JULY 21, 2010

In order to qualify for a reward, a whistleblower must "voluntarily" provide "original information to the Commission that led to the successful enforcement of the covered judicial or administrative action." § 21F(b)(1), 15 U.S.C. § 78u-6(b)(1). In denying petitioner's award claim, the Commission predicated its decision on its interpretation of the meaning of the term "original information."

According to the Commission, "original information" included within its definition a timing requirement, namely that the information had to be submitted to the Commission *after* July 21, 2010 (i.e., after the Dodd-Frank Act was signed into law). The Commission added this timing requirement to the statutory definition of "original information" as part of its Final Rule implementing the whistleblower reward provisions of the Dodd-Frank Act. 17 C.F.R. § 240.21F-4(b)(1)(iv).

If the concept of "original information" defined by Congress in the Dodd-Frank Act was clear and "unambiguous," then, under the *Chevron* analysis, this Court must give full effect to Congress's definition of the term, and "no further inquiry is necessary." *New York ex rel. Office of Children*, 556 F.3d at 97. Thus, the first—and in this case final—step in deciding whether the Commission's definition of "original information" can withstand judicial challenge under

27

*Chevron* is for this Court to determine whether or not Congress's definition of that concept was "unambiguously expressed" by the "statutory text." *Id.*

In this case Congress clearly and unambiguously defined the term "original information." First, Congress explicitly defined the term "original information." Congress was crystal clear as to the meaning of "original information" under the whistleblower provision of the Dodd-Frank Act.

Second, not only did Congress explicitly define "original information," and set forth a specific three-part test for determining whether or not information provided to the Commission qualified as "original information," Congress also explicitly used the term of art—"means"—in defining the term. Congress' decision to use the term "means" in this definition is extremely significant. When Congress uses the term "means" in a definition, that definition is the "exclusive definition." *U.S. v. DiCristina*, 726 F.3d 92, 99 (2d Cir. 2013); *Colette v. Franklin*, 439 U.S. 379, 392, n. 10 (1979) ("As a rule, a definition which declares what a term 'means' […] excludes *any meaning that is not stated*.") (internal citations and quotations omitted) (emph. added). As the Supreme Court explained, when Congress intends that its definition of a term constitute the "exclusive definition" of that term, "the word 'means' is employed." *Gorman v. Commissioner*, 302 U.S. 82, 86 (1937).

Thus, Congress clearly, unambiguously, and explicitly defined the concept of "original information." Any doubt that the very clear words contained in this

definition are conclusive upon the Commission was removed when Congress employed the word "means" in defining "original information." Thus, the Commission's decision to add a fourth criterion to the meaning of "original information" violates the clear intent of Congress, and is inconsistent with the statute's definition of the term.

Finally, Congress directed that the Commission "shall apply" its definition of "original information" when adjudicating a whistleblower award case. 15 U.S.C. § 78u-6(a).

Given the clarity of the statutory language, and Congress's intent to foreclose any other definition of "original information," the term is not subject to reasonable doubt or ambiguity. Accordingly, because Congress' definition of "original information" is "unambiguous," this Court need not undergo any "further inquiry" into the definition of that term. *New York ex rel. Office of Children*, 556 F.3d at 97 (If statutory text "is unambiguous, no further inquiry is necessary").

In this case the Commission admitted that it altered the Congressional definition of "original information."  In doing so they did not even attempt to address the "plain meaning" rule mandated by *Chevron*.  As for the term "means" and the clause "shall apply" that are also part of the Congressional definition of "original information," the Commission's decision failed to even mention these

29

requirements, let alone attempt to explain why they should not be applied to the definition of "original information."

Because §240.21F-4(b)(1)(iv) of Commission's rule defining "original information" is impermissible, this Court must remand the Commission's order denying petitioner's award, with instruction to consider all of the information petitioner provided to the Commission, commencing in 2004, under the definition of "original information" set forth by Congress in § 21F(a)(3) of the Securities Exchange Act, 15 U.S.C. § 78u-6(a)(3).

## III.   CONGRESS DELIBERATELY CHOSE NOT TO EXCLUDE INFORMATION PROVIDED BEFORE JULY 21, 2010

Even if this court finds that the Act's definition of "original information" is not itself clear and unambiguous, another provision of the statute demonstrates that Congress did not intend to exclude information provided before July 21, 2010. In particular, Congress explicitly spoke to the issue of which classes of claimants are disqualified, and did not state that those providing information before July 21, 2010 were among them. 15 U.S.C. § 78u-6(c)(2). This omission was deliberate on the part of Congress, which did not intend that the date information was provided to the Commission constitute a basis for excluding an otherwise eligible transmission of "original information." *See Comm'r v. Clark*, 489 U.S. 726, 739 (1989)("[W]e usually read exceptions narrowly in order to preserve the primary operation of the provision."); *City of New York v. Beretta*, 524 F.3d 384, 403 (2d

30

Cir. 2008) ("statutory exceptions are to be construed 'narrowly'"); *Hardy v. New York City Health*, 164 F.3d 789, 794 (2d Cir. 1999)(rule of statutory construction *expressio unius est exclusio alterius* supports interpretation of the disqualification list as exclusive); *Financial Planning v. S.E.C.*, 482 F.3d 481, 488 (D.C. Cir. 2007)("plain meaning" of a statutory list of exemptions "should be conclusive except in rare cases in which the literal application of the statute will produce a result demonstrably at odds with the intentions of the drafters")(internal quotations omitted).

Under section 21F(c)(2), congress clearly set forth a specific list of four exclusions any of which the Commission could use to deny an award. 15 U.S.C. § 78u-6(c)(2). None of these exclusions permit or authorize—whether directly or indirectly—the Commission to use the date upon which information is provided to the Commission as a basis to deny a reward. The list is clear, and pursuant to the well-established tool of statutory construction, the *expressio unius est exclusio alterius* canon, it would not be proper to "engraft[] an additional exception" to Congress's list. *Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011).

The Commission may argue that the rulemaking authority set forth in subsection (D) gives the Commission the discretion to expand the list of exclusions. § 21F(c)(2)(D). However, such an argument is not persuasive. First, the Commission did not deny Mr. Stryker's award on the basis of this list and/or the

31

Commission's rulemaking authority set forth in subsection (D). Second, the rulemaking authority of the Commission set forth in subsection (D) is very limited. The Commission was given the authority to mandate the "form" for which a whistleblower could apply for a reward, and was granted the authority to deny a reward if the whistleblower failed to file for a reward as required under such a "form." This grant of authority to the Commission was not a substantive grant of authority to re-define the meaning of "original information," nor was it a grant of authority to add new substantive exclusions to the list Congress had carefully crafted. It was purely procedural in nature.

Although in the original bills considered by Congress the Commission was granted discretion in granting an award [Addendum pp. 57-67], the final law enacted by Congress instructed that the Commission "shall" grant an award to whistleblowers who satisfied the mandatory Congressional definitions and requirements. Congress supplanted the Commission's prior discretionary authority to deny rewards, and ensured that the whistleblower provisions of Dodd-Frank contained very clear definitions of precisely who was entitled to a reward, and under what circumstances. At the center of these requirements was the term "original information," a term of art that defined the precise conduct for which a whistleblower must engage in to qualify. If a whistleblower performed the public service implied within the definition of "original information," the grounds for

which the Commission was permitted to exclude that individual from a reward were limited by statute.

The exclusions list carefully restricts the basis for award denials, and clearly limits the ability to the Commission to create any further substantive restrictions through rulemaking. Whistleblowers can be required to file for rewards in the "form" mandated by the SEC, but the parameters of eligibility themselves are set by Congress alone.[14] None of the exclusions are consistent with § 240.21F-4(b)(1)(iv) of the Commission's rule defining "original information."

## IV. THE BROADER STATUTORY SCHEME SUPPORTS THE ELEGIBILITY OF PRE-ENACTMENT INFORMATION

While the plain language of the Dodd-Frank Act contains a clear definition of "original information," the act's operative provision—section 78u-6(b)(1)—also unquestionably establishes petitioner's eligibility for a reward, and also clearly limits the discretion of the Commission to create substantive exclusions that could be used to deny such rewards.

---

[14] Recognizing that there was no legislative history supporting its interpretation of "original information," or any grant of authority to the Commission to expand the list of disqualifying actions, the Commission tried to rely on language in early versions of the law that referenced the date original information was provided to the Commission. At best the Commission's reliance on these early versions is reaching for straws. It is well settled that when isolated material in the legislative history is "unclear," this Court should give such legislative materials "little or no weight." This is "distinguished from a legislative committee's formal report on its enactment." *Murphy v. Empire of America*, 746 F.3d 931, 935 (2d Cir. 1984). As explained above, the Senate Report provides no support whatsoever for the Commission's rule. Senate Rep. 111-176, Addendum, p. 6.

The Act contains a clear statement as to the requirements for eligibility:

In *any* covered judicial or administrative action, or related action, the Commission, under regulations prescribed by the Commission and subject to subsection (c), *shall* pay an award or awards to 1 or more whistleblowers who voluntarily provided *original information* to the Commission that led to the successful enforcement of the *covered judicial or administrative action*, or related action….

§ 21F(b) (emph. added), 15 U.S.C. § 78u-6(b)(1). This provision explains the specific requirements that a whistleblower must meet in order to be eligible for a reward. Once these factors are met, the Commission "shall pay" the reward.

Key to qualifying for a reward is providing the Commission with "original information." But the other qualifying requirements are consistent with Congress' definition of "original information" and further require that the Commission re-evaluate Mr. Stryker's claim in accordance with the statutory language. These grounds are as follows:

First, the rewards provision applies *only* to monies obtained by the Commission in a "covered judicial or administrative action, or related action." § 21F(b), 15 U.S.C. § 78u-6(b). Thus, if monies are obtained from other types of actions, the Commission must deny a reward. But if the monies are obtained by the U.S. government from a case fitting within the definition of "*any* covered judicial or administrative action, or related action," those monies would be subject to the reward provisions.

34

Congress next provided a clear definition of the precise meaning of a "covered judicial or administrative action, or related action." This definition does not tie eligibility to the date upon which a violation of the Securities Exchange Act occurred, or to the date for which information was provided to the Commission. Instead, the final triggering event that establishes eligibility for an award depends on the date for which the Commission *obtained* $1 million or more in "sanctions" from the wrongdoer.

In §21F(a)(1) of the Dodd-Frank Act Congress set forth the definition of "covered judicial or administrative action." As defined by Congress this term means as follows:

> COVERED JUDICIAL OR ADMINISTRATIVE ACTION. – The term 'covered judicial or administrative action' *means* any judicial or administrative action brought by the Commission under the securities laws that results in monetary sanctions exceeding $1,000,000.

> 15 U.S.C. § 78u-6(a)(1) (emph. added).

Thus, mandatory eligibility is not tied to the date of a violation, or any date related to the time period for which a whistleblower provided information to the U.S. government. Eligibility is tied to a clear, well-defined, event: the conclusion of "any" judicial or administrative "action brought by the Commission under securities laws" resulting in a "monetary sanction" of over $1 million dollars. Once again, Congress used the term of art "means" when defining a "covered judicial or administrative action," in order to ensure that the Commission and the Courts were

35

fully cognizant that this definition meant precisely what it said. *See U.S. v. DiCristina*, 726 F.3d 92, 99 (2d Cir. 2013).

> To avoid any ambiguity, Congress further defined "monetary sanction":
>
> (A) any monies, including penalties, disgorgement, and interest, ordered to be paid; and (B) any monies deposited into a disgorgement fund or other fund pursuant to section 308(b) of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246)b)), as a result of such action or any settlement of such action.

15 U.S.C. § 78u-6(a)(4).

Again, the triggering date for eligibility was tied to the date in which either a monetary sanction was paid and/or deposited into a specific fund identified in the Act. What was relevant was *when* the money was paid, not *when* the whistleblower provided the information that led to the payment.

The Act's eligibility mandate established a bright-line rule. This rule was not based on an analysis of when information was provided to the Commission,[15] but rather on when the Commission became fully entitled to, and received, an actual sanction of $1 million dollars or more.

## V. THE COMMISSION IMPERMISSIBLY CONSIDERED THE AMOUNT OF ASSETS IN THE INVESTOR PROTECTION FUND

In denying Mr. Stryker's award the Commission also focused on the "limited assets" of the "Investor Protection Fund" in order to divine a

---

[15] Such analyses can be very subjective or contentious, especially where, as in this case, some of the information was provided to the Commission before July 21, 2010 and some was provided after.

Congressional intent in support of its re-interpretation of Congress' definition of "original information." Final Order, pp. 11-12. According to the Commission, "Leveraging the limited assets of the Investor Protection Fund established by Section 21F(g) of the Exchange Act to pay those individuals who respond to the new incentive by coming forward after Dodd-Frank's enactment is consistent with that Congressional purpose." Final Decision, p. 11. In this argument, the Commission uses the amount of money in the Investor Protection Fund to justify its rule-making and the denial of petitioner's claim. This reliance is completely impermissible. Congress prohibited the Commission from engaging in this type of analysis

First, Congress feared that the Commission would use the amount of money in the Investor Protection Fund as a basis to deny or reduce rewards. Consequently, Congress *explicitly prohibited* the Commission from taking the Fund's balance into consideration when making decisions on an award. The Congressional directive is clear: the Commission "*shall not take into consideration the balance of the Fund*" when making a determination as to the amount of an award. 15 U.S.C. § 78u-6(c)(1)(B)(ii) (emph. added).

Second, there is nothing in the legislative history of the Act to support the Commission's interpretation. The Senate Report—upon which the Commission relied to divine Congress's intent—does not support the Commission's concern, let

alone provide any basis whatsoever to use this so-called concern as a rationale to materially change its definition of "original information." It was Congress' intent to reward whistleblowers who provided original information that led to a collection of sanctions "whenever" that information led to an enforcement action resulting in over $1 million dollars in damages. S. Rep. 111-176 at 111-12, Addendum, pp. 45-46.

Third, Congress did not intend for the Commission to be parsimonious in granting awards. Rather, it was the express "intent" of Congress that the Commission "actively" grant "ample awards," not only to encourage more employees to step forward, but also to send a message to the financial markets that would "promote the integrity of the financial markets." *Id.* at 112. Granting "ample awards" would have a major positive impact on promoting integrity in financial markets, as wrongdoers would be deterred by fear that the awards program was working, and was in fact an effective inducement for insiders to turn them in.

Fourth, the available legislative history plainly shows that Congress was dissatisfied with the SEC's failure to grant awards under its previous program. In the Senate Report, Congress stated as much, and specifically discussed the findings of the SEC's Office of Inspector General, which were highly critical of the Commission's prior treatment of whistleblowers. Citing to the Inspector General's findings, the Senate Report noted that "since the inception of the program in 1989,

there have been a total of only seven payouts to five whistleblowers for a meager total of $159,537." *Id.* at 111.

Shortly after the OIG issued this report, Congress agreed to a critical change in the Dodd-Frank whistleblower reward program. Congress agreed to reject earlier language approved by the House of Representatives that vested exclusive discretion for granting rewards to the Commission. Instead, Congress agreed to make whistleblower awards mandatory, if certain specifically enumerated conditions were met. This change from a discretionary reward program to a mandatory reward program was triggered, in large part, by the Commission's history of not rewarding whistleblowers.

Fifth, in order to ensure that whistleblowers were promptly rewarded, Congress created a mechanism to immediately fund the Investor Protection Fund with over $450 million, earmarked almost exclusively for paying whistleblowers. Unfortunately, the Commission has again repeated its pre-Dodd-Frank practice of failing to grant awards. Congress required the Commission to issue an annual report setting forth precisely how much money they granted to whistleblowers each year. The results have been shockingly small:

| Year | Amount in Fund | Amount Awarded |
|------|----------------|----------------|
| 2010 | $451,909,854.07 | -0- |
| 2011 | $452,788,943.74 | -0- |

39

| | | |
|---|---|---|
| 2012 | $453,429,825.58 | $45,739.16 |
| 2013 | $439,196,609.36 | $14,831,956.64 |

SEC Annual Reports on the Dodd-Frank Whistleblower Program, FYs 2011, 2012 and 2013, published at www.sec.gov. *See* Addendum, pp. 53-56.

Not only did the Commission grant awards to only a tiny handful of whistleblowers in the nearly four years since Dodd-Frank was enacted, a comparison of the awards given under a comparable government whistleblower reward program demonstrates the radical failure of the Commission to use whistleblower awards as a mechanism to promote its program and ensure that whistleblowers are protected and properly compensated for the risks they take.

The U.S. Department of Justice publishes statistics on the amount of awards paid to whistleblowers under the False Claims Act, a program that like, the SEC's, entitles qualifying whistleblowers to a reward of between 15-30% of collected proceeds when their original information leads to the actual collection of sanctions from a wrongdoer. In FY's 2011-13 the Department of Justice paid whistleblowers $1,075,778,327.00.*See http://www.justice.gov/civil/docs_forms/C-FRAUDS_FCA_Statistics.pdf*. The fact that the SEC awarded less then $15 million dollars during the same time period that the Department of Justice paid over $1 billion dollars for whistleblowers, demonstrates that Congress' fear that the SEC's tradition of parsimony was well founded. Given the Commission's historic

40

institutional reluctance to grant whistleblower awards, Congress was wise to carefully delineate who was eligible for a reward.

Finally, the Commission's argument that the Fund would somehow be depleted if the Commission were to follow the Congressional definition of "original information" is simply wrong. Rather than funding the award program through a series of future monetary appropriations, Congress provided a mechanism for the Fund to be automatically replenished in order to ensure that whistleblowers could be paid, as required by the Act. To do so, Congress established a formula that triggered deposits into the Fund, should the balance of the Fund fall below $300 million. 15 U.S.C. § 78u-6(g)(3).

The failure of the Commission to grant rewards has permitted the SEC to actually or potentially divert the depositing of millions of dollars into the Investor Protection Fund. If the Commission does not pay rewards to whistleblowers, the monies that would be required to be deposited to the Fund can be used by the Commission for other purposes. By failing to pay awards, the Commission can ensure that the amount of money in the Fund would not fall below the $300 million mark, and thus the requirement that the Commission deposit certain monies into the Fund would not be met. *Id.* Congress sought to prevent this from happening by explicitly prohibiting the SEC from considering the amount of money in the Fund

when evaluating how much money a whistleblower should be awarded. 15 U.S.C.
§ 78u-6(c)(1)(B)(ii).

Thus, by changing the rules, and failing to define "original information" as
required by Congress, the SEC has succeeded in creating a standard that most
likely has diverted millions of dollars that should have been earmarked for
whistleblower payments to other programs. This is clearly counter to Congress'
intent to "amply reward" whistleblowers in order to protect the integrity of the
markets.

## VI. THE TRADITIONAL TOOLS OF STATUTORY INTERPRETATION DEMONSTRATE THAT THE SEC'S RULE IS CONTRARY TO THE CLEAR INTENT OF CONGRESS

While the Act's plain language clearly shows that Congress did not impose a
date limitation on "original information," "traditional tools" of statutory
interpretation also make it clear that no other reading of the statute is possible.
Central to any statutory analysis is the presumption that Congress acts purposefully
and intentionally when it crafts statutory language, and thus the inclusion or
exclusion of certain language is also purposeful and intended. *BFP v. Resolution
Trust Corp.*, 511 U.S. 531, 537 (1994).

One rule of statutory interpretation applicable to the present case is *expressio
unius exclusio alterius*, meaning that "[t]o express or include one thing implies the
exclusion of the other, or of the alternative." In other words, where Congress

42

defines a thing by listing conditions, or states a general rule with a list of exceptions, those lists are presumptively exclusive. *See, e.g., Andrus v. Glover Const. Co.*, 446 U.S. 608, 616-17 (1980) (holding that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."); *Nashville Milk Co. v. Carnation Co.,* 355 U.S. 373, 376 (1958) (holding that Congress' decision to define a general term with a list meant the list was exclusive); *Cont'l Cas. Co. v. United States*, 314 U.S. 527, 533 (1942) (holding "[t]he statement of the conditions negatives action without the satisfaction of those requirements. Generally speaking a 'legislative affirmative description' implies denial of the nondescribed powers."); *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 794 (2d Cir. 1999).

As this Court has warned, courts and agencies should be "caution[ed]" "against engrafting an additional exception to what is an already complex statute." *Jacobs v. N.Y. Founding Hosp.*, 577 F.3d 93, 100 (2d Cir. 2009) (internal quotations omitted); *accord City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008) ("statutory exceptions are to be construed narrowly in order to preserve the primary operation of the general rule") (internal quotations omitted); *Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("we usually read the exception narrowly in order to preserve the primary operation of the provision").

In this case, Congress defined original information with an explicit list of factors and, conversely, provided an explicit list of exceptions to the general rule that the SEC "*shall* pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement." 15 U.S.C. § 78u-6(b)(1). By omitting the date of submission of original information—or any other date—from these explicit lists, Congress clearly demonstrated its intent to make the date that a whistleblower submits information irrelevant to his eligibility to receive an award.

The whistleblower provisions of the Dodd-Frank Act are riddled with specific deadlines and references to statutes of limitations. Congress unquestionably knew how to impose date-specific or time-specific requirements, but clearly chose not to regarding the concept of "original information." For example, Section 21F of the Dodd-Frank Act also contains a prohibition on retaliating against whistleblowers. Congress expressly created a statute of limitations for whistleblower retaliation cases, stating that such cases:

> may not be brought more than 6 years after the date on which the violation . . . occurred; or more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the employee alleging a violation . . . . [and] may not in any circumstance be brought more than 10 years after the date on which the violation occurs.

15 U.S.C. § 78u-6(h)(1)(B)(iii).

Had Congress wished to create a similar limitation on submissions of original information, it knew well how to do so. In fact, Congress established *numerous* other time-specific deadlines in the Dodd-Frank Act's whistleblower provisions.[16]

The fact that, in the same section of the Dodd-Frank Act for which Congress wrote a very specific definition of "original information," Congress also created numerous time-based limitations, but did not do so in defining either "original information" or award eligibility, further supports an interpretation that Congress did not intend to create any time-based bars to eligibility, beyond requiring that the whistleblower be the first (i.e. the "original") source of information to the SEC.

Nor is there any evidence that Congress intended a different result. The only provisions in the Dodd-Frank Act that so much as mention the date original information is submitted are Sections 924(b) and (c).

---

[16] Congress referenced numerous other date-specific requirements in the whistleblower section of the Dodd-Frank Act, clearly indicating that if Congress wanted to create a deadline, or a date-specific requirement, it knew how to do it. *See* 15 U.S.C. § 78u-6(d)("*prior* to the payment of an award, a whistleblower shall disclose . . . ."); 15 U.S.C. § 78u-6(f)("Any determination . . . may be appealed . . . not more then 30 days after . . . .); 15 U.S.C. § 78u-6(g)(5)("Not later than October 30 of each fiscal year . . . ."); 15 U.S.C. § 78u-6(h)(B)(iii)(establishing three separate filing periods depending on factual circumstances); 15 U.S.C. § 78u-7(a)("The Commission shall issue final regulations . . . not later then 270 days after . . . ."); Section 922 of the Dodd-Frank Act, subsection "(c)" (changing deadline for filing claim from 90 days to 180 days); Section 922 of the Dodd-Frank Act, subsection "(d)(2)" (requiring Inspector General to take specified action "not later than 30 months after the date of enactment of this Act.").

Consistent with the Congress' definition of "original information," Congress ensured that the fact that a violation of the Securities Exchange Act occurred *before* the enactment of the Dodd-Frank Act could not be used by either the Commission or a regulated industry to argue against the applicability of the Act's whistleblower provisions to violations that occurred prior to the passage of the Act. Section 924(c) of the Act mandates that the whistleblower provisions apply to any violation, regardless of when that violation occurred:

> A whistleblower may receive an award pursuant to section 78u-6 of this title, regardless of whether any violation of a provision of the securities laws, or a rule or regulation thereunder, underlying the judicial or administrative action upon which the award is based, occurred prior to July 21, 2010.

15 U.S.C. § 78u-7(c).

This provision did not alter the definition of "original information." It simply sought to address, in part, a potential argument that could be raised which would have justified denying rewards to whistleblowers who provided "original information" to the Commission prior to passage of the Dodd-Frank Act.

Section 924(b) provides that:

> Information provided to the Commission in writing by a whistleblower shall not lose the status of original information (as defined in section 78u-6(a)(3) of this title) solely because the whistleblower provided the information prior to the effective date of the regulations, if the information is provided by the whistleblower after July 21, 2010.

15 U.S.C. § 78u-7(b).

46

The plain text of this provision simply states that original information submitted after July 21, 2010, but before the enactment of the SEC's regulations, is still original information. The purpose for this provision is clear: it encourages whistleblowers who have original information to report it as soon as possible, and not to wait until the Commission issues its final rules on the program.  This provision reconciles the Commission's authority, after July 21, 2010, to require the "form" for which a request for a Dodd-Frank award must be made, and ensuring that any person who filed for a Dodd-Frank Act reward after the law was passed, but prior to the publication of the final rules, would still be fully eligible, even if their submission was in violation of the "form" the Commission would eventually require under its rules.

Section 21F(c)(2)(D) gives the SEC authority to create procedural regulations regarding the "form" of submitted information and permits it to deny awards if information is not submitted in that form. 15 U.S.C. § 78u-6(c)(2)(D). Absent Section 924(b), the SEC could have attempted to deny an award to any whistleblower who submitted original information before the enactment of its regulations, simply because the whistleblower failed to follow procedures that did not yet exist. Without Section 924(b), whistleblowers who had information about ongoing securities violations would thus justifiably feel the need to delay their submission until after the enactment of the regulations, thereby delaying

47

enforcement actions and increasing the injury to shareholders and the public. This provision simply closed that loophole. It did not further add to or subtract from the definition of "original information." It did clarify that the right of the Commission to deny a reward based on the failure to submit an application in the required "form" could not be used to disqualify applications submitted prior to the finalization of its rules.

Moreover, while the primary purpose of Section 924(b) is to address the treatment of submissions made after July 21, 2010, it also reaffirms that the definition of original information is not subject to the SEC's regulation. As explained above, the SEC's authority to regulate the submission of information is set out in 15 U.S.C. § 78u-6(c)(2)(D), which limits that authority to making procedural rules as to the "form" of submissions. Section 924(b) reinforces this instruction by making it clear that the SEC's regulations must treat information submitted before their enactment the same as information submitted after, i.e., the regulations may not change what constitutes original information.

Nor does the fact that Section 924(b) is silent as to the treatment of information submitted before July 21, 2010 imply that Congress intended to exclude such submissions from the definition of original information. Any ambiguity of Section 924(b) as to the treatment of such submissions is fully resolved by Congress' explicit definition of "original information" and explicit

criteria for denying eligibility in 15 U.S.C. § 78u-6(a)(3) and (c)(2). As the SEC's

authority to interpret these sections is limited to crafting procedures as to the

"form" of submitted information, it has no authority to alter the statutory definition

of what constitutes original information and may not use any ambiguity in Section

924(b) to override the clear statement of Congressional intent in 15 U.S.C. § 78u-

6(a)(3) and (c)(2).

Finally, the legislative history and plain text of the Act are quite clear that

Congress intended the SEC to give awards to *all* whistleblowers:

> *whenever* a whistleblower or whistleblowers tip leads the SEC to
> collect sanctions and penalties . . . *the intent of the Committee is to*
> *reward the whistleblower* prior or at the same time as paying such
> victims, recognizing that were it not for the whistleblower's actions,
> there would have been no discovery of the harm to the investors and
> no collection of any sanctions for their benefit.

S. Rep. 111-176, pages 111-12, Addendum pp. 45-46 (emph. added), and:

> In *any* covered judicial or administrative action, or related action, the
> Commission, under regulations prescribed by the Commission and
> subject to subsection (c), *shall* pay an award or awards to 1 or more
> whistleblowers who voluntarily provided original information to the
> Commission that led to the successful enforcement of the covered
> judicial or administrative action, or related action….

15 U.S.C. § 78u-6(b)(1)(emph. added).

By emphasizing that any regulations enacted by the SEC are subject to the

denial criteria set forth in Section (c), 15 U.S.C. § 78u-6(c), Congress again

49

emphasized the exclusivity of its list of factors for denying awards to whistleblowers.

In sum, the plain text, structure, and legislative history of the Act clearly intend to reward all whistleblowers, and neither the exclusive definition of original information, nor the exclusive factors for denying an award, contain any mention of a bar on information submitted before the passage of the Act. The SEC's regulation changing the definition of original information to exclude submissions made before July 21, 2010, 17 C.F.R. § 240.21F-4(b)(1)(iv), is both contrary to the clear intent of Congress and beyond its authority.

## VII. THE ONLY TIMING REQUIREMENT GOVERNING AWARD ELIGIBILITY IS A PROCEDURAL RULE THAT APPLICATIONS BE SUBMITTED WITHIN 90 DAYS OF THE SEC'S PUBLICATION OF A NOTICE OF A COVERED ACTION

While it is clear that Congress did not intend to bar awards to whistleblowers who submitted original information before July 21, 2010, there is at least one time-sensitive requirement with respect to award eligibility. Pursuant to its authority to promulgate procedural regulations as to the submission of information and denial of awards, the SEC properly crafted a rule stating that it will post notice each time an action results in sanctions of at least $1,000,000, and instructing whistleblowers wishing to claim an award to submit such claims within 90 days. 17 C.F.R. § 240.21F-10(a). This rule is consistent with Congress' clear intent to "reward the whistleblower prior or at the same time as paying such victims, recognizing that

were it not for the whistleblower's actions, there would have been no discovery of the harm to the investors and no collection of any sanctions for their benefit." S. Rep. 111-176 at 111-12. It is also consistent with the Dodd-Frank Act's requirement that eligibility for an award is triggered by the date that the SEC collects the sanctions from the wrongdoer, *not* the date of the underlying violation or the date that a whistleblower commences to disclose "original" information to the Commission. 15 U.S.C. §§ 78u-6(a)(4) and (b)(1).

Moreover, by making it clear that a whistleblower's eligibility for receiving an award does not begin until after the SEC has completed an enforcement action and recovered sanctions, the SEC has again reaffirmed Congress' intent to give awards "*whenever* a whistleblower or whistleblowers tip leads the SEC to collect sanctions and penalties . . . ." S. Rep. 111-176, 111-12 (emph. added). Unlike the False Claims Act, where the originality of a whistleblower's information is a jurisdictional requirement to filing suit, the originality of an SEC whistleblower's information does not become relevant until after the SEC has completed its enforcement action and collected "sanctions" of over $1 million, as defined under the statute. 15 U.S.C. §§ 78u-6(a)(4).

The question of *when* the whistleblower submitted his information is irrelevant to this analysis. So long as the whistleblower "voluntarily provided original information to the Commission that led to the successful enforcement of

the covered judicial or administrative action," the plain text of the Act states that

the SEC "*shall* pay an award." 15 U.S.C. §§ 78u-6(b)(1).

## VIII.   THE SEC'S REGULATIONS ARE UNREASONABLE AND CANNOT BE APPLIED TO MR. STRYKER

As set forth above, subsection (iv) of the SEC's Rule defining "original

information," 17 C.F.R. § 240.21F(4)(b)(1)(iv), cannot pass muster under Part I of

the *Chevron* test.  As this Court has recognized under its *Chevron* analysis, that

analysis "begins" "with the statutory text." If that language is "unambiguous, no

further inquiry is necessary."  *New York ex rel. Office of Children and Family*

*Services v. U.S. HHS Admin.*, 556 F.3d 90, 97 (2d Cir. 2009).

It is hard to imagine how Congress could have been clearer in its definition

of "original information."  First, Congress commanded that the SEC "shall apply"

its definition of "original information." 15 U.S.C. § 78u-6(a).  There is not even a

hint of a grant of discretion in applying the concept as defined by Congress.

Second, Congress instructed the SEC that its definition of "original information"

"means" precisely what it says. 15 U.S.C. § 78u-6(a)(3). Use of that term, as a

matter of law, excludes the SEC from adding additional qualifications to the

definition.  Finally, Congress clearly defined the term, and set forth three specific

criteria necessary for a whistleblower's disclosure to constitute "original

information."  *Id.*

Under *Chevron*, the analysis of this term should stop here. It is clear on the face of the statute. However, as explained above, other definitions and provisions set forth in the Act, along with the Act's legislative history and Congress's immediate allocation of over $450 million to pay awards, all support a finding that this Court should give the definition of "original information" it plain meaning.

But if, for whatever reason, this Court were to decide that despite Congress' clear language, it "still" could not "conclude that Congress had directly addressed" the meaning of "original information," the Court must then perform "step two" of the *Chevron* analysis. Under a "step two" analysis this Court must "defer to an agency's interpretation of the statute it administers, so long as it is reasonable." *New York ex rel. Office of Children and Family Services*, 556 F.3d at 97.

For the reasons set forth above, the SEC's interpretation of "original information" is not reasonable. The prompt payment of awards, which Congress clearly indicated they wanted generously paid-out, would serve as the best advertisement to potential whistleblowers that it was safe and potentially profitable to report violations of securities law. It is impossible to quantify how many high-quality whistleblowers were discouraged from submitting information to the SEC based on the SEC's failure to pay any rewards in 2010 and 2011, and its payment of only one surprisingly very modest award in 2012. Congress wanted to prevent this by fully funding a special Fund that had the assets to commence paying awards

immediately upon passage of the Act. The colloquial expression, "put your money where your mouth is," is *apropos* in this context. Congress' intent was clearly expressed not only by its words, but also by its deeds.

The SEC's unsupportable definition of "original information" has clearly contributed to an underpayment of awards, and a nearly four-year lag in the payment of awards that would send a strong message to the financial markets that fraud will be detected, and those who risk their careers will be rewarded, if their "original information" was of the quality necessary to meet Congress's mandatory requirements. Congress' primary "intent" behind the awards provision was to send a message, not just to whistleblowers, but also to the financial markets themselves, that fraud will be reported. Nothing would send a stronger message than the timely and "generous" payment of awards. However, tinkering with the unambiguous Congressional definition of "original information" in a manner that would unquestionably cause a long-term delay in the payment of rewards, would send a terrible message to the markets, undermining Congress' intent.

But assuming that this Court also found that the SEC's definition of "original information" was "reasonable," this Court still must reverse and remand the decision denying Mr. Stryker his award. It is well settled that a rule issued by a regulatory agency cannot be retroactively applied, especially if there was not "express authorization" for "retroactive rulemaking." *Bowen v. Georgetown*

54

*University Hospital*, 488 U.S. 204, 213 (1988).  Agency rules only have "legal consequences" for the "future." *Id.*, p. 217 (Justice Scalia concurring).  In this case, Congress did not provide the Commission with any authority to issue rules that would alter the Congressional definition of "original information" prior to the Commission's issuance of final rules.

At the time Mr. Stryker applied for his award, he had voluntarily provided to the SEC a large amount of materials (and testimony) that met Congress' definition of "original information."  He also made sure that when he applied for his reward he gave copies of all of his prior whistleblower submissions to the SEC Whistleblower Office so that office would have a complete factual record to determine whether or not his "original information" contributed to the post-Dodd-Frank collection of "sanctions" from a "covered judicial or administrative action," as defined in the Act.  15 U.S.C. §§ 78u-6(a)(1) and (4). He explained how his "original information" contributed to the "sanctions" obtained by the SEC that are the triggering event for an award. 15 U.S.C. §§ 78u-6(b)(1).

In fact, the Commission admitted that "sanctions" of over $1 million had been obtained by the Commission from a "covered judicial or administrative action" for which qualified whistleblowers were entitled to a reward when, according to its own regulations, it published a Notice of Covered Action 2011-4. This Notice concerned the SEC's enforcement action in *SEC v. Advanced*

*Technologies Group, et al.* and confirmed that the Commission had obtained a sanction of over $1 million. *See* Preliminary Determination, Addendum p. 1 ("In response to the above-referenced Notice of Covered Action, the Securities and Exchange Commission" "received a timely whistleblower award claim.").  Under the SEC's own regulations the Commission *only* publishes Notices of Covered Action if monetary sanctions are actually obtained  by the Commission for which qualified whistleblowers are entitled to a reward. 17 C.F.R. § 240.21F-3(a)(defining the mandatory qualifications for a whistleblower to be entitled to an award) and  17 C.F.R. § 240.21F-3(a) and § 240.21F-10(a)("whenever a Commission action results in monetary sanctions totaling more than $1,000,000, the Office of the Whistleblower will cause to be published . . . a 'Notice of Covered Action.'").

Thus, subsection (iv) of the Commission's definition of "original information" is not reasonable, and, in any event, cannot be applied to Mr. Stryker's claim.

## **CONCLUSION**

Because the Commission denied Mr. Stryker's application for a reward based on an impermissible definition of "original information," the Commission's Final Decision must be vacated, and this case must be remanded to the Commission for further proceedings consistent with Congress' definition of

56

"original information." The Commission must be instructed to apply the Congressional definition of "original information" in all future proceedings. This Court should find that the definition of "original information" set forth in Commission Rule 21F-4(b)(1)(iv), 17 C.F.R. § 240.21F-4(b)(1)(iv), was not issued in accordance with law, and is arbitrary and capricious. The Commission's application of subsection (iv) to Mr. Stryker's case was an abuse of discretion.

Respectfully submitted,

/s/ Stephen Kohn

STEPHEN M. KOHN
Lead Counsel
MICHAEL D. KOHN
DAVID K. COLAPINTO
Kohn, Kohn & Colapinto, LLP
3233 P Street, N.W.
Washington, D.C. 20007
(202) 342-6980
(202) 342-6984 (fax)
*sk@kkc.com*

and

KARIM KAMAL
Law Office of Karim H. Kamal
10 East 40th Street, Suite 3110
New York, NY 10016
(212) 586-0510
*khklaw@gmail.com*

**Federal Rules of Appellate Procedure Form 6.  Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed.R. App. P.32(a)(7)(B) because:

   ☑    this brief contains  [13,329]                words, excluding the
        parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii), *or*

   ☐    this brief uses a monospaced typeface and contains  [state the number of]
        lines of text , excluding the parts of the brief
        exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the
        type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑    this brief has been prepared in a proportionally spaced typeface
        using [ Microsoft Office Word                        ] in
        [ 14-Point Times New Roman            ], *or*

   ☐    this brief has been prepared in a monospaced typeface using
        [ state name and version of word processing program  ] with
        [ state number of characters per inch and name of type style ].

(s)  **Stephen M. Kohn**  _____

Attorney for **Petitioner Larry Stryker**

Dated: **March 23, 2014** _____

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on March 23, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Stephen Kohn
STEPHEN M. KOHN
Kohn, Kohn & Colapinto, LLP
3233 P Street, N.W.
Washington, D.C. 20007
(202) 342-6980
(202) 342-6984 (fax)
*sk@kkc.com*

# INDEX TO THE ADDENDUM

1.  Preliminary Determination
    SEC Claims Review Staff (November 5, 2012)…...………………1

2.  SEC Order Denying Whistleblower Claim
    (October 30, 2013)……………...……………………………… 2

3.  The Dodd-Frank Act
    Whistleblower Award Provisions
    15 U.S.C. §§ 78u-6 and 78u-7…...…………………………….. 22

4.  SEC Rules implementing the Dodd-Frank Act's
    Whistleblower Award  Provisions
    17 C.F.R. §§ 21F-1 through F-17……………………...………… 26

5.  Comparison Between the Statutory Definition of
    "Original Information" and the Definition
    Approved by the SEC…………………………………………… 42

6.  Senate Report 111-176, "The Restoring American
    Financial Stability Act of 2010" (*Section 922. Whistleblower
    Protection*, pp. 110-12)(April 30, 2010)…...…………………….. 43

7.  SEC Office of Inspector General, Office of Audits,
    "Assessment of the SEC's Bounty Program
    Report No. 474 (March 29, 2010)(excerpts)………...……...…… 47

8.  SEC "Annual Report on the Dodd-Frank Whistleblower
    Program, Fiscal Year 2011" (November 2011)(excerpts)….....… 51

9.  SEC "Annual Report on the Dodd-Frank Whistleblower
    Program, Fiscal Year 2012" (November 2012)(excerpts)….....… 53

10. SEC "Annual Report on the Dodd-Frank Whistleblower
    Program, Fiscal Year 2013" (November 2013)(excerpts)…….... 55

i

11.     H.R. 3817, excerpts from bill, Sections 21F(a) and (e) of
        the Securities Exchange Act
        (October 15, 2009)……………………………………………. 57

12.     H.R. 4173, excerpts from bill that passed the House
        proposing amendments to §§ 21F(a) and (e) of the
        Securities Exchange Act (January 20, 2010)…………………….. 60

13.     Excerpts from the "Discussion Draft" of the Dodd-Frank Act
        presented by Senator Dodd on November 10, 2009, proposing
        Sections 21F(b) and (f) of the Securities Exchange Act…....…....…63

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas,* 10-cv-4868
(S.D.N.Y. 2010)

## PRELIMINARY DETERMINATION OF THE CLAIMS REVIEW STAFF

In response to the above-referenced Notice of Covered Action, the Securities and
Exchange Commission (the "Commission") received a timely whistleblower award claim.
Pursuant to Section 21F of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule
21F-10 promulgated thereunder, the Claims Review Staff has evaluated the claim in accordance
with the criteria set forth in Rules 21F-1 through 21F-17 of the Exchange Act. The Claims
Review Staff has recommended that the Commission deny an award to Claimant. The basis for
this determination is as follows:

1. The information provided by Claimant prior to July 21, 2010, including such
   information that was re-submitted subsequent to July 21, 2010, is not "original
   information" within the meaning of Section 21F(a)(1) of the Exchange Act and Rule
   21F-4(b)(1)(iv) thereunder because it was not provided to the Commission for the
   first time after July 21, 2010; and

2. The information provided by Claimant after July 21, 2010 did not lead to successful
   enforcement of a covered judicial or administrative action within the meaning of
   Section 21F(b)(1) of the Exchange Act and Rules 21F-3(a) and 21F-4(c) thereunder
   because it did not:

   a. cause the Commission to (i) commence an examination, (ii) open or
      reopen an investigation, or (iii) inquire into different conduct as part of a
      current Commission examination or investigation under Rule 21F-
      4(c)(1) of the Exchange Act; or

   b. significantly contribute to the success of a Commission judicial or
      administrative enforcement action under Rule 21F-4(c)(2) of the
      Exchange Act.

By:  Claims Review Staff
Date:  November 5, 2012

# NON-PUBLIC

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 70772 / October 30, 2013

WHISTLEBLOWER AWARD PROCEEDING
File No. 2014-1

---

In the Matter of the Claim for Award

in connection with

*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Notice of Covered Action 2011-4

---

## ORDER DENYING WHISTLEBLOWER AWARD CLAIM

Larry Stryker timely filed a whistleblower award claim pursuant to Section 21F of the Securities Exchange Act of 1934 (the "Exchange Act"),[1] in connection with Notice of Covered Action 2011-4. The Claims Review Staff ("CRS") issued a Preliminary Determination recommending that Stryker's claim be denied. Stryker filed a response contesting the Preliminary Determination. For the reasons set forth below, Stryker's claim is denied.

### I. Background

Beginning in 2004 and continuing through July 2009, Stryker submitted information to the Division of Enforcement ("Enforcement") staff regarding wrongdoing purportedly being engaged in by Alexander Stelmak ("Stelmak"), among others, in connection with the solicitation of securities by Advanced Technologies Group LTD ("ATG") and its predecessor entity.[2] In addition to calling and emailing the staff and sending it certain documents, Stryker also met with the staff in April 2009.

---

[1] 15 U.S.C. § 78u-6.

[2] Stryker was a former business partner of Stelmak in a venture engaged in by Stelmak prior to the activities that were the subject of the ATG investigation.

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-
4868 (S.D.N.Y. 2011)
Page 2

The staff opened an investigation of ATG, Stelmak and Stelmak's partner, Abelis Raskas
("Raskas")[3] on or about March 5, 2009 (the "ATG Investigation"). On June 23, 2010, the
Commission filed an enforcement action in *SEC v. Advanced Technologies Group LTD,
Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (the "ATG Action"). The Commission
alleged in its complaint that ATG, Stelmak, and Raskas, engaged in a series of offerings of
unregistered non-exempt securities of ATG and ATG's predecessor entities between 1997 and
2006 in violation of Section 5 of the Securities Act of 1933. The unlawful offerings occurred
through nationwide cold-calling campaigns supervised by Stelmak.

Effective July 21, 2010, Congress enacted Section 21F of the Exchange Act, "Securities
Whistleblower Incentives and Protection," as part of the Dodd-Frank Wall Street Reform and
Consumer Protection Act ("Dodd-Frank").[4] Section 21F directs the Commission to pay
whistleblower awards, subject to certain statutory criteria and "under regulations prescribed by
the Commission,"[5] to individuals who provide information that leads to successful enforcement
actions. One of the statutory requirements found in Section 21F is that the information provided
by a whistleblower be "original information."[6]

On September 14, 2010, Stryker sent a brief email to an Enforcement attorney whom he
had previously communicated with, as well as certain other SEC officials, in which he identified
two allegedly inaccurate statements that Stelmak made in his deposition taken during discovery
in the ATG Action (the "September 2010 Email"). The first was Stelmak's statement that he
was the sole employee of one of his entities (Stryker provided the staff with a list of three
additional management contacts for that entity). The second was Stelmak's statement that one of
his associates was a computer consultant when, in fact, Stryker asserted, that associate was
"always [a] cold caller."

On October 5, 2010, Commission staff notified the district court that they and the
defendants had negotiated the agreed to terms of a proposed settlement that would soon be
submitted to the Commission for its consideration; thereafter, in mid-November 2010, following
the Commission's acceptance of those settlement terms, ATG, Stelmak and Raskas signed
consent agreements that formally settled the ATG Action.[7] On January 12, 2011, the court

---

[3] ATG was owned and operated by Stelmak and Raskas.

[4] Pub. L. No. 111-203, § 922, 124 Stat. 1376, 1841 (July 21, 2010).

[5] 15 U.S.C. 78u-6(b)(1).

[6] 15 U.S.C. 78u-6(a)(3).

[7] See, e.g., Order of Oct. 6, 2010 (S.D.N.Y. 10-civ-4868) (Dkt. #37); Raskas Consent Agreement (attached to Final
Judgment as to Defendant Abelis Raskas (S.D.N.Y. 10-civ-4868) (Dkt. #41)); Stelmak and ATG Consent

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 3

entered final judgments against the defendants in which, among other remedies, ATG and Stelmak were ordered jointly and severally liable for disgorgement in the amount of $14,741,760.76, together with prejudgment interest in the amount of $4,444,775.56, and ordered to pay civil penalties of $65,000 and $6,500, respectively. Of this disgorgement amount, defendant Raskas was jointly and severally liable for $3,639,920, together with prejudgment interest in the amount of $1,110,028.03.

On January 11, 2011, Stryker's counsel submitted a claim for a whistleblower award along with a letter and exhibits in support of his claim. In this submission, Stryker's counsel restated information his client had provided to the staff between 2004 and 2009, as well as the September 2010 Email. By letter dated February 11, 2011, Stryker resubmitted this package to the Commission.

Effective August 12, 2011, we adopted Rules 21F-1 through 21F-17 under the Exchange Act to implement our whistleblower program.[8] Rule 21F-4(b)(1) defines "original information" in the same manner as that term is defined in Section 21F(a)(3) of the Exchange Act, but adds that the information must be "[p]rovided to the Commission for the first time after July 21, 2010 (the date of enactment of [Dodd-Frank])."[9]

On August 12, 2011, the Office of the Whistleblower ("OWB") posted a Notice of Covered Action (the "NoCA") for the ATG Action. As noted, Stryker had previously submitted a claim application setting forth the information and assistance he had provided to the Commission.[10] In his application, he claimed that he was entitled to an award because both the Commission and the general public "benefitted from [his] persistent efforts to bring Stelmak's and ATG's, as well as related individuals' and entities', wrongful conduct to light . . . [and that] [h]is efforts substantially assisted the SEC in its enforcement action."

In support of his application for an award, Stryker identifies information that he communicated to Enforcement staff between 2004 and September 2010 concerning possible securities law violations committed by Stelmak, ATG, and other related individuals and entities.

---

Agreement (attached to Judgment (S.D.N.Y. 10-civ-4868) (Dkt. #42)).

[8] 17 C.F.R. §§ 240.21F-1 to -17.

[9] 17 C.F.R. § 240.21F-4(b)(1); 15 U.S.C. § 78u-6(a)(3).

[10] On August 17, 2011, following the effective date of the final rules implementing the whistleblower program, Stryker sent a letter to the OWB asking for confirmation that he did not need to resubmit his claim application and that his earlier submissions were sufficient to satisfy the requirements for submitting a claim under the rules. In an email dated August 23, 2011, the OWB confirmed that it was not necessary for Stryker to resubmit.

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 4

However, with the exception of the September 2010 Email, all of Stryker's information was submitted to the staff between 2004 and 2009, well before the enactment of Section 21F. As described above, in an apparent effort to overcome this obstacle, Stryker repackaged his information and provided it again in written submissions to the Commission in January and February 2011 – after Section 21F was enacted (collectively, Stryker's "2011 Submissions").

## II.    Preliminary Determination (November 5, 2012)

In its Preliminary Determination, the CRS found that the information provided by Stryker prior to July 21, 2010, including information that Stryker re-submitted after July 21, 2010, was not "original information" within the meaning Section 21F(a)(1) of the Exchange Act and Rule 21F-4(b)(1)(iv) because it was not provided to the Commission for the first time after July 21, 2010 as required by the rule. The CRS further determined that the September 2010 Email did not lead to the successful enforcement of a covered judicial or administrative action as required by Section 21F(b)(1) of the Exchange Act and Rules 21F-3(a) and 21F-4(c) because it did not cause the Commission to open the ATG Investigation (or inquire into different conduct as part of the investigation) nor did it significantly contribute to the success of the ATG Action. Accordingly, the CRS recommended denying Stryker's award application.

## III.    Stryker's Response to the Preliminary Determination

Pursuant to Rule 21F-10(e)(1)(i), the OWB permitted Stryker to review the materials from among those set forth in Rule 21F-12(a) that formed the basis of the CRS's Preliminary Determination. However, Stryker sought extensive discovery, not permitted by the Commission's rules, of other documents and information relating to the ATG Investigation. Because the OWB denied these discovery requests, Stryker contests not only the CRS's Preliminary Determination to deny him a whistleblower award, but also the procedural rights that he has been afforded under our rules.

### A.    Stryker's motions and requests following the Preliminary Determination

On November 16, 2012, Stryker's attorneys requested that they be permitted to review the materials that formed the basis of the Preliminary Determination,[11] and that the OWB meet with them to discuss the Preliminary Determination.[12] On December 4, 2012, the OWB mailed

---

[11] Rule 21F-10(e)(1)(i) permits a claimant, before deciding whether to contest a Preliminary Determination, to request that OWB make available for the claimant's review "the materials . . . that formed the basis of the Claims Review Staff's Preliminary Determination."

[12] Rule 21F-10(e)(1)(ii) permits a claimant, before deciding whether to contest a Preliminary Determination to "request a meeting with the Office of the Whistleblower; however, such meetings are not required and the office may in its sole discretion decline the request."

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-
4868 (S.D.N.Y. 2011)
Page 5

the requested materials to Stryker's attorneys; however, the packet inadvertently excluded the second of two sworn staff declarations that the CRS had relied upon.[13]

On December 19, 2012, senior staff of the OWB, as well as staff of the Commission's Office of General Counsel, met with Stryker's attorneys. Stryker's counsel primarily used the meeting as an opportunity to present their views on the retroactivity issue, explaining why in their view the legislative history and case law require the Commission to make awards for information provided for the first time before Dodd-Frank's enactment.

On December 21, 2012, Stryker's attorneys submitted various requests for documents relating to the April 2009 meeting between Enforcement staff and Stryker; specifically, (1) any transcript of the April 2009 meeting; (2) a copy of the documentary evidence provided by Stryker to Enforcement staff in connection with the April 2009 meeting; and (3) any formal order of investigation which would have been available or in effect at that time.

On December 26, 2012, the OWB discovered that it had omitted the second staff declaration from the packet it had sent to Stryker's attorneys on December 4, 2012. On that same day, December 26, the OWB emailed the second declaration to Stryker's attorneys, advising them that this declaration had been inadvertently omitted from the December 4 package. The OWB further advised Stryker's attorneys that, as a result of this error, the OWB would re-start the 60-day period for Stryker to contest the Preliminary Determination, such that the new date for Stryker to file a response would be February 25, 2013.[14]

By letter dated December 28, 2012, Stryker's counsel made five demands regarding the second staff declaration: (1) that both staff declarations be stricken from the record; (2) that Stryker's counsel be permitted to take the Enforcement staff attorney's deposition to discover, among other matters, the extent of the information Stryker provided to the Enforcement staff, the degree to which this information assisted the staff in the underlying investigation and enforcement action, and the circumstances surrounding the preparation of the two staff

---

[13] At a meeting held on September 14, 2012 to consider the Stryker award application, the CRS deferred issuing a preliminary determination and directed the OWB to request that the Enforcement staff supplement the record with additional detail concerning the ATG investigation, the ATG Action, and the information provided by Stryker. At a meeting held on November 5, 2012, the CRS considered a second staff declaration, dated October 26, 2012. In compiling the documents to send to Stryker's attorneys, OWB included all the documents from the binder it had assembled in advance of the September 14 meeting but inadvertently omitted the October 26 staff declaration.

[14] Rule 21F-10(e)(2) provides that a claimant who wishes to contest a Preliminary Determination must submit his written request and supporting materials within 60 days of the later of the date of the Preliminary Determination or the date OWB makes the CRS's review materials available to the claimant.

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-
4868 (S.D.N.Y. 2011)
Page 6

declarations; (3) that counsel be permitted to obtain all documents from the Enforcement staff
pertaining to Stryker's April 2009 meeting with the staff and, more broadly, the underlying
investigation and enforcement action so that Stryker's counsel could determine the extent to
which Stryker assisted in the investigation and the enforcement action; (4) that the OWB disclose
all intra-agency communications with the staff attorney regarding the creation and purpose of the
two declarations; and (5) that the OWB delay the start of the 60-day period for responding to the
Preliminary Determination until 60 days after counsel has completed the discovery sought in its
letter.

On January 4, 2013, the OWB responded that the whistleblower rules did not authorize
the OWB to amend the record or to grant claimants discovery of materials not considered by the
CRS.[15] With regard to counsel's request that the OWB delay the start of the 60-day period for
responding to the Preliminary Determination until 60 days after counsel had completed the
discovery sought in its letter, the OWB pointed out that Rule 21F-10(e)(2) provided that the 60-
day period to contest the Preliminary Determination began when the OWB made available the
materials that formed the basis of the Claims Review Staff's preliminary determination. Further,
the OWB explained that it had provided the last of those materials (*i.e.*, the second staff
declaration dated October 26, 2012) to counsel on December 26, 2012, and thus the 60-day
period commenced on that date.

On January 22, 2013, Stryker's attorneys requested that the OWB advise them when any
and all Matters Under Inquiry ("MUIs") commenced with respect to the ATG Investigation.[16]
On January 23, 2013, the OWB responded that, as such information was not included in the
record that formed the basis of the CRS's Preliminary Determination, the OWB was not
authorized to provide it to counsel.[17]

---

[15] The OWB specifically directed counsel's attention to Rule 21F-12(b) which states, in relevant part, that claimants
are not entitled to obtain any materials from the Commission other than the materials delineated in Rule 21F-12(a)
that the Commission and the CRS may rely upon in making an award determination. The OWB did inform counsel,
however, that pursuant to Rules 6 and 7(a) of the SEC's Rules Relating to Investigations, 17 C.F.R. §§ 203.6 and
203.7(a), it was working with Enforcement staff to respond to counsel's requests for the transcript of Stryker's
meeting with Enforcement staff attorneys in April 2009 and the formal order of investigation that led to the covered
action. On January 11, 2013, OWB provided Stryker's counsel with copies of the documents produced by Stryker at
the April 2009 meeting and the formal order of investigation for the ATG Investigation. With regard to counsel's
request for a transcript of the April 2009 meeting, OWB advised counsel that the meeting had not been recorded or
transcribed.

[16] Enforcement opens a MUI if it determines that "the facts underlying the MUI show that there is potential to
address conduct that violates the federal securities laws; and [that]. . . the assignment of a MUI to a particular office
will be the best use of resources for the Division as a whole." SEC Enforcement Manual, ¶ 2.3.1.

[17] Because the CRS determined that the information provided by Stryker, other than the September 2010 Email, was
not original information within the meaning of Rule 21F-4(b)(1), the CRS did not need to consider the relationship

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 7

On January 28, 2013, Stryker's counsel requested copies of the entire deposition transcripts of Stelmak and Raskas, portions of which had been attached as exhibits to the Commission's Declaration in Support of Plaintiff's Application for Asset Freeze and Other Relief in the ATG Action. On January 31, 2013, the OWB again responded that it was not authorized to provide these items since they were not included in the materials that formed the basis of the CRS's Preliminary Determination.[18]

**B.   Stryker's response contesting the Preliminary Determination**

On February 25, 2013, Stryker submitted a response contesting the Preliminary Determination. Stryker raised three central contentions:

- The requirement of Rule 21F-4(b)(1)(iv) that information be submitted to the Commission for the first time after the enactment of Dodd-Frank "was neither included nor required in the Dodd-Frank Act . . . [and] cannot be applied retroactively to the Claimant who provided information to the Commission before July 21, 2010, and then timely submitted that information in writing after the passage of the Act but before the Final Rules became effective."

- At a minimum, the information Stryker has provided to the Commission since 2004 either caused the Commission to commence the ATG investigation or, to the extent the investigation was already underway, significantly contributed to the success of the enforcement action.

- The OWB "committed a variety of procedural errors" in reviewing and processing his claim that "deprive[d] the Claimant of due process of law," including denying him a "fair opportunity to take discovery" in order to contest "the wrongfulness of [] the assertions" made in the two staff attorney declarations.

Additionally, Stryker requested that, if the Preliminary Determination is upheld, then he should be permitted to conduct a "*de novo* review" with the "opportunity to take reasonable discovery from the Commission (including, without limitation, deposition(s) of any and all individuals who executed declarations) on issues pertaining to [his] claim for award."

---

between Stryker's information and the opening of either the MUI or the formal ATG Investigation.

[18] In its response, the OWB also noted that the Commission's Rules Relating to Investigations do not authorize Stryker's access to the requested transcripts, citing specifically to Rule 203.6, 17 C.F.R § 203.6, which provides that "[a] person who has submitted . . . testimony in a formal investigative proceeding shall be entitled . . . to procure a copy of . . . a transcript of his testimony." The OWB pointed out that counsel's request for these deposition transcripts fell outside of this rule since counsel was not requesting the transcripts on Stelmak's and Raskas's behalf.

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 8

IV.    Analysis

    A.    Stryker's argument about "retroactive" application of Rule 21F-4(b)(1)(iv) has no merit.

Stryker's first contention is that the CRS should not have denied his claim based on the information that he originally submitted to the Commission before the effective date of Dodd-Frank and later re-packaged and submitted to the Commission in 2011. Stryker does not dispute that this denial followed from Rule 21F-4(b)(1)(iv), which requires that a whistleblower submission have been "[p]rovided to the Commission for the first time after July 21, 2010 (the date of enactment of [Dodd-Frank])" in order for it to be considered "original information." Rather, he argues that Rule 21F-4(b)(1)(iv) constitutes impermissible retroactive rulemaking by the Commission.

While Stryker's argument is not entirely clear, he appears to be framing it in two different ways. First, he claims that Rule 21F-4(b)(1)(iv) is contrary to the statute insofar as it requires that information be submitted to the Commission for the first time after Dodd-Frank's effective date. Second, he claims that the rule is impermissibly retroactive because it deprives him of his "vested right" to an award based on his 2011 Submissions. As we explain below, each of these contentions is incorrect.

The first variant of Stryker's argument, in our view, is not really about impermissible retroactivity of the Commission's rule. It is simply an argument that the Commission rule should be considered invalid because it conflicts with the statute. In fact, it is Stryker whose position relies on a retroactive application of law; in his view, Dodd-Frank *requires* that he be paid for information he provided before the whistleblower statute even existed. While he appears to accept that he cannot literally base his award claim on the submissions of information he made from 2004 to 2009 – *i.e.*, before Dodd-Frank was the law – he argues that by resubmitting the same information in written form in 2011, he made himself eligible for an award arising from the ATG action, even though that action had already been filed in June 2010 and was then on the verge of final settlement.

Stryker argues that his 2011 Submissions entitle him to an award because they satisfy the statutory definition of "original information." He further claims that his argument is supported by Section 924(b) of Dodd-Frank, which states that "[i]nformation provided to the Commission in writing by a whistleblower shall not lose the status of original information . . . solely because the whistleblower provided the information prior to the effective date of the regulations, if the information is provided by the whistleblower after the date of enactment of this subtitle."[19] In

---

[19] Pub. L. No. 111-203, § 924(b), 124 Stat. 1376, 1850 (July 21, 2010).

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 9

essence, Stryker contends that Section 924(b) *requires* the Commission to treat information submitted before the enactment of Dodd-Frank as eligible for an award as long as the information is re-submitted in writing after the date of enactment.

We disagree. Neither the statutory language, the legislative history, nor sound policy considerations suggest that Congress's adoption of a new whistleblower reward program in July 2010 was intended to pay awards to people like Stryker who gave the Commission original information years before the statute was enacted.

The starting point in any statutory analysis is the statutory language. Here, there is nothing in the statutory language that demonstrates Congressional direction to pay awards based on information submitted before Dodd-Frank was enacted. To the contrary, the few statutory provisions that specifically address timing issues do not mention payments for information provided before enactment.

Dodd-Frank includes a general effective date provision; one day after enactment "[e]xcept as otherwise specifically provided" in the statute.[20] No provision of Dodd-Frank establishes a different effective date for our whistleblower award program. Two provisions pertaining to whistleblower awards specifically address timing issues -- Sections 924(b) and 924(c) – but each has its own very specific and limited focus, and neither suggests that Congress intended to pay awards for information submitted prior to enactment.

As noted, Section 924(b) requires that information that satisfies the statutory definition of "original information" be treated as such if it is submitted in writing after the effective date of the statute but before the promulgation of the Commission's regulations. This provision shows that Congress expressly considered, and provided for, the issue of how to treat information submitted *after* enactment of the statute but *before* adoption of the implementing Commission rules. Congress affirmatively directed that the Commission should treat as eligible for award payments all such information provided in writing, but *only if "the information [was] provided ... after the date of enactment...."* Congress did not similarly direct payment for information provided *before* the date of enactment, although it could have done so.[21]

Section 924(c) is to similar effect. That section provides that a whistleblower "may receive an award ... regardless of whether any violation ... underlying the judicial or

---

[20] Pub. L. No. 111–203, §4, 124 Stat. 1376, 1390 (Jul. 21, 2010).

[21] Here we are particularly mindful of the well-established canon of statutory construction expression *unius est exclusion alterius*, or the expression of one thing implies the exclusion of others. *See, e.g., TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001); *United States v. Giordano*, 416 U.S. 505, 514 (1974).

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 10

administrative action upon which the award is based, occurred prior to the date of enactment" of Dodd-Frank.[22] Thus, Congress expressly provided that payments could be made even if the *violation* underlying the action on which the award is based occurred before enactment, but once again failed to include a similar express statement for *information* provided before enactment. It is clear from Sections 924(b) and 924(c) that Congress knew how to give specific directions for the pre-enactment application of the statute, yet plainly did not require the Commission to pay awards for information submitted before enactment.

The legislative history of Section 924(b) also supports our conclusion that Congress intended that the Commission only make awards for information provided for the first time after Dodd-Frank's enactment. In both the House and Senate bills, the provision that became Section 924(b) treated information submitted after the date of enactment, but before the adoption of our rules, as "original information" eligible for award consideration. However, the House bill also would have conferred "original information" status on information submitted pre-enactment if the information could have merited an award under the Commission's previous insider trading bounty program.[23] The Senate-passed substitute for the House bill would have permitted awards for information submitted by a whistleblower before enactment of the statute as long as the Commission collected monetary sanctions in the resulting enforcement action after the date of enactment.[24] Both of these provisions were omitted from the final version of Section 924(b) that emerged from the conference committee.[25] Thus, Congress considered alternatives that would have provided for varying degrees of retroactivity in the whistleblower award program, but ultimately failed to include them in the final version of Section 924(b). We take this as a strong indication that Congress made a conscious decision against authorizing whistleblower awards for information that was provided to the Commission prior to the Act's passage. At the very least, it provides no support for Stryker's claim that Congress meant to *require* the Commission to

---

[22] Pub. L. No. 111-203, § 924(c), 124 Stat. 1376, 1850 (July 21, 2010).

[23] *Wall Street Reform and Consumer Protection Act of 2009*, H.R. 4173, 111th Cong. § 7205(b) (as passed by House, Dec. 11, 2009) (information deemed original information "provided such information was submitted after the date of enactment of this subtitle, *or related to insider trading violations for which a bounty could have been paid at the time such information was submitted*.") (emphasis added). Former Section 21A(e) of the Exchange Act authorized the Commission to award bounties to persons who provided information leading to the recovery of civil penalties for insider trading violations. Section 21A(e) was repealed by Section 923(b) of Dodd-Frank.

[24] *Restoring American Financial Stability Act of 2010*, H.R. 4173, 111th Cong. § 924(b) (as passed by Senate, May 20, 2010) (information deemed original information "provided that the information is— (1) provided by the whistleblower after the date of enactment of this subtitle, *or monetary sanctions are collected after the date of enactment of this subtitle*; ....") (emphasis added).

[25] The Senate language providing for award eligibility where monetary sanctions were collected after enactment of the statute was used in the base text that went to the conference committee, but was deleted by the conferees.

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 11

consider pre-enactment submissions of information as eligible for awards.[26]

      We believe that the Congressional purpose in creating the new whistleblower program also supports the conclusion that Congress did not intend the program to cover information provided to the Commission for the first time before the enactment of Dodd-Frank. The principal purpose of Section 21F was "to motivate those with inside knowledge to come forward and assist the Government to identify and prosecute persons who have violated securities laws...."[27] As further explained in the adopting release accompanying the final rules:

> Congress enacted Section 21F in order to provide new incentives for individuals with knowledge of securities violations to report those violations to the Commission. We believe that applying Section 21F prospectively—for new information provided to the Commission after the statute's enactment and not to information previously submitted—is most consistent with Congressional intent and with the language of the statute.[28]

In our view Congress did not intend for Section 21F to reward individuals who came forward before Dodd-Frank's enactment; rather, Congress intended for the award program to create powerful new incentives for the public to assist the Commission in its fight against securities law violations. Leveraging the limited assets of the Investor Protection Fund established by Section 21F(g) of the Exchange Act to pay those individuals who respond to the new incentive by coming forward after Dodd-Frank's enactment is consistent with that Congressional purpose.[29]

---

[26] The Senate-passed version of Section 924(b) also would have treated as "original information" any information provided by a whistleblower that was "related to a violation for which an award under section 21F of the Securities Exchange Act of 1934, as added by this subtitle, could have been paid at the time the information was provided by the whistleblower." *Id.* § 924(b)(2). While this language is not entirely clear, it arguably would have supported blanket retroactivity, permitting whistleblower awards for any information submitted to the Commission pre-Dodd-Frank that satisfied the criteria set forth under Section 21F. This language was also deleted from the final version of Section 924(b).

[27] S. Rep. No. 111-176 at 110 (2010).

[28] *Securities Whistleblower Incentives and Protections*, Release No. 34-64545, 76 Fed. Reg. 34300, 34310 (June 13, 2011). The Commission further observed that "[t]he statute incentivizes whistleblowers to report possible securities law violations to the Commission by offering them financial awards, reducing the risks from employment retaliation, and lowering the barriers through user-friendly procedures and appellate redress." 76 Fed. Reg. at 34326, n.228.

[29] Section 21F(g) of the Exchange Act, 15 U.S.C. § 78u-6(g), established the "Securities and Exchange Commission Investor Protection Fund" (the "Fund") to fund the payment of whistleblower awards. In general, this section provides that the money to be paid into the Fund will come from "monetary sanction[s] collected by the Commission in any judicial or administrative action brought by the Commission under the securities laws that is not . . . otherwise distributed to victims of a violation of the securities laws." The method for funding award payments

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 12

For all of the above reasons, we believe that the whistleblower statutory provisions do not authorize awards for information originally provided prior to Dodd-Frank's enactment. It is, in any event, clear that the statute does not *require* the Commission to pay awards based on pre-enactment submissions of information. Moreover, to the extent there is any ambiguity based on the lack of express direction in the statutory language, we believe, as set forth in Rule 21F-4(b)(iv), and based on our experience and expert judgment, that the better approach here is to allow whistleblower awards only for information provided to the Commission for the first time after July 21, 2010. As we observed, "overly broad definitions and unduly permissive provisions could result in inefficient use of the Investor Protection Fund."[30] Simply put, our interpretation of "original information" ensures that the Fund is used to reward those who provide new, high quality tips, not to pay for information that was already in the Commission's possession on July 21, 2010.

As noted above, Stryker presents a second variation of his retroactivity argument: he argues that our rule represents improper retroactive rulemaking because it takes away his "vested right" to have his 2011 Submissions considered as "original information." In this version of his argument, he seeks to rely on principles of retroactivity law by noting that a rule is retroactive when it "takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past."[31] Stryker asserts, in essence, that Dodd-Frank unambiguously created a vested right to have his re-submission of previously submitted information treated as "original information," and that Rule 21F-4(b)(1)(iv) upset that vested right. As explained above, however, the statute creates no such right, as it nowhere indicates that the Commission is required to consider re-submissions of pre-enactment information as eligible for awards.

---

thus operates prospectively only. If, as Stryker argues, Dodd-Frank requires that awards must be paid for information provided before its enactment and simply resubmitted in writing afterwards, whistleblower claims based on such repackaged information could threaten to exhaust the fund in short order. If that had been its intention, we believe Congress would have established additional and more robust funding mechanisms to satisfy the possible flood of claims from individuals who provided information to the Commission in the past.

[30] 76 Fed. Reg. at 34356 (June 13, 2011).

[31] Quoting *Hughes Aircraft Co. v. U.S. ex rel Shumer*, 520 U.S 939, 947 (1997) (internal quotation omitted). For a more recent enunciation of this principle, *see Coalition for Common Sense in Government Procurement v. United States Department of Defense*, 707 F.3d 311, 317 (D.C. Cir. 2013) (citing *National Mining Association v. Department of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002)). *See also Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994) (a statute has retroactive effect if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."); *Enterprise Mortg. Acceptance Co., LLC, Securities Litigation v. Enterprise Mortg. Acceptance Co.*, 391 F.3d 401, 406 (2d Cir. 2004) (same).

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 13

Accordingly, this version of Stryker's retroactivity argument also must fail.[32]

In sum, we reject Stryker's contention that Rule 21F-4(b)(1)(iv) is impermissibly retroactive.

**B.    Stryker's information did not lead to the ATG Action.**

Stryker's response to the Preliminary Determination further contends that the information he provided to the Commission after Dodd-Frank led to the successful enforcement of the ATG Action. Specifically, Stryker claims that, in the second declaration, the Enforcement attorney "wrongfully attempt[ed] to discredit Claimant as the original source of the information contained in Claimant's September 2010 Email." Stryker argues that the second declaration erroneously states that none of the information in the September 2010 Email about defendant Stelmak's associate, Felix Strashnov, was new to the staff. Stryker bases this argument on his belief that, if the Commission had previously known that information, it "would surely have led Enforcement to open the Investigation and commence the Enforcement Action" years before the investigation was actually opened.

We credit the staff's representation that the staff had long been aware of the associate's true role in the Stelmak operation from a separate investigation into a fraud that the associate perpetrated shortly after leaving Stelmak's employment, for which he was then serving a prison sentence. In any event, there is no evidence that this information led to the success of the action, either in causing the staff to open a new avenue of its investigation or by significantly contributing to the success of the ATG Action.

---

[32] We note that Section 21F(b) of the Exchange Act expressly provides that whistleblower awards shall be paid "under regulations prescribed by the Commission." Therefore, until the Commission issued its final regulations spelling out the procedures for whistleblower awards and the Commission's interpretations of relevant statutory provisions, Stryker could have not had any "vested right" to a particular interpretation of the statute that would require that his award application be granted. As noted above, in adopting the definition of original information found in Rule 21F-4(b)(1), we relied on our understanding of Congressional intent, as well as our expertise as to how the whistleblower program could best assist in the Commission's efforts to enforce the securities laws. *Cf. Ohio Head Start Association, Inc. v. HHS*, 873 F. Supp. 2d 335, 348 (D.D.C. 2012), *aff'd*, 510 Fed. App'x 1 (D.C. Cir. 2013 (where Congress directed HHS to develop a system for ensuring that renewals of Head Start grants were only given to high-quality service providers, regulation that required grantees with a single deficiency finding to re-compete for grants did not operate retroactively against grantees who received deficiency findings between date of statutory authorization and date of regulation because regulation merely "codified the authority Congress granted to the Secretary...."); *Coalition for Common Sense in Government Procurement v. United States Department of Defense*, 671 F. Supp. 2d 48, 58 (D.D.C. 2009), *aff'd*, 703 F.3d 311 (D.C. Cir. 2013) (retroactivity not a concern where statute clearly subjected prescriptions to federal price ceilings as of a certain date, and all parties understood that their transactions could be governed by subsequent rule; "...the rule only identifies how that statutory requirement is implemented.").

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 14

Original information "leads to" a successful enforcement action if either: (i) the information caused the staff to open an investigation, commence an examination, or to inquire into different conduct as part of an existing investigation or examination, and we bring a successful action based in whole or in part on conduct that was the subject of the original information; or (ii) the conduct was already under investigation or examination, and the original information significantly contributes to the success of the action.[33] We find no evidence that the September 2010 Email was used in either the ATG Investigation or in the ATG Action. The Enforcement staff states in its sworn declaration that it did not use the information from Stryker's September 2010 Email in any way and that the information had no impact on the terms of the October 2010 settlement of the ATG Action. The staff further states in its declaration that the September 2010 Email did not cause the staff to correct any of Stelmak's purported false testimony or to ask Stelmak for any clarification of his testimony. Stryker's contentions to the contrary are based on pure conjecture and we do not find them credible.

Because we have already determined that Stryker's 2011 Submissions did not constitute "original information," we do not need to consider their impact on the ATG Investigation or the ATG Action. Moreover, the court entered final judgments in the ATG Action on January 12, 2011 – one day after Stryker submitted his award claim, including his re-submitted information. It is manifest that a submission made a mere one day before an action is concluded cannot have led to the success of the action.

C.    **Stryker has been given a fair proceeding in accordance with the Commission's rules and due process requirements.**

Stryker asserts that the Commission through the OWB committed numerous procedural errors that denied him a fair proceeding. Specifically, he objects to the denial of his requests to depose the Enforcement attorney who signed the staff declarations and to obtain certain documents that were not relied upon by the CRS.[34] Stryker also contends that he should be permitted discovery "from the Commission (including, without limitation, deposition(s) of any and all individuals who executed declarations) on issues pertaining to [his] claim for award."

Rule 21F-10(e)(1)(i) provides that before deciding whether to contest a Preliminary Determination, a claimant may request "that the Office of the Whistleblower make available for

---

[33] Rule 21F-4(c)(1)-(2).

[34] Among the denied requests was Stryker's motion to obtain all documents pertaining to his April 2009 meeting with the staff and to require that the OWB disclose all intra-agency communications regarding the creation and purpose of the two declarations.

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC,* 10-cv-4868 (S.D.N.Y. 2011)
Page 15

[the claimant's] review the materials from among those set forth in § 240.21F-12(a) of this chapter that formed the basis of the Claims Review Staff's Preliminary Determination." Stryker received all of the materials permitted to him by Rule 21F-12(a). These materials included publicly available materials from the ATG Action, such as the complaint, the October 2010 settlement order and the final judgments, Stryker's 2011 Submissions, additional correspondence between Stryker's attorneys and the OWB, and the two sworn declarations provided by Enforcement staff with direct knowledge of the case. While the second of these declarations was received by Stryker approximately three weeks after the rest of the materials, the OWB advised Stryker's counsel in its accompanying email that they would have the full 60 days authorized under Rule 21F-10(e)(2) from their receipt of the second declaration to submit a written response contesting the Preliminary Determination. We therefore find that Stryker received all of the materials he was entitled to receive under our rules and that he was accorded the complete time period set out in the rules to review these materials before submitting his written response to the Preliminary Determination.

While a claimant has a right to request and to review these materials before contesting the Preliminary Determination, the rules "do not entitle claimants to obtain from the Commission any materials (including any pre-decisional or internal deliberative process materials that are prepared exclusively to assist the Commission in deciding the claim) other than those listed in [Rule 21F-12(a)]."[35] Stryker nonetheless claims that, notwithstanding that the rules do not authorize additional discovery, the OWB's decision not to grant his requests denied him a fair review of his claim.

Stryker's argument has no merit. In enacting the whistleblower program, Congress expressly provided in Section 21F(j) that "[t]he Commission shall have the authority to issue such rules and regulations as may be necessary or appropriate to implement the provisions of this section consistent with the purposes of this section."[36] "Absent constitutional constraints or extremely compelling circumstances" an administrative agency "should be free to fashion [its] own rules of procedure and to pursue methods of inquiry capable of permitting [it] to discharge [its] multitudinous duties."[37] Indeed, it is "the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure."[38]

---

[35] Rule 21F-12(b).

[36] Similarly, Section 21F(b)(1) states that the Commission shall pay awards "under regulations prescribed by the Commission."

[37] *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 543 (1978).

[38] *Id.* at 544. *See, e.g., Katzon Bros., Inc. v. E.P.A.*, 839 F.2d 1396, 1399 (10th Cir. 1988).

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC,* 10-cv-4868 (S.D.N.Y. 2011)
Page 16

      Here, the Commission Rules 21F-10(e) and 12 give claimants the right to review all the materials that formed the basis of the CRS's Preliminary Determination, other than pre-decisional or internal deliberative process materials. Importantly, the materials made available to claimants include declarations from knowledgeable Commission staff, sworn to under penalty of perjury, "regarding any matters relevant to the award determination."[39] In this case the CRS requested that the record be supplemented with additional information relevant to the ATG Investigation from the staff declarant, and Stryker was given access to this declaration as well as to the rest of the material upon which the CRS relied. To go further and permit claimants free-wheeling discovery on issues such as the staff's internal deliberations in evaluating and utilizing a whistleblower's information or in considering the merits of a claimant's application, would constitute an unwarranted and a potentially damaging intrusion into our investigative processes, including the frank discussion of legal and policy decisions concerning whether an enforcement action should be brought, the specific causes of action that should be charged, and the parties that should be named as defendants.[40] The disclosure of this sort of information would, as we explained when it adopted the whistleblower rules, "have a chilling effect on our decision-making process."[41]

---

[39] Rule 21F-12(a)(4).

[40] 76 Fed. Reg. at 34347 and n.360 (citing to *United States v. Farley,* 11 F.3d 1385, 1389 (7th Cir. 1993), which held that "frank discussion of legal and policy matters is essential to the decision-making process of a governmental agency"). In this regard, we note that Rules 21F-10(e)(1) and 21F-12 are consistent with the long-recognized privilege of government agencies to protect against disclosure of information that would tend to reveal law enforcement investigative techniques or sources. *See e.g., Black v. Sheraton Corp. of America,* 564 F.2d 531, 545 (D.C. Cir. 1977). The purpose of this privilege is "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, [and] to safeguard the privacy of individuals involved in an investigation . . . . ." *In re Department of Investigation of City of New York,* 856 F.2d 481, 484 (2d Cir. 1988). Further, the public interest in nondisclosure does not terminate simply because the subject investigation has concluded. *Black* at 546, quoting *Aspin v. Department of Defense,* 491 F.2d 24, 30 (D.C. Cir. 1973)("[I]f investigatory files were made public subsequent to the termination of enforcement proceedings, the ability of any investigatory body to conduct future investigations would be seriously impaired."); *Frankel v. SEC,* 460 F.2d 813, 817 (2d Cir. 1972) (noting that, if disclosure of an agency's investigative files were required as soon as an investigation concluded, "it would soon become a matter of common knowledge with the result that few individuals, if any, would come forth to embroil themselves in controversy or possible recrimination by notifying the [agency] of something which might justify investigation," quoting *Evans v. Dept. of Transportation,* 446 F.2d 821, 824 (5th Cir. 1971)); *In re City of New York,* 607 F.3d 923, 944 (2d Cir. 2010) (holding that an investigation need not be ongoing for the law enforcement privilege to apply as "the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information" is revealed to the public); *Dorsett v. County of Nassau,* 762 F. Supp. 2d 500, 520 (E.D.N.Y. 2011) (same).

[41] 76 Fed. Reg. at 34347 and n.361 (citing *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8-9 (2001) which stated that the "deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news").

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 17

Finally, even were it appropriate in extraordinary circumstances to permit discovery beyond the information provided for in Rule 21F-12(a), this would surely not be the proper case in which to do so. This is because much, if not all, of the information Stryker seeks has no bearing on his claim for an award since it concerns how Enforcement handled the information he provided *before the enactment of Dodd-Frank.*

Stryker asserts that due process requires that we permit him to take sweeping discovery in order to bolster his claim for an award, citing *Mathews v. Eldridge*, 424 U.S 319 (1976). We do not decide whether Section 21F created any protected property interest subject to due process requirements[42] because, even assuming that the statute did so, our whistleblower rules provide all the discovery and other procedural opportunities that due process could possibly require in a proceeding of this kind.

In *Mathews v. Eldridge*, the Supreme Court held that the Social Security Administration ("SSA") was not required to hold an evidentiary hearing prior to terminating disability benefits and that the administrative procedures for such termination fully comported with due process. In assessing whether an agency has provided sufficient procedural protections, the Court stated that the reviewing court must weigh three distinct factors:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[43]

Here, all three factors support our view that Stryker was accorded all the procedural protections required under the Due Process Clause.

---

[42] "Whether a given statutory scheme gives rise to a protected interest depends on whether the authority promulgating the statute or regulation has placed *substantive* limits on official discretion." *Tarpeh-Doe v. United States*, 904 F.2d 719, 722 (D.C. Cir. 1990), citing *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) (emphasis in original). Although Section 21F directs the Commission to pay whistleblower awards to individuals who voluntarily provide the Commission with original information that leads to the successful enforcement of covered judicial or administrative actions, Congress left it entirely to our discretion to determine, by rule, when we consider a claimant's information to have "led to" a successful enforcement action. *See Ohio Head Start Association, Inc. v. Department of Health and Human Services*, 873 F. Supp. 2d 335, 349-50 (D.D.C. 2012), *aff'd*, 2013 U.S. App. LEXIS 11540 (D.C. Cir. 2013) (no protected property interest in renewal of Head Start grants where statute directed agency to award grants to providers of "high-quality and comprehensive" services but left agency discretion to decide which providers met that standard).

[43] 424 U.S. at 335.

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 18

First, the private interest that will be affected by our action is the denial of Stryker's claim for a monetary award. While the receipt of an award would no doubt benefit Stryker, its denial would not rise to the level of economic impact that might result, for example, from the termination of disability or welfare benefits where a recipient's very well-being could be at risk.[44]

Second, the procedures established under our whistleblower rules provide substantial safeguards against erroneous decisions. In *Mathews*, the Supreme Court pointed to SSA's policy of:

> allowing the disability recipient's representative full access to all information relied upon by the state agency. In addition, prior to the cutoff of benefits the agency informs the recipient of its tentative assessment, the reasons therefor, and provides a summary of the evidence that it considers most relevant. Opportunity is then afforded the recipient to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions. These procedures . . . enable the recipient to "mold" his argument to respond to the precise issues which the decisionmaker regards as crucial.[45]

Our whistleblower award procedures are directly analogous. Specifically, our rules allowed Stryker and his counsel access to all information relied upon by the CRS other than deliberative process materials. In addition, the Preliminary Determination informed Stryker of the bases upon which the CRS determined to deny his claim. OWB staff then granted the request of Stryker's counsel for a meeting at which Stryker was able to present any additional information concerning the merits of his claim. Stryker has also been afforded the opportunity to submit additional evidence and arguments in writing, enabling him to challenge directly the information in the record, and the Preliminary Determination of the CRS. Finally, under our rules, once Stryker challenged the Preliminary Determination, his award claim was elevated from the CRS directly to the Commission. As in *Mathews v. Eldridge*, these procedures were fully in accordance with the strictures of due process, enabling Stryker to "mold" his argument to respond to the precise issues which the CRS regarded as crucial in its Preliminary Determination.

Finally, in weighing the Government's interest, we note that "the Commission's primary

---

[44] *See id.* at 342 (finding that "significant" hardship imposed upon erroneously terminated disability recipient not sufficient to require an evidentiary hearing).

[45] *Mathews v. Eldridge*, 424 U.S. at 345-6.

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 19

goal, consistent with the congressional intent behind Section 21F, is to encourage the submission of high-quality information to facilitate the effectiveness and efficiency of the Commission's enforcement program."[46] If claimants were granted the extensive discovery rights that Stryker seeks, this would not only cause the "chilling effect on our decision-making process," as discussed above,[47] it would also inevitably lengthen the claims resolution process, delay the Commission's ability to pay awards to eligible whistleblowers, and, thereby, potentially discourage prospective whistleblowers from submitting information to the Commission.[48]

Accordingly, we find that Stryker received all of the discovery and other process that the rules provide and due process requires.

* * *

Finally, we take this opportunity to remind counsel that the Commission has a substantial interest in granting awards to whistleblower applicants who satisfy the statutory and regulatory criteria for an award. In furtherance of that interest, our goal is to work with whistleblowers and their counsel in a collaborative, non-adversarial manner to determine whether the whistleblowers satisfy the award criteria. We firmly believe that this approach best serves the interests of whistleblowers and the Commission, and thus should help maximize the award program's

---

[46] 76 Fed. Reg. at 34323.

[47] *See supra* n.41 and text therein.

[48] *See* 424 U.S. at 347 (1976) (in determining the appropriate process an agency owes to a claimant, a court must weigh in assessing the appropriate due process balance "the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases . . . .").

Notice of Covered Action 2011-4
*SEC v. Advanced Technologies Group LTD, Alexander Stelmak, and Abelis Raskas, LLC*, 10-cv-4868 (S.D.N.Y. 2011)
Page 20

overall effectiveness in the enforcement of the federal securities laws and the protection of investors.

## V.    Conclusion

It is ORDERED that Larry Stryker's whistleblower award claim be, and hereby is, denied.


By the Commission.

Elizabeth M. Murphy
Secretary

REFERENCES IN TEXT

This chapter, referred to in subsecs. (c)(1), (f), and (g), was in the original "this title". See References in Text note set out under section 78a of this title.

EFFECTIVE DATE

This section not to affect or apply to any private action arising under this chapter or title I of the Securities Act of 1933 (15 U.S.C. 77a et seq.), commenced before and pending on Dec. 22, 1995, see section 108 of Pub. L. 104–67, set out as an Effective Date of 1995 Amendment note under section 77l of this title.

CONSTRUCTION

Nothing in section to be deemed to create or ratify any implied right of action, or to prevent Commission. by rule or regulation, from restricting or otherwise regulating private actions under this chapter, see section 203 of Pub. L. 104–67, set out as a note under section 78j–1 of this title.

§ 78u–6. Securities whistleblower incentives and protection

(a) Definitions

In this section the following definitions shall apply:

(1) Covered judicial or administrative action

The term "covered judicial or administrative action" means any judicial or administrative action brought by the Commission under the securities laws that results in monetary sanctions exceeding $1,000,000.

(2) Fund

The term "Fund" means the Securities and Exchange Commission Investor Protection Fund.

(3) Original information

The term "original information" means information that—

(A) is derived from the independent knowledge or analysis of a whistleblower;

(B) is not known to the Commission from any other source, unless the whistleblower is the original source of the information; and

(C) is not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless the whistleblower is a source of the information.

(4) Monetary sanctions

The term "monetary sanctions", when used with respect to any judicial or administrative action, means—

(A) any monies, including penalties, disgorgement, and interest, ordered to be paid; and

(B) any monies deposited into a disgorgement fund or other fund pursuant to section 308(b) of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(b)), as a result of such action or any settlement of such action.

(5) Related action

The term "related action", when used with respect to any judicial or administrative action brought by the Commission under the securities laws, means any judicial or administrative action brought by an entity described in subclauses (I) through (IV) of subsection (h)(2)(D)(i) that is based upon the original information provided by a whistleblower pursuant to subsection (a) that led to the successful enforcement of the Commission action.

(6) Whistleblower

The term "whistleblower" means any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws to the Commission, in a manner established, by rule or regulation, by the Commission.

(b) Awards

(1) In general

In any covered judicial or administrative action, or related action, the Commission, under regulations prescribed by the Commission and subject to subsection (c), shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action, or related action, in an aggregate amount equal to—

(A) not less than 10 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions; and

(B) not more than 30 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions.

(2) Payment of awards

Any amount paid under paragraph (1) shall be paid from the Fund.

(c) Determination of amount of award; denial of award

(1) Determination of amount of award

(A) Discretion

The determination of the amount of an award made under subsection (b) shall be in the discretion of the Commission.

(B) Criteria

In determining the amount of an award made under subsection (b), the Commission—

(i) shall take into consideration—

(I) the significance of the information provided by the whistleblower to the success of the covered judicial or administrative action;

(II) the degree of assistance provided by the whistleblower and any legal representative of the whistleblower in a covered judicial or administrative action;

(III) the programmatic interest of the Commission in deterring violations of the securities laws by making awards to whistleblowers who provide information that lead to the successful enforcement of such laws; and

(IV) such additional relevant factors as the Commission may establish by rule or regulation; and

(ii) shall not take into consideration the balance of the Fund.

**(2) Denial of award**

No award under subsection (b) shall be made—

  (A) to any whistleblower who is, or was at the time the whistleblower acquired the original information submitted to the Commission, a member, officer, or employee of—

    (i) an appropriate regulatory agency;

    (ii) the Department of Justice;

    (iii) a self-regulatory organization;

    (iv) the Public Company Accounting Oversight Board; or

    (v) a law enforcement organization;

  (B) to any whistleblower who is convicted of a criminal violation related to the judicial or administrative action for which the whistleblower otherwise could receive an award under this section;

  (C) to any whistleblower who gains the information through the performance of an audit of financial statements required under the securities laws and for whom such submission would be contrary to the requirements of section 78j–1 of this title; or

  (D) to any whistleblower who fails to submit information to the Commission in such form as the Commission may, by rule, require.

**(d) Representation**

**(1) Permitted representation**

Any whistleblower who makes a claim for an award under subsection (b) may be represented by counsel.

**(2) Required representation**

**(A) In general**

Any whistleblower who anonymously makes a claim for an award under subsection (b) shall be represented by counsel if the whistleblower anonymously submits the information upon which the claim is based.

**(B) Disclosure of identity**

Prior to the payment of an award, a whistleblower shall disclose the identity of the whistleblower and provide such other information as the Commission may require, directly or through counsel for the whistleblower.

**(e) No contract necessary**

No contract with the Commission is necessary for any whistleblower to receive an award under subsection (b), unless otherwise required by the Commission by rule or regulation.

**(f) Appeals**

Any determination made under this section, including whether, to whom, or in what amount to make awards, shall be in the discretion of the Commission. Any such determination, except the determination of the amount of an award if the award was made in accordance with subsection (b), may be appealed to the appropriate court of appeals of the United States not more than 30 days after the determination is issued by the Commission. The court shall review the determination made by the Commission in accordance with section 706 of title 5.

**(g) Investor Protection Fund**

**(1) Fund established**

There is established in the Treasury of the United States a fund to be known as the "Securities and Exchange Commission Investor Protection Fund".

**(2) Use of Fund**

The Fund shall be available to the Commission, without further appropriation or fiscal year limitation, for—

  (A) paying awards to whistleblowers as provided in subsection (b); and

  (B) funding the activities of the Inspector General of the Commission under section 78d(i) of this title.

**(3) Deposits and credits**

**(A) In general**

There shall be deposited into or credited to the Fund an amount equal to—

  (i) any monetary sanction collected by the Commission in any judicial or administrative action brought by the Commission under the securities laws that is not added to a disgorgement fund or other fund under section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246) or otherwise distributed to victims of a violation of the securities laws, or the rules and regulations thereunder, underlying such action, unless the balance of the Fund at the time the monetary sanction is collected exceeds $300,000,000;

  (ii) any monetary sanction added to a disgorgement fund or other fund under section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246) that is not distributed to the victims for whom the Fund was established, unless the balance of the disgorgement fund at the time the determination is made not to distribute the monetary sanction to such victims exceeds $200,000,000; and

  (iii) all income from investments made under paragraph (4).

**(B) Additional amounts**

If the amounts deposited into or credited to the Fund under subparagraph (A) are not sufficient to satisfy an award made under subsection (b), there shall be deposited into or credited to the Fund an amount equal to the unsatisfied portion of the award from any monetary sanction collected by the Commission in the covered judicial or administrative action on which the award is based.

**(4) Investments**

**(A) Amounts in Fund may be invested**

The Commission may request the Secretary of the Treasury to invest the portion of the Fund that is not, in the discretion of the Commission, required to meet the current needs of the Fund.

**(B) Eligible investments**

Investments shall be made by the Secretary of the Treasury in obligations of the United States or obligations that are guar-

anteed as to principal and interest by the United States, with maturities suitable to the needs of the Fund as determined by the Commission on the record.

**(C) Interest and proceeds credited**

The interest on, and the proceeds from the sale or redemption of, any obligations held in the Fund shall be credited to the Fund.

**(5) Reports to Congress**

Not later than October 30 of each fiscal year beginning after July 21, 2010, the Commission shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives a report on—

(A) the whistleblower award program, established under this section, including—

(i) a description of the number of awards granted; and

(ii) the types of cases in which awards were granted during the preceding fiscal year;

(B) the balance of the Fund at the beginning of the preceding fiscal year;

(C) the amounts deposited into or credited to the Fund during the preceding fiscal year;

(D) the amount of earnings on investments made under paragraph (4) during the preceding fiscal year;

(E) the amount paid from the Fund during the preceding fiscal year to whistleblowers pursuant to subsection (b);

(F) the balance of the Fund at the end of the preceding fiscal year; and

(G) a complete set of audited financial statements, including—

(i) a balance sheet;

(ii) income statement; and

(iii) cash flow analysis.

**(h) Protection of whistleblowers**

**(1) Prohibition against retaliation**

**(A) In general**

No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower—

(i) in providing information to the Commission in accordance with this section;

(ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or

(iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter, section 1513(e) of title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

**(B) Enforcement**

**(i) Cause of action**

An individual who alleges discharge or other discrimination in violation of subparagraph (A) may bring an action under this subsection in the appropriate district court of the United States for the relief provided in subparagraph (C).

**(ii) Subpoenas**

A subpoena requiring the attendance of a witness at a trial or hearing conducted under this section may be served at any place in the United States.

**(iii) Statute of limitations**

**(I) In general**

An action under this subsection may not be brought—

(aa) more than 6 years after the date on which the violation of subparagraph (A) occurred; or

(bb) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the employee alleging a violation of subparagraph (A).

**(II) Required action within 10 years**

Notwithstanding subclause (I), an action under this subsection may not in any circumstance be brought more than 10 years after the date on which the violation occurs.

**(C) Relief**

Relief for an individual prevailing in an action brought under subparagraph (B) shall include—

(i) reinstatement with the same seniority status that the individual would have had, but for the discrimination;

(ii) 2 times the amount of back pay otherwise owed to the individual, with interest; and

(iii) compensation for litigation costs, expert witness fees, and reasonable attorneys' fees.

**(2) Confidentiality**

**(A) In general**

Except as provided in subparagraphs (B) and (C), the Commission and any officer or employee of the Commission shall not disclose any information, including information provided by a whistleblower to the Commission, which could reasonably be expected to reveal the identity of a whistleblower, except in accordance with the provisions of section 552a of title 5, unless and until required to be disclosed to a defendant or respondent in connection with a public proceeding instituted by the Commission or any entity described in subparagraph (C). For purposes of section 552 of title 5, this paragraph shall be considered a statute described in subsection (b)(3)(B) of such section.

**(B) Exempted statute**

For purposes of section 552 of title 5, this paragraph shall be considered a statute described in subsection (b)(3)(B) of such section 552.

**(C) Rule of construction**

Nothing in this section is intended to limit, or shall be construed to limit, the

ability of the Attorney General to present such evidence to a grand jury or to share such evidence with potential witnesses or defendants in the course of an ongoing criminal investigation.

**(D) Availability to government agencies**

**(i) In general**

Without the loss of its status as confidential in the hands of the Commission, all information referred to in subparagraph (A) may, in the discretion of the Commission, when determined by the Commission to be necessary to accomplish the purposes of this chapter and to protect investors, be made available to—

(I) the Attorney General of the United States;

(II) an appropriate regulatory authority;

(III) a self-regulatory organization;

(IV) a State attorney general in connection with any criminal investigation;

(V) any appropriate State regulatory authority;

(VI) the Public Company Accounting Oversight Board;

(VII) a foreign securities authority; and

(VIII) a foreign law enforcement authority.

**(ii) Confidentiality**

**(I) In general**

Each of the entities described in subclauses (I) through (VI) of clause (i) shall maintain such information as confidential in accordance with the requirements established under subparagraph (A).

**(II) Foreign authorities**

Each of the entities described in subclauses (VII) and (VIII) of clause (i) shall maintain such information in accordance with such assurances of confidentiality as the Commission determines appropriate.

**(3) Rights retained**

Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any whistleblower under any Federal or State law, or under any collective bargaining agreement.

**(i) Provision of false information**

A whistleblower shall not be entitled to an award under this section if the whistleblower—

(1) knowingly and willfully makes any false, fictitious, or fraudulent statement or representation; or

(2) uses any false writing or document knowing the writing or document contains any false, fictitious, or fraudulent statement or entry.

**(j) Rulemaking authority**

The Commission shall have the authority to issue such rules and regulations as may be necessary or appropriate to implement the provisions of this section consistent with the purposes of this section.

(June 6, 1934, ch. 404, title I, §21F, as added Pub. L. 111–203, title IX, §922(a), July 21, 2010, 124 Stat. 1841.)

REFERENCES IN TEXT

The Sarbanes-Oxley Act of 2002, referred to in subsec. (h)(1)(A)(iii), is Pub. L. 107–204, July 30, 2002, 116 Stat. 745. For complete classification of this Act to the Code, see Short Title note set out under section 7201 of this title and Tables.

This chapter, referred to in subsec. (h)(1)(A)(iii), was in the original ''the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.)''. This chapter, referred to in subsec. (h)(2)(D)(i), was in the original ''this Act''. See References in Text note set out under section 78a of this title.

EFFECTIVE DATE

Section effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as a note under section 5301 of Title 12, Banks and Banking.

**§ 78u–7. Implementation and transition provisions for whistleblower protection**

**(a) Implementing rules**

The Commission shall issue final regulations implementing the provisions of section 78u–6 of this title, as added by this subtitle, not later than 270 days after July 21, 2010.

**(b) Original information**

Information provided to the Commission in writing by a whistleblower shall not lose the status of original information (as defined in section 78u–6(a)(3) of this title, as added by this subtitle) solely because the whistleblower provided the information prior to the effective date of the regulations, if the information is provided by the whistleblower after July 21, 2010.

**(c) Awards**

A whistleblower may receive an award pursuant to section 78u–6 of this title, as added by this subtitle, regardless of whether any violation of a provision of the securities laws, or a rule or regulation thereunder, underlying the judicial or administrative action upon which the award is based, occurred prior to July 21, 2010.

**(d) Administration and enforcement**

The Securities and Exchange Commission shall establish a separate office within the Commission to administer and enforce the provisions of section 78u–6 of this title (as add[1] by section 922(a)).[2] Such office shall report annually to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives on its activities, whistleblower complaints, and the response of the Commission to such complaints.

(Pub. L. 111–203, title IX, §924, July 21, 2010, 124 Stat. 1850.)

REFERENCES IN TEXT

This subtitle, referred to in subsecs. (a) to (c), means subtitle B (§§921–929Z) of title IX of Pub. L. 111–203.

Section 922(a), referred to in subsec. (d), means section 922(a) of Pub. L. 111–203.

CODIFICATION

Section was enacted as part of the Investor Protection and Securities Reform Act of 2010, and also as part

---

[1] So in original. Probably should be ''added''.
[2] See References in Text note below.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

**Securities and Exchange Commission** §240.21F–1

by the staff of the Commission for consideration by the organization in its disposition of the matter or the incorporation by reference of such information, and a statement of the organization's views thereon; and

(9) Such other matters as the organization or person deems relevant.

If the application contains assertions of material facts not a matter of record before the organization, such facts shall be sworn to by affidavit of the person or organization offering such facts for Commission consideration.

(f) *Definitions.* For purposes of this rule:

(1) The term *applicable disqualification* shall mean:

(i) Any effective order of the Commission pursuant to section 15(b) (4) or (6), 15B(c) (2) or (4) or 19(h) (2) or (3) of the Act—

(A) Revoking, suspending or placing limitations on the registration, activities, functions, or operations of a broker or dealer;

(B) Suspending, barring, or placing limitations on the association, activities, or functions of an associated person of a broker or dealer;

(C) Suspending or expelling any person from membership or participation in a self-regulatory organization; or

(D) Suspending or barring any person from being associated with a member of a national securities exchange or registered securities association;

(ii) Any conviction of injunction of a type described in section 15(b)(4) (B) or (C) of the Act; or

(iii) A failure under the provisions of Rule G–4 of the Municipal Securities Rulemaking Board under the Act, to meet qualifications standards, and such failure may be remedied by a finding or determination by the Commission pursuant to such rule(s) that the person affected nevertheless meets such standards.

(2) The term *control* shall mean the power to direct or cause the direction of the management or policies of a company whether through ownership of securities, by contract or otherwise; *Provided, however,* That

(i) Any person who, directly or indirectly, (A) has the right to vote 10 percent or more of the voting securities, (B) is entitled to receive 10 percent or more of the net profits, or (C) is a director (or person occupying a similar status or performing similar functions) of a company shall be presumed to be a person who controls such company;

(ii) Any person not covered by paragraph (i) shall be presumed not to be a person who controls such company; and

(iii) Any presumption may be rebutted on an appropriate showing.

(g) Where it deems appropriate to do so, the Commission may determine whether to (1) direct, pursuant to section 6(c)(2), 15A(g)(2) or 17A(b)(4)(A) of the Act, that a proposed admission covered by a notice filed pursuant to paragraph (a) of this section shall be denied or an order barring a proposed association issued or (2) grant or deny an application filed pursuant to paragraph (d) of this section on the basis of the notice or application filed by the self-regulatory organization, the person subject to the disqualification, or other applicant (such as the proposed employer) on behalf of such person, without oral hearing. Any request for oral hearing or argument should be submitted with the notice or application.

(h) The Rules of Practice (17 CFR part 201) shall apply to proceedings under this rule to the extent that they are not inconsistent with this rule.

(15 U.S.C. 78a et seq., as amended by Pub. L. 94–29 (June 4, 1975) and by Pub. L. 98–38 (June 6, 1983), particularly secs. 11A, 15, 19 and 23 thereof (15 U.S.C. 78k–1, 78o, 78s and 78w))

[46 FR 58661, Dec. 3, 1981, as amended at 48 FR 53691, Nov. 29, 1983]

SECURITIES WHISTLEBLOWER INCENTIVES AND PROTECTIONS

SOURCE: Sections 240.21F–1 through 240.21F–17 appear at 76 FR 34363, June 13, 2011.

§240.21F–1 General.

Section 21F of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. 78u–6), entitled "Securities Whistleblower Incentives and Protection," requires the Securities and Exchange Commission ("Commission") to pay awards, subject to certain limitations and conditions, to whistleblowers who provide the Commission with original information about violations of the Federal securities laws. These

599

rules describe the whistleblower program that the Commission has established to implement the provisions of Section 21F, and explain the procedures you will need to follow in order to be eligible for an award. You should read these procedures carefully because the failure to take certain required steps within the time frames described in these rules may disqualify you from receiving an award for which you otherwise may be eligible. Unless expressly provided for in these rules, no person is authorized to make any offer or promise, or otherwise to bind the Commission with respect to the payment of any award or the amount thereof. The Securities and Exchange Commission's Office of the Whistleblower administers our whistleblower program. Questions about the program or these rules should be directed to the SEC Office of the Whistleblower, 100 F Street, NE., Washington, DC 20549–5631.

### § 240.21F–2 Whistleblower status and retaliation protection.

(a) *Definition of a whistleblower.* (1) You are a whistleblower if, alone or jointly with others, you provide the Commission with information pursuant to the procedures set forth in § 240.21F–9(a) of this chapter, and the information relates to a possible violation of the Federal securities laws (including any rules or regulations thereunder) that has occurred, is ongoing, or is about to occur. A whistleblower must be an individual. A company or another entity is not eligible to be a whistleblower.

(2) To be eligible for an award, you must submit original information to the Commission in accordance with the procedures and conditions described in §§ 240.21F–4, 240.21F–8, and 240.21F–9 of this chapter.

(b) *Prohibition against retaliation.* (1) For purposes of the anti-retaliation protections afforded by Section 21F(h)(1) of the Exchange Act (15 U.S.C. 78u–6(h)(1)), you are a whistleblower if:

(i) You possess a reasonable belief that the information you are providing relates to a possible securities law violation (or, where applicable, to a possible violation of the provisions set forth in 18 U.S.C. 1514A(a)) that has oc-

curred, is ongoing, or is about to occur, and;

(ii) You provide that information in a manner described in Section 21F(h)(1)(A) of the Exchange Act (15 U.S.C. 78u–6(h)(1)(A)).

(iii) The anti-retaliation protections apply whether or not you satisfy the requirements, procedures and conditions to qualify for an award.

(2) Section 21F(h)(1) of the Exchange Act (15 U.S.C. 78u–6(h)(1)), including any rules promulgated thereunder, shall be enforceable in an action or proceeding brought by the Commission.

### § 240.21F–3 Payment of awards.

(a) *Commission actions:* Subject to the eligibility requirements described in §§ 240.21F–2, 240.21F–8, and 240.21F–16 of this chapter, the Commission will pay an award or awards to one or more whistleblowers who:

(1) Voluntarily provide the Commission

(2) With original information

(3) That leads to the successful enforcement by the Commission of a Federal court or administrative action

(4) In which the Commission obtains monetary sanctions totaling more than $1,000,000.

NOTE TO PARAGRAPH (a): The terms *voluntarily, original information, leads to successful enforcement, action,* and *monetary sanctions* are defined in § 240.21F–4 of this chapter.

(b) *Related actions:* The Commission will also pay an award based on amounts collected in certain related actions.

(1) A *related action* is a judicial or administrative action that is brought by:

(i) The Attorney General of the United States;

(ii) An appropriate regulatory authority;

(iii) A self-regulatory organization; or

(iv) A state attorney general in a criminal case, and is based on the same original information that the whistleblower voluntarily provided to the Commission, and that led the Commission to obtain monetary sanctions totaling more than $1,000,000.

NOTE TO PARAGRAPH (b)(1): The terms *appropriate regulatory authority* and *self-regulatory organization* are defined in § 240.21F–4 of this chapter.



**Securities and Exchange Commission**

(2) In order for the Commission to make an award in connection with a related action, the Commission must determine that the same original information that the whistleblower gave to the Commission also led to the successful enforcement of the related action under the same criteria described in these rules for awards made in connection with Commission actions. The Commission may seek assistance and confirmation from the authority bringing the related action in making this determination. The Commission will deny an award in connection with the related action if:

(i) The Commission determines that the criteria for an award are not satisfied; or

(ii) The Commission is unable to make a determination because the Office of the Whistleblower could not obtain sufficient and reliable information that could be used as the basis for an award determination pursuant to § 240.21F–12(a) of this chapter. Additional procedures apply to the payment of awards in related actions. These procedures are described in §§ 240.21F–11 and 240.21F–14 of this chapter.

(3) The Commission will not make an award to you for a related action if you have already been granted an award by the Commodity Futures Trading Commission ("CFTC") for that same action pursuant to its whistleblower award program under Section 23 of the Commodity Exchange Act (7 U.S.C. 26). Similarly, if the CFTC has previously denied an award to you in a related action, you will be precluded from relitigating any issues before the Commission that the CFTC resolved against you as part of the award denial.

**§ 240.21F–4 Other definitions.**

(a) *Voluntary submission of information.* (1) Your submission of information is made *voluntarily* within the meaning of §§ 240.21F–1 through 240.21F–17 of this chapter if you provide your submission before a request, inquiry, or demand that relates to the subject matter of your submission is directed to you or anyone representing you (such as an attorney):

(i) By the Commission;

(ii) In connection with an investigation, inspection, or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or

(iii) In connection with an investigation by Congress, any other authority of the Federal government, or a state Attorney General or securities regulatory authority.

(2) If the Commission or any of these other authorities direct a request, inquiry, or demand as described in paragraph (a)(1) of this section to you or your representative first, your submission will not be considered voluntary, and you will not be eligible for an award, even if your response is not compelled by subpoena or other applicable law. However, your submission of information to the Commission will be considered voluntary if you voluntarily provided the same information to one of the other authorities identified above prior to receiving a request, inquiry, or demand from the Commission.

(3) In addition, your submission will not be considered voluntary if you are required to report your original information to the Commission as a result of a pre-existing legal duty, a contractual duty that is owed to the Commission or to one of the other authorities set forth in paragraph (a)(1) of this section, or a duty that arises out of a judicial or administrative order.

(b) *Original information.* (1) In order for your whistleblower submission to be considered *original information*, it must be:

(i) Derived from your independent knowledge or independent analysis;

(ii) Not already known to the Commission from any other source, unless you are the original source of the information;

(iii) Not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless you are a source of the information; and

(iv) Provided to the Commission for the first time after July 21, 2010 (the date of enactment of the *Dodd-Frank Wall Street Reform and Consumer Protection Act*).

(2) *Independent knowledge* means factual information in your possession

601

that is not derived from publicly available sources. You may gain independent knowledge from your experiences, communications and observations in your business or social interactions.

(3) *Independent analysis* means your own analysis, whether done alone or in combination with others. *Analysis* means your examination and evaluation of information that may be publicly available, but which reveals information that is not generally known or available to the public.

(4) The Commission will not consider information to be derived from your independent knowledge or independent analysis in any of the following circumstances:

(i) If you obtained the information through a communication that was subject to the attorney-client privilege, unless disclosure of that information would otherwise be permitted by an attorney pursuant to § 205.3(d)(2) of this chapter, the applicable state attorney conduct rules, or otherwise;

(ii) If you obtained the information in connection with the legal representation of a client on whose behalf you or your employer or firm are providing services, and you seek to use the information to make a whistleblower submission for your own benefit, unless disclosure would otherwise be permitted by an attorney pursuant to § 205.3(d)(2) of this chapter, the applicable state attorney conduct rules, or otherwise;

(iii) In circumstances not covered by paragraphs (b)(4)(i) or (b)(4)(ii) of this section, if you obtained the information because you were:

(A) An officer, director, trustee, or partner of an entity and another person informed you of allegations of misconduct, or you learned the information in connection with the entity's processes for identifying, reporting, and addressing possible violations of law;

(B) An employee whose principal duties involve compliance or internal audit responsibilities, or you were employed by or otherwise associated with a firm retained to perform compliance or internal audit functions for an entity;

(C) Employed by or otherwise associated with a firm retained to conduct an inquiry or investigation into possible violations of law; or

(D) An employee of, or other person associated with, a public accounting firm, if you obtained the information through the performance of an engagement required of an independent public accountant under the Federal securities laws (other than an audit subject to § 240.21F–8(c)(4) of this chapter), and that information related to a violation by the engagement client or the client's directors, officers or other employees.

(iv) If you obtained the information by a means or in a manner that is determined by a United States court to violate applicable Federal or state criminal law; or

(v) *Exceptions.* Paragraph (b)(4)(iii) of this section shall not apply if:

(A) You have a reasonable basis to believe that disclosure of the information to the Commission is necessary to prevent the relevant entity from engaging in conduct that is likely to cause substantial injury to the financial interest or property of the entity or investors;

(B) You have a reasonable basis to believe that the relevant entity is engaging in conduct that will impede an investigation of the misconduct; or

(C) At least 120 days have elapsed since you provided the information to the relevant entity's audit committee, chief legal officer, chief compliance officer (or their equivalents), or your supervisor, or since you received the information, if you received it under circumstances indicating that the entity's audit committee, chief legal officer, chief compliance officer (or their equivalents), or your supervisor was already aware of the information.

(vi) If you obtained the information from a person who is subject to this section, unless the information is not excluded from that person's use pursuant to this section, or you are providing the Commission with information about possible violations involving that person.

(5) The Commission will consider you to be an *original source* of the same information that we obtain from another source if the information satisfies the

602

§ 240.21F–4

definition of original information and the other source obtained the information from you or your representative. In order to be considered an original source of information that the Commission receives from Congress, any other authority of the Federal government, a state Attorney General or securities regulatory authority, any self-regulatory organization, or the Public Company Accounting Oversight Board, you must have voluntarily given such authorities the information within the meaning of these rules. You must establish your status as the original source of information to the Commission's satisfaction. In determining whether you are the original source of information, the Commission may seek assistance and confirmation from one of the other authorities described above, or from another entity (including your employer), in the event that you claim to be the original source of information that an authority or another entity provided to the Commission.

(6) If the Commission already knows some information about a matter from other sources at the time you make your submission, and you are not an original source of that information under paragraph (b)(5) of this section, the Commission will consider you an original source of any information you provide that is derived from your independent knowledge or analysis and that materially adds to the information that the Commission already possesses.

(7) If you provide information to the Congress, any other authority of the Federal government, a state Attorney General or securities regulatory authority, any self-regulatory organization, or the Public Company Accounting Oversight Board, or to an entity's internal whistleblower, legal, or compliance procedures for reporting allegations of possible violations of law, and you, within 120 days, submit the same information to the Commission pursuant to § 240.21F–9 of this chapter, as you must do in order for you to be eligible to be considered for an award, then, for purposes of evaluating your claim to an award under §§ 240.21F–10 and 240.21F–11 of this chapter, the Commission will consider that you provided in-

formation as of the date of your original disclosure, report or submission to one of these other authorities or persons. You must establish the effective date of any prior disclosure, report, or submission, to the Commission's satisfaction. The Commission may seek assistance and confirmation from the other authority or person in making this determination.

(c) *Information that leads to successful enforcement.* The Commission will consider that you provided original information that led to the successful enforcement of a judicial or administrative action in any of the following circumstances:

(1) You gave the Commission original information that was sufficiently specific, credible, and timely to cause the staff to commence an examination, open an investigation, reopen an investigation that the Commission had closed, or to inquire concerning different conduct as part of a current examination or investigation, and the Commission brought a successful judicial or administrative action based in whole or in part on conduct that was the subject of your original information; or

(2) You gave the Commission original information about conduct that was already under examination or investigation by the Commission, the Congress, any other authority of the Federal government, a state Attorney General or securities regulatory authority, any self-regulatory organization, or the PCAOB (except in cases where you were an original source of this information as defined in paragraph (b)(4) of this section), and your submission significantly contributed to the success of the action.

(3) You reported original information through an entity's internal whistleblower, legal, or compliance procedures for reporting allegations of possible violations of law before or at the same time you reported them to the Commission; the entity later provided your information to the Commission, or provided results of an audit or investigation initiated in whole or in part in response to information you reported to the entity; and the information the entity provided to the Commission satisfies either paragraph (c)(1) or (c)(2) of

603

this section. Under this paragraph (c)(3), you must also submit the same information to the Commission in accordance with the procedures set forth in § 240.21F–9 within 120 days of providing it to the entity.

(d) An *action* generally means a single captioned judicial or administrative proceeding brought by the Commission. Notwithstanding the foregoing:

(1) For purposes of making an award under § 240.21F–10 of this chapter, the Commission will treat as a Commission action two or more administrative or judicial proceedings brought by the Commission if these proceedings arise out of the same nucleus of operative facts; or

(2) For purposes of determining the payment on an award under § 240.21F–14 of this chapter, the Commission will deem as part of the Commission action upon which the award was based any subsequent Commission proceeding that, individually, results in a monetary sanction of $1,000,000 or less, and that arises out of the same nucleus of operative facts.

(e) *Monetary sanctions* means any money, including penalties, disgorgement, and interest, ordered to be paid and any money deposited into a disgorgement fund or other fund pursuant to Section 308(b) of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(b)) as a result of a Commission action or a related action.

(f) *Appropriate regulatory agency* means the Commission, the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and any other agencies that may be defined as appropriate regulatory agencies under Section 3(a)(34) of the Exchange Act (15 U.S.C. 78c(a)(34)).

(g) *Appropriate regulatory authority* means an appropriate regulatory agency other than the Commission.

(h) *Self-regulatory organization* means any national securities exchange, registered securities association, registered clearing agency, the Municipal Securities Rulemaking Board, and any other organizations that may be defined as self-regulatory organizations

under Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26)).

§ 240.21F–5  Amount of award.

(a) The determination of the amount of an award is in the discretion of the Commission.

(b) If all of the conditions are met for a whistleblower award in connection with a Commission action or a related action, the Commission will then decide the percentage amount of the award applying the criteria set forth in § 240.21F–6 of this chapter and pursuant to the procedures set forth in §§ 240.21F–10 and 240.21F–11 of this chapter. The amount will be at least 10 percent and no more than 30 percent of the monetary sanctions that the Commission and the other authorities are able to collect. The percentage awarded in connection with a Commission action may differ from the percentage awarded in connection with a related action.

(c) If the Commission makes awards to more than one whistleblower in connection with the same action or related action, the Commission will determine an individual percentage award for each whistleblower, but in no event will the total amount awarded to all whistleblowers in the aggregate be less than 10 percent or greater than 30 percent of the amount the Commission or the other authorities collect.

§ 240.21F–6  Criteria for determining amount of award.

In exercising its discretion to determine the appropriate award percentage, the Commission may consider the following factors in relation to the unique facts and circumstances of each case, and may increase or decrease the award percentage based on its analysis of these factors. In the event that awards are determined for multiple whistleblowers in connection an action, these factors will be used to determine the relative allocation of awards among the whistleblowers.

(a) *Factors that may increase the amount of a whistleblower's award.* In determining whether to increase the amount of an award, the Commission will consider the following factors, which are not listed in order of importance.

(1) *Significance of the information provided by the whistleblower.* The Commission will assess the significance of the information provided by a whistleblower to the success of the Commission action or related action. In considering this factor, the Commission may take into account, among other things:

(i) The nature of the information provided by the whistleblower and how it related to the successful enforcement action, including whether the reliability and completeness of the information provided to the Commission by the whistleblower resulted in the conservation of Commission resources;

(ii) The degree to which the information provided by the whistleblower supported one or more successful claims brought in the Commission or related action.

(2) *Assistance provided by the whistleblower.* The Commission will assess the degree of assistance provided by the whistleblower and any legal representative of the whistleblower in the Commission action or related action. In considering this factor, the Commission may take into account, among other things:

(i) Whether the whistleblower provided ongoing, extensive, and timely cooperation and assistance by, for example, helping to explain complex transactions, interpreting key evidence, or identifying new and productive lines of inquiry;

(ii) The timeliness of the whistleblower's initial report to the Commission or to an internal compliance or reporting system of business organizations committing, or impacted by, the securities violations, where appropriate;

(iii) The resources conserved as a result of the whistleblower's assistance;

(iv) Whether the whistleblower appropriately encouraged or authorized others to assist the staff of the Commission who might otherwise not have participated in the investigation or related action;

(v) The efforts undertaken by the whistleblower to remediate the harm caused by the violations, including assisting the authorities in the recovery of the fruits and instrumentalities of the violations; and

(vi) Any unique hardships experienced by the whistleblower as a result of his or her reporting and assisting in the enforcement action.

(3) *Law enforcement interest.* The Commission will assess its programmatic interest in deterring violations of the securities laws by making awards to whistleblowers who provide information that leads to the successful enforcement of such laws. In considering this factor, the Commission may take into account, among other things:

(i) The degree to which an award enhances the Commission's ability to enforce the Federal securities laws and protect investors; and

(ii) The degree to which an award encourages the submission of high quality information from whistleblowers by appropriately rewarding whistleblowers' submission of significant information and assistance, even in cases where the monetary sanctions available for collection are limited or potential monetary sanctions were reduced or eliminated by the Commission because an entity self-reported a securities violation following the whistleblower's related internal disclosure, report, or submission.

(iii) Whether the subject matter of the action is a Commission priority, whether the reported misconduct involves regulated entities or fiduciaries, whether the whistleblower exposed an industry-wide practice, the type and severity of the securities violations, the age and duration of misconduct, the number of violations, and the isolated, repetitive, or ongoing nature of the violations; and

(iv) The dangers to investors or others presented by the underlying violations involved in the enforcement action, including the amount of harm or potential harm caused by the underlying violations, the type of harm resulting from or threatened by the underlying violations, and the number of individuals or entities harmed.

(4) *Participation in internal compliance systems.* The Commission will assess whether, and the extent to which, the whistleblower and any legal representative of the whistleblower participated in internal compliance systems. In considering this factor, the Commission


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

§ 240.21F–7

may take into account, among other things:

(i) Whether, and the extent to which, a whistleblower reported the possible securities violations through internal whistleblower, legal or compliance procedures before, or at the same time as, reporting them to the Commission; and

(ii) Whether, and the extent to which, a whistleblower assisted any internal investigation or inquiry concerning the reported securities violations.

(b) *Factors that may decrease the amount of a whistleblower's award.* In determining whether to decrease the amount of an award, the Commission will consider the following factors, which are not listed in order of importance.

(1) *Culpability.* The Commission will assess the culpability or involvement of the whistleblower in matters associated with the Commission's action or related actions. In considering this factor, the Commission may take into account, among other things:

(i) The whistleblower's role in the securities violations;

(ii) The whistleblower's education, training, experience, and position of responsibility at the time the violations occurred;

(iii) Whether the whistleblower acted with scienter, both generally and in relation to others who participated in the violations;

(iv) Whether the whistleblower financially benefitted from the violations;

(v) Whether the whistleblower is a recidivist;

(vi) The egregiousness of the underlying fraud committed by the whistleblower; and

(vii) Whether the whistleblower knowingly interfered with the Commission's investigation of the violations or related enforcement actions.

(2) *Unreasonable reporting delay.* The Commission will assess whether the whistleblower unreasonably delayed reporting the securities violations. In considering this factor, the Commission may take into account, among other things:

(i) Whether the whistleblower was aware of the relevant facts but failed to take reasonable steps to report or prevent the violations from occurring or continuing;

(ii) Whether the whistleblower was aware of the relevant facts but only reported them after learning about a related inquiry, investigation, or enforcement action; and

(iii) Whether there was a legitimate reason for the whistleblower to delay reporting the violations.

(3) *Interference with internal compliance and reporting systems.* The Commission will assess, in cases where the whistleblower interacted with his or her entity's internal compliance or reporting system, whether the whistleblower undermined the integrity of such system. In considering this factor, the Commission will take into account whether there is evidence provided to the Commission that the whistleblower knowingly:

(i) Interfered with an entity's established legal, compliance, or audit procedures to prevent or delay detection of the reported securities violation;

(ii) Made any material false, fictitious, or fraudulent statements or representations that hindered an entity's efforts to detect, investigate, or remediate the reported securities violations; and

(iii) Provided any false writing or document knowing the writing or document contained any false, fictitious or fraudulent statements or entries that hindered an entity's efforts to detect, investigate, or remediate the reported securities violations.

§ 240.21F–7 **Confidentiality of submissions.**

(a) Section 21F(h)(2) of the Exchange Act (15 U.S.C. 78u–6(h)(2)) requires that the Commission not disclose information that could reasonably be expected to reveal the identity of a whistleblower, except that the Commission may disclose such information in the following circumstances:

(1) When disclosure is required to a defendant or respondent in connection with a Federal court or administrative action that the Commission files or in another public action or proceeding that is filed by an authority to which we provide the information, as described below;

(2) When the Commission determines that it is necessary to accomplish the purposes of the Exchange Act (15 U.S.C.

606

78a) and to protect investors, it may provide your information to the Department of Justice, an appropriate regulatory authority, a state attorney general in connection with a criminal investigation, any appropriate state regulatory authority, the Public Company Accounting Oversight Board, or foreign securities and law enforcement authorities. Each of these entities other than foreign securities and law enforcement authorities is subject to the confidentiality requirements set forth in Section 21F(h) of the Exchange Act (15 U.S.C. 78u–6(h)). The Commission will determine what assurances of confidentiality it deems appropriate in providing such information to foreign securities and law enforcement authorities.

(3) The Commission may make disclosures in accordance with the Privacy Act of 1974 (5 U.S.C. 552a).

(b) You may submit information to the Commission anonymously. If you do so, however, you must also do the following:

(1) You must have an attorney represent you in connection with both your submission of information and your claim for an award, and your attorney's name and contact information must be provided to the Commission at the time you submit your information;

(2) You and your attorney must follow the procedures set forth in §240.21F–9 of this chapter for submitting original information anonymously; and

(3) Before the Commission will pay any award to you, you must disclose your identity to the Commission and your identity must be verified by the Commission as set forth in §240.21F–10 of this chapter.

### §240.21F–8  Eligibility.

(a) To be eligible for a whistleblower award, you must give the Commission information in the form and manner that the Commission requires. The procedures for submitting information and making a claim for an award are described in §240.21F–9 through §240.21F–11 of this chapter. You should read these procedures carefully because you need to follow them in order to be eligible for an award, except that the

Commission may, in its sole discretion, waive any of these procedures based upon a showing of extraordinary circumstances.

(b) In addition to any forms required by these rules, the Commission may also require that you provide certain additional information. You may be required to:

(1) Provide explanations and other assistance in order that the staff may evaluate and use the information that you submitted;

(2) Provide all additional information in your possession that is related to the subject matter of your submission in a complete and truthful manner, through follow-up meetings, or in other forms that our staff may agree to;

(3) Provide testimony or other evidence acceptable to the staff relating to whether you are eligible, or otherwise satisfy any of the conditions, for an award; and

(4) Enter into a confidentiality agreement in a form acceptable to the Office of the Whistleblower, covering any non-public information that the Commission provides to you, and including a provision that a violation of the agreement may lead to your ineligibility to receive an award.

(c) You are not eligible to be considered for an award if you do not satisfy the requirements of paragraphs (a) and (b) of this section. In addition, you are not eligible if:

(1) You are, or were at the time you acquired the original information provided to the Commission, a member, officer, or employee of the Commission, the Department of Justice, an appropriate regulatory agency, a self-regulatory organization, the Public Company Accounting Oversight Board, or any law enforcement organization;

(2) You are, or were at the time you acquired the original information provided to the Commission, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Exchange Act (15 U.S.C. 78c(a)(52));

(3) You are convicted of a criminal violation that is related to the Commission action or to a related action (as defined in § 240.21F–4 of this chapter) for which you otherwise could receive an award;

(4) You obtained the original information that you gave the Commission through an audit of a company's financial statements, and making a whistleblower submission would be contrary to requirements of Section 10A of the Exchange Act (15 U.S.C. 78j–a).

(5) You are the spouse, parent, child, or sibling of a member or employee of the Commission, or you reside in the same household as a member or employee of the Commission;

(6) You acquired the original information you gave the Commission from a person:

(i) Who is subject to paragraph (c)(4) of this section, unless the information is not excluded from that person's use, or you are providing the Commission with information about possible violations involving that person: or

(ii) With the intent to evade any provision of these rules: or

(7) In your whistleblower submission, your other dealings with the Commission, or your dealings with another authority in connection with a related action, you knowingly and willfully make any false, fictitious, or fraudulent statement or representation, or use any false writing or document knowing that it contains any false, fictitious, or fraudulent statement or entry with intent to mislead or otherwise hinder the Commission or another authority.

### § 240.21F–9  Procedures for submitting original information.

(a) To be considered a whistleblower under Section 21F of the Exchange Act (15 U.S.C. 78u–6(h)), you must submit your information about a possible securities law violation by either of these methods:

(1) Online, through the Commission's Web site located at *http://www.sec.gov*; or

(2) By mailing or faxing a Form TCR (Tip, Complaint or Referral) (referenced in § 249.1800 of this chapter) to the SEC Office of the Whistleblower,

100 F Street NE., Washington, DC 20549–5631, Fax (703) 813–9322.

(b) Further, to be eligible for an award, you must declare under penalty of perjury at the time you submit your information pursuant to paragraph (a)(1) or (2) of this section that your information is true and correct to the best of your knowledge and belief.

(c) Notwithstanding paragraphs (a) and (b) of this section, if you are providing your original information to the Commission anonymously, then your attorney must submit your information on your behalf pursuant to the procedures specified in paragraph (a) of this section. Prior to your attorney's submission, you must provide your attorney with a completed Form TCR (referenced in § 249.1800 of this chapter) that you have signed under penalty of perjury. When your attorney makes her submission on your behalf, your attorney will be required to certify that he or she:

(1) Has verified your identity;

(2) Has reviewed your completed and signed Form TCR (referenced in § 249.1800 of this chapter) for completeness and accuracy and that the information contained therein is true, correct and complete to the best of the attorney's knowledge, information and belief;

(3) Has obtained your non-waivable consent to provide the Commission with your original completed and signed Form TCR (referenced in § 249.1800 of this chapter) in the event that the Commission requests it due to concerns that you may have knowingly and willfully made false, fictitious, or fraudulent statements or representations, or used any false writing or document knowing that the writing or document contains any false fictitious or fraudulent statement or entry; and

(4) Consents to be legally obligated to provide the signed Form TCR (referenced in § 249.1800 of this chapter) within seven (7) calendar days of receiving such request from the Commission.

(d) If you submitted original information in writing to the Commission after July 21, 2010 (the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act) but before the effective date of these

rules, your submission will be deemed to satisfy the requirements set forth in paragraphs (a) and (b) of this section. If you were an anonymous whistleblower, however, you must provide your attorney with a completed and signed copy of Form TCR (referenced in §249.1800 of this chapter) within 60 days of the effective date of these rules, your attorney must retain the signed form in his or her records, and you must provide of copy of the signed form to the Commission staff upon request by Commission staff prior to any payment of an award to you in connection with your submission. Notwithstanding the foregoing, you must follow the procedures and conditions for making a claim for a whistleblower award described in §§240.21F–10 and 240.21F–11 of this chapter.

**§240.21F–10  Procedures for making a claim for a whistleblower award in SEC actions that result in monetary sanctions in excess of $1,000,000.**

(a) Whenever a Commission action results in monetary sanctions totaling more than $1,000,000, the Office of the Whistleblower will cause to be published on the Commission's Web site a "Notice of Covered Action." Such Notice will be published subsequent to the entry of a final judgment or order that alone, or collectively with other judgments or orders previously entered in the Commission action, exceeds $1,000,000; or, in the absence of such judgment or order subsequent to the deposit of a disgorgement or other fund pursuant to Section 308(b) of the Sarbanes-Oxley Act of 2002. A claimant will have ninety (90) days from the date of the Notice of Covered Action to file a claim for an award based on that action, or the claim will be barred.

(b) To file a claim for a whistleblower award, you must file Form WB-APP, *Application for Award for Original Information Provided Pursuant to Section 21F of the Securities Exchange Act of 1934* (referenced in §249.1801 of this chapter). You must sign this form as the claimant and submit it to the Office of the Whistleblower by mail or fax. All claim forms, including any attachments, must be received by the Office of the

Whistleblower within ninety (90) calendar days of the date of the Notice of Covered Action in order to be considered for an award.

(c) If you provided your original information to the Commission anonymously, you must disclose your identity on the Form WB-APP (referenced in §249.1801 of this chapter), and your identity must be verified in a form and manner that is acceptable to the Office of the Whistleblower prior to the payment of any award.

(d) Once the time for filing any appeals of the Commission's judicial or administrative action has expired, or where an appeal has been filed, after all appeals in the action have been concluded, the staff designated by the Director of the Division of Enforcement ("Claims Review Staff") will evaluate all timely whistleblower award claims submitted on Form WB-APP (referenced in §249.1801 of this chapter) in accordance with the criteria set forth in these rules. In connection with this process, the Office of the Whistleblower may require that you provide additional information relating to your eligibility for an award or satisfaction of any of the conditions for an award, as set forth in §240.21F–(8)(b) of this chapter. Following that evaluation, the Office of the Whistleblower will send you a Preliminary Determination setting forth a preliminary assessment as to whether the claim should be allowed or denied and, if allowed, setting forth the proposed award percentage amount.

(e) You may contest the Preliminary Determination made by the Claims Review Staff by submitting a written response to the Office of the Whistleblower setting forth the grounds for your objection to either the denial of an award or the proposed amount of an award. The response must be in the form and manner that the Office of the Whistleblower shall require. You may also include documentation or other evidentiary support for the grounds advanced in your response.

(1) Before determining whether to contest a Preliminary Determination, you may:

(i) Within thirty (30) days of the date of the Preliminary Determination, request that the Office of the Whistleblower make available for your review

609



the materials from among those set forth in § 240.21F–12(a) of this chapter that formed the basis of the Claims Review Staff's Preliminary Determination.

(ii) Within thirty (30) calendar days of the date of the Preliminary Determination, request a meeting with the Office of the Whistleblower; however, such meetings are not required and the office may in its sole discretion decline the request.

(2) If you decide to contest the Preliminary Determination, you must submit your written response and supporting materials within sixty (60) calendar days of the date of the Preliminary Determination, or if a request to review materials is made pursuant to paragraph (e)(1) of this section, then within sixty (60) calendar days of the Office of the Whistleblower making those materials available for your review.

(f) If you fail to submit a timely response pursuant to paragraph (e) of this section, then the Preliminary Determination will become the Final Order of the Commission (except where the Preliminary Determination recommended an award, in which case the Preliminary Determination will be deemed a Proposed Final Determination for purposes of paragraph (h) of this section). Your failure to submit a timely response contesting a Preliminary Determination will constitute a failure to exhaust administrative remedies, and you will be prohibited from pursuing an appeal pursuant to § 240.21F–13 of this chapter.

(g) If you submit a timely response pursuant to paragraph (e) of this section, then the Claims Review Staff will consider the issues and grounds advanced in your response, along with any supporting documentation you provided, and will make its Proposed Final Determination.

(h) The Office of the Whistleblower will then notify the Commission of each Proposed Final Determination. Within thirty 30 days thereafter, any Commissioner may request that the Proposed Final Determination be reviewed by the Commission. If no Commissioner requests such a review within the 30-day period, then the Proposed Final Determination will become the

Final Order of the Commission. In the event a Commissioner requests a review, the Commission will review the record that the staff relied upon in making its determinations, including your previous submissions to the Office of the Whistleblower, and issue its Final Order.

(i) The Office of the Whistleblower will provide you with the Final Order of the Commission.

§ 240.21F–11  Procedures for determining awards based upon a related action.

(a) If you are eligible to receive an award following a Commission action that results in monetary sanctions totaling more than $1,000,000, you also may be eligible to receive an award based on the monetary sanctions that are collected from a related action (as defined in § 240.21F–3 of this chapter).

(b) You must also use Form WB–APP (referenced in § 249.1801 of this chapter) to submit a claim for an award in a related action. You must sign this form as the claimant and submit it to the Office of the Whistleblower by mail or fax as follows:

(1) If a final order imposing monetary sanctions has been entered in a related action at the time you submit your claim for an award in connection with a Commission action, you must submit your claim for an award in that related action on the same Form WB–APP (referenced in § 249.1801 of this chapter) that you use for the Commission action.

(2) If a final order imposing monetary sanctions in a related action has not been entered at the time you submit your claim for an award in connection with a Commission action, you must submit your claim on Form WB–APP (referenced in § 249.1801 of this chapter) within ninety (90) days of the issuance of a final order imposing sanctions in the related action.

(c) The Office of the Whistleblower may request additional information from you in connection with your claim for an award in a related action to demonstrate that you directly (or through the Commission) voluntarily provided the governmental agency, regulatory authority or self-regulatory

610

organization the same original information that led to the Commission's successful covered action, and that this information led to the successful enforcement of the related action. The Office of the Whistleblower may, in its discretion, seek assistance and confirmation from the other agency in making this determination.

(d) Once the time for filing any appeals of the final judgment or order in a related action has expired, or if an appeal has been filed, after all appeals in the action have been concluded, the Claims Review Staff will evaluate all timely whistleblower award claims submitted on Form WB-APP (referenced in §249.1801 of this chapter) in connection with the related action. The evaluation will be undertaken pursuant to the criteria set forth in these rules. In connection with this process, the Office of the Whistleblower may require that you provide additional information relating to your eligibility for an award or satisfaction of any of the conditions for an award, as set forth in §240.21F-(8)(b) of this chapter. Following this evaluation, the Office of the Whistleblower will send you a Preliminary Determination setting forth a preliminary assessment as to whether the claim should be allowed or denied and, if allowed, setting forth the proposed award percentage amount.

(e) You may contest the Preliminary Determination made by the Claims Review Staff by submitting a written response to the Office of the Whistleblower setting forth the grounds for your objection to either the denial of an award or the proposed amount of an award. The response must be in the form and manner that the Office of the Whistleblower shall require. You may also include documentation or other evidentiary support for the grounds advanced in your response.

(1) Before determining whether to contest a Preliminary Determination, you may:

(i) Within thirty (30) days of the date of the Preliminary Determination, request that the Office of the Whistleblower make available for your review the materials from among those set forth in §240.21F-12(a) of this chapter that formed the basis of the Claims Re-

view Staff's Preliminary Determination.

(ii) Within thirty (30) days of the date of the Preliminary Determination, request a meeting with the Office of the Whistleblower; however, such meetings are not required and the office may in its sole discretion decline the request.

(2) If you decide to contest the Preliminary Determination, you must submit your written response and supporting materials within sixty (60) calendar days of the date of the Preliminary Determination, or if a request to review materials is made pursuant to paragraph (e)(1)(i) of this section, then within sixty (60) calendar days of the Office of the Whistleblower making those materials available for your review.

(f) If you fail to submit a timely response pursuant to paragraph (e) of this section, then the Preliminary Determination will become the Final Order of the Commission (except where the Preliminary Determination recommended an award, in which case the Preliminary Determination will be deemed a Proposed Final Determination for purposes of paragraph (h) of this section). Your failure to submit a timely response contesting a Preliminary Determination will constitute a failure to exhaust administrative remedies, and you will be prohibited from pursuing an appeal pursuant to §240.21F-13 of this chapter.

(g) If you submit a timely response pursuant to paragraph (e) of this section, then the Claims Review Staff will consider the issues and grounds that you advanced in your response, along with any supporting documentation you provided, and will make its Proposed Final Determination.

(h) The Office of the Whistleblower will notify the Commission of each Proposed Final Determination. Within thirty 30 days thereafter, any Commissioner may request that the Proposed Final Determination be reviewed by the Commission. If no Commissioner requests such a review within the 30-day period, then the Proposed Final Determination will become the Final Order of the Commission. In the event a Commissioner requests a review, the Commission will review the record that

611

Case 13-4404, Document 43, 03/25/2014, 1186242, Page107 of 135

the staff relied upon in making its determinations, including your previous submissions to the Office of the Whistleblower, and issue its Final Order.

(i) The Office of the Whistleblower will provide you with the Final Order of the Commission.

§ 240.21F–12 Materials that may form the basis of an award determination and that may comprise the record on appeal.

(a) The following items constitute the materials that the Commission and the Claims Review Staff may rely upon to make an award determination pursuant to §§ 240.21F–10 and 240.21F–11 of this chapter:

(1) Any publicly available materials from the covered action or related action, including:

(i) The complaint, notice of hearing, answers and any amendments thereto;

(ii) The final judgment, consent order, or final administrative order;

(iii) Any transcripts of the proceedings, including any exhibits;

(iv) Any items that appear on the docket; and

(v) Any appellate decisions or orders.

(2) The whistleblower's Form TCR (referenced in § 249.1800 of this chapter), including attachments, and other related materials provided by the whistleblower to assist the Commission with the investigation or examination;

(3) The whistleblower's Form WB–APP (referenced in § 249.1800 of this chapter), including attachments, and any other filings or submissions from the whistleblower in support of the award application;

(4) Sworn declarations (including attachments) from the Commission staff regarding any matters relevant to the award determination;

(5) With respect to an award claim involving a related action, any statements or other information that the entity provides or identifies in connection with an award determination, provided the entity has authorized the Commission to share the information with the claimant. (Neither the Commission nor the Claims Review Staff may rely upon information that the entity has not authorized the Commission to share with the claimant); and

(6) Any other documents or materials including sworn declarations from

third-parties that are received or obtained by the Office of the Whistleblower to assist the Commission resolve the claimant's award application, including information related to the claimant's eligibility. (Neither the Commission nor the Claims Review Staff may rely upon information that the entity has not authorized the Commission to share with the claimant).

(b) These rules do not entitle claimants to obtain from the Commission any materials (including any predecisional or internal deliberative process materials that are prepared exclusively to assist the Commission in deciding the claim) other than those listed in paragraph (a) of this section. Moreover, the Office of the Whistleblower may make redactions as necessary to comply with any statutory restrictions, to protect the Commission's law enforcement and regulatory functions, and to comply with requests for confidential treatment from other law enforcement and regulatory authorities. The Office of the Whistleblower may also require you to sign a confidentiality agreement, as set forth in § 240.21F–(8)(b)(4) of this chapter, before providing these materials.

§ 240.21F–13 Appeals.

(a) Section 21F of the Exchange Act (15 U.S.C. 78u–6) commits determinations of whether, to whom, and in what amount to make awards to the Commission's discretion. A determination of whether or to whom to make an award may be appealed within 30 days after the Commission issues its final decision to the United States Court of Appeals for the District of Columbia Circuit, or to the circuit where the aggrieved person resides or has his principal place of business. Where the Commission makes an award based on the factors set forth in § 240.21F–6 of this chapter of not less than 10 percent and not more than 30 percent of the monetary sanctions collected in the Commission or related action, the Commission's determination regarding the amount of an award (including the allocation of an award as between multiple whistleblowers, and any factual

612


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

**Securities and Exchange Commission** §240.21F–16

findings, legal conclusions, policy judgments, or discretionary assessments involving the Commission's consideration of the factors in §240.21F–6 of this chapter) is not appealable.

(b) The record on appeal shall consist of the Preliminary Determination, the Final Order of the Commission, and any other items from those set forth in §240.21F–12(a) of this chapter that either the claimant or the Commission identifies for inclusion in the record. The record on appeal shall not include any pre-decisional or internal deliberative process materials that are prepared exclusively to assist the Commission in deciding the claim (including the staff's Draft Final Determination in the event that the Commissioners reviewed the claim and issued the Final Order).

### §240.21F–14 Procedures applicable to the payment of awards.

(a) Any award made pursuant to these rules will be paid from the Securities and Exchange Commission Investor Protection Fund (the "Fund").

(b) A recipient of a whistleblower award is entitled to payment on the award only to the extent that a monetary sanction is collected in the Commission action or in a related action upon which the award is based.

(c) Payment of a whistleblower award for a monetary sanction collected in a Commission action or related action shall be made following the later of:

(1) The date on which the monetary sanction is collected; or

(2) The completion of the appeals process for all whistleblower award claims arising from:

(i) The Notice of Covered Action, in the case of any payment of an award for a monetary sanction collected in a Commission action; or

(ii) The related action, in the case of any payment of an award for a monetary sanction collected in a related action.

(d) If there are insufficient amounts available in the Fund to pay the entire amount of an award payment within a reasonable period of time from the time for payment specified by paragraph (c) of this section, then subject to the following terms, the balance of the payment shall be paid when amounts become available in the Fund, as follows:

(1) Where multiple whistleblowers are owed payments from the Fund based on awards that do not arise from the same Notice of Covered Action (or related action), priority in making these payments will be determined based upon the date that the collections for which the whistleblowers are owed payments occurred. If two or more of these collections occur on the same date, those whistleblowers owed payments based on these collections will be paid on a pro rata basis until sufficient amounts become available in the Fund to pay their entire payments.

(2) Where multiple whistleblowers are owed payments from the Fund based on awards that arise from the same Notice of Covered Action (or related action), they will share the same payment priority and will be paid on a pro rata basis until sufficient amounts become available in the Fund to pay their entire payments.

### §240.21F–15 No amnesty.

The Securities Whistleblower Incentives and Protection provisions do not provide amnesty to individuals who provide information to the Commission. The fact that you may become a whistleblower and assist in Commission investigations and enforcement actions does not preclude the Commission from bringing an action against you based upon your own conduct in connection with violations of the Federal securities laws. If such an action is determined to be appropriate, however, the Commission will take your cooperation into consideration in accordance with its Policy Statement Concerning Cooperation by Individuals in Investigations and Related Enforcement Actions (17 CFR 202.12).

### §240.21F–16 Awards to whistleblowers who engage in culpable conduct.

In determining whether the required $1,000,000 threshold has been satisfied (this threshold is further explained in §240.21F–10 of this chapter) for purposes of making any award, the Commission will not take into account any monetary sanctions that the whistleblower is ordered to pay, or that are ordered against any entity whose liability is

613


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

§ 240.21F–17

based substantially on conduct that the whistleblower directed, planned, or initiated. Similarly, if the Commission determines that a whistleblower is eligible for an award, any amounts that the whistleblower or such an entity pay in sanctions as a result of the action or related actions will not be included within the calculation of the amounts collected for purposes of making payments.

### § 240.21F–17 Staff communications with individuals reporting possible securities law violations.

(a) No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement (other than agreements dealing with information covered by § 240.21F–4(b)(4)(i) and § 240.21F–4(b)(4)(ii) of this chapter related to the legal representation of a client) with respect to such communications.

(b) If you are a director, officer, member, agent, or employee of an entity that has counsel, and you have initiated communication with the Commission relating to a possible securities law violation, the staff is authorized to communicate directly with you regarding the possible securities law violation without seeking the consent of the entity's counsel.

INSPECTION AND PUBLICATION OF
INFORMATION FILED UNDER THE ACT

### § 240.24b–1 Documents to be kept public by exchanges.

Upon action of the Commission granting an exchange's application for registration or exemption, the exchange shall make available to public inspection at its offices during reasonable office hours a copy of the statement and exhibits filed with the Commission (including any amendments thereto) except those portions thereof to the disclosure of which the exchange shall have filed objection pursuant to § 240.24b–2 which objection shall not have been overruled by the Commission pursuant to section 24(b) of the Act.

(Sec. 24, 48 Stat. 901; 15 U.S.C. 78x)

17 CFR Ch. II (4–1–13 Edition)

CROSS REFERENCE: For regulations relating to registration and exemption of exchanges. see §§ 240.6a–1 to 240.6a–3.

[13 FR 8214, Dec. 22, 1948]

### § 240.24b–2 Nondisclosure of information filed with the Commission and with any exchange.

PRELIMINARY NOTE: Confidential treatment requests shall be submitted in paper format only, whether or not the filer is required to submit a filing in electronic format.

(a) Any person filing any registration statement, report, application, statement, correspondence, notice or other document (herein referred to as the material filed) pursuant to the Act may make written objection to the public disclosure of any information contained therein in accordance with the procedure set forth below. The procedure provided in this rule shall be the exclusive means of requesting confidential treatment of information required to be filed under the Act.

(b) The person shall omit from material filed the portion thereof which it desires to keep undisclosed (hereinafter called the confidential portion). In lieu thereof, it shall indicate at the appropriate place in the material filed that the confidential portion has been so omitted and filed separately with the Commission. The person shall file with the copies of the material filed with the Commission:

(1) One copy of the confidential portion, marked "Confidential Treatment," of the material filed with the Commission. The copy shall contain an appropriate identification of the item or other requirement involved and, notwithstanding that the confidential portion does not constitute the whole of the answer, the entire answer thereto; except that in the case where the confidential portion is part of a financial statement or schedule, only the particular financial statement or schedule need be included. The copy of the confidential portion shall be in the same form as the remainder of the material filed;

(2) An application making objection to the disclosure of the confidential portion. Such application shall be on a sheet or sheets separate from the confidential portion, and shall contain (i) an identification of the portion; (ii) a

# COMPARISON BETWEEN THE STATUTORY DEFINITION OF "ORIGINAL INFORMATION" AND THE DEFINITION APPROVED BY THE SEC

## STATUTORY DEFINITION

**Dodd Frank Act**
**15 U.S.C. § 78u-6(a)(3)**

**(a)** DEFINITIONS.—In this section the following definitions **shall apply** . . .
**(3)** ORIGINAL INFORMATION.—The term "original information" **means** information that—
**(A)** is derived from the independent knowledge or analysis of a whistleblower;
**(B)** is not known to the Commission from any other source, unless the whistleblower is the original source of the information; and
**(C)** is not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless the whistleblower is a source of the information.

## SEC'S DEFINITION

**Securities and Exchange Commission**
**17 C.F.R. § 240.21F-4(b)**

(b) *Original information.* (1) In order for your whistleblower submission to be considered original information, it must be:
(i) Derived from your independent knowledge or independent analysis;
(ii) Not already known to the Commission from any other source, unless you are the original source of the information;
(iii) Not exclusively derived from an allegation made in a judicial or administrative hearing, in a governmental report, hearing, audit, or investigation, or from the news media, unless you are a source of the information; and
(iv) **Provided to the Commission for the first time after July 21, 2010 (the date of enactment of the *Dodd-Frank Wall Street Reform and Consumer Protection Act*).**

[Note: Emphasis Added to Highlight Differences between Statute and Rule]



# Calendar No. 349

| 111TH CONGRESS 2d Session | SENATE | REPORT 111–176 |
|---|---|---|

## THE RESTORING AMERICAN FINANCIAL STABILITY ACT OF 2010

APRIL 30, 2010.—Ordered to be printed

Mr. DODD, from the Committee on Banking, Housing, and Urban Affairs, submitted the following

## R E P O R T

together with

## MINORITY VIEWS

[To accompany S. 3217]

The Committee on Banking, Housing, and Urban Affairs, having considered the original bill (S. 3217) to promote the financial stability of the United States by improving accountability and transparency in the financial system, to end "too big to fail", to protect the American taxpayer by ending bailouts, to protect consumers from abusive financial services practices, and for other purposes, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

### CONTENTS

| | |
|---|---|
| I. Introduction | 2 |
| II. Purpose and Scope of the Legislation | 2 |
| III. Background and Need for Legislation | 39 |
| IV. History of the Legislation | 44 |
| V. Section-by-Section Analysis of Bill | 46 |
| VI. Hearing Record | 186 |
| VII. Committee Consideration | 203 |
| VIII. Congressional Budget Office Cost Estimate | 203 |
| IX. Regulatory Impact Statement | 227 |
| X. Changes In Existing Law (Cordon Rule) | 230 |
| XI. Minority Views | 231 |

89–010

110

municipal securities dealer to arbitrate any dispute between them. This provision was included in the Treasury Department's legislative proposal.[172]

There have been concerns over the past several years that mandatory pre-dispute arbitration is unfair to the investors. In a letter to Chairman Dodd and Ranking Member Shelby, AARP expressed support for this provision. In listing some of the problems with mandatory pre-dispute arbitration, the letter identified "high upfront costs; limited access to documents and other key information; limited knowledge upon which to base the choice of arbitrator; the absence of a requirement that arbitrators follow the law or issue written decisions; and extremely limited grounds for appeal."[173]

The North American Securities Administrators Association also supports this provision, stating in testimony that a "major step toward improving the integrity of the arbitration system is the removal of the mandatory industry arbitrator. This mandatory industry arbitrator, with their industry ties, automatically puts the investor at an unfair disadvantage."[174] The Consumer Federation of America,[175] AARP,[176] and the Public Investors Arbitration Bar Association support this approach.[177]

## Section 922. Whistleblower protection

The Whistleblower Program, established and administered by the Securities and Exchange Commission, is intended to provide monetary rewards to those who contribute "original information" that lead to recoveries of monetary sanctions of $1,000,000 or more in criminal and civil proceedings. The genesis of the program is found in President Obama's June 2009 financial regulatory reform proposal.[178] A similar provision was included in the House of Representatives financial reform bill (H.R. 4173).

The Whistleblower Program aims to motivate those with inside knowledge to come forward and assist the Government to identify and prosecute persons who have violated securities laws and recover money for victims of financial fraud. In a testimony for the Senate Banking Committee, Certified Fraud Examiner and Madoff whistleblower Harry Markopolos testified in support of creating a strong Whistleblower Program. He cited statistics showing the efficiency of Whistleblower Programs: "whistleblower tips detected 54.1% of uncovered fraud schemes in public companies. External auditors, and the SEC exam teams would certainly be considered external auditors, detected a mere 4.1% of uncovered fraud schemes. Whistleblower tips were 13 times more effective than external audits, hence my recommendation to the SEC to encourage

---

[172] *FACT SHEET: ADMINISTRATION'S REGULATORY REFORM AGENDA MOVES FORWARD; Legislation for Strengthening Investor Protection Delivered to Capitol Hill*, U.S. Department of the Treasury, Press Release, July 10, 2009, *www.financialstability.gov*.

[173] AARP, letter to Senators Dodd and Shelby, November 19, 2009.

[174] *Enhancing Investor Protection and the Regulation of Securities Markets—Part II: Testimony before the U.S. Senate Committee on Banking, Housing, and Urban Affairs*, 111th Congress, 1st session, p.18 (2009) (Testimony of Mr. Fred Joseph).

[175] Consumer Federation of America (November 10, 2009), "CFA Applauds Introduction of Senator Dodd's Financial Reform Package," Press release, *www.consumerfed.org*.

[176] AARP, letter to Senators Dodd and Shelby, November 19, 2009.

[177] The following article references the Public Investors Arbitration Bar Association's support for this provision: "Death Knell For Mandatory Arbitration," Helen Kearney, *On Wall Street*, August 1, 2009.

[178] *Fact Sheet: Administration's Regulatory Reform Agenda Moves Forward; Legislation for Strengthening Investor Protection Delivered to Capitol Hill*, U.S. Department of the Treasury, Press Release, July 10, 2009. Available at *http://www.financialstability.gov*.

111

the submission of whistleblower tips." [179] In his letter to Senator Dodd, SEC Inspector General David Kotz also recommended a similar Whistleblower Program.[180]

Recognizing that whistleblowers often face the difficult choice between telling the truth and the risk of committing "career suicide", the program provides for amply rewarding whistleblower(s), with between 10% and 30% of any monetary sanctions that are collected based on the "original information" offered by the whistleblower. The program is modeled after a successful IRS Whistleblower Program enacted into law in 2006. The reformed IRS program, which, too, has a similar minimum-maximum award levels and an appeals process,[181] is credited to have reinvigorated the earlier, largely ineffective, IRS Whistleblower Program. The Committee feels the critical component of the Whistleblower Program is the minimum payout that any individual could look towards in determining whether to take the enormous risk of blowing the whistle in calling attention to fraud.

We also note a recent report of the current SEC insider-trading Whistleblower Program by the Office of Inspector General of SEC. Since the inception of the program in 1989, there have been a total of only seven payouts to five whistleblowers for a meager total of $159,537.[182] In the report, the Inspector General recommends several important guidelines that any current or future SEC Whistleblower Programs should follow, including: development of specific criteria for bounty awards (including a provision to award whistleblowers that partly rely upon public information), development of tips and complaints tracking systems, incorporating best practices from DOJ and IRS's Whistleblower Programs, and establishment of a timeframe for the new policies.

"Original information" is defined as information that is derived from the independent analysis or knowledge of the whistleblower, and is not derived from an allegation in court or government reports, and is not exclusively from news media. In circumstances when bits and pieces of the whistleblower's information were known to the media prior to the emergence of the whistleblower, and that for the purposes of the SEC enforcement [183] the critical components of the information was supplied by the whistleblower, the intent of the Committee is to require the SEC to reward such person(s) in accordance with the degree of assistance that was provided. The rewards are to be from the Investor Protection Fund, which receives funds from sanctions collected based on civil enforcement and from other funds within SEC that are otherwise not distributed to investors (i.e., unused disgorgement funds). Whenever a whistleblower or whistleblowers tip leads the SEC to collect sanctions and penalties that are determined to be distributed to the victims of the fraud, the intent of the Committee is to reward

---

[179] "Oversight of the SEC's Failure to Identify the Bernard L. Madoff Ponzi Scheme and How to Improve SEC Performance: Testimony before the U.S. Senate Committee on Banking, Housing, and Urban Affairs", 111th Congress, 1st session, p.33 (2009) (Testimony of Mr. Harry Markopolos).

[180] Inspector General H. David Kotz, letter to Senator Dodd, October 29, 2009.

[181] Like the IRS program, the new SEC Whistleblower Program provides for an appeals process, the appropriate court of appeals will review the determination made by the Commission in accordance with section 706 of title 5 of U.S. Code (i.e., abuse of discretion).

[182] "Assessment of the SEC's Bounty Program", Office of Inspector General, U.S. Securities and Exchange Commission, Report No. 474, March 29, 2010.

[183] Same would apply to cases when SEC forwards criminal cases to DOJ that lead to penalties and sanctions.

112

the whistleblower prior or at the same time as paying such victims, recognizing that were it not for the whistleblower's actions, there would have been no discovery of the harm to the investors and no collection of any sanctions for their benefit.

The SEC has discretion in determining the amount and whether or not a whistleblower is eligible to be awarded. In cases when whistleblowers feel that the SEC had abused its discretion in determining the amount of the award, they have the right to appeal, within 30 days of the decision to a court of appeals. The court is to review the determination in accordance with section 706 of title 5 of U.S. Code. The Committee feels that this review process will significantly contribute to make the program reliable for persons who are contemplating whether or not to blow the whistle on fraud. It will add to the notion of enforceable payout. The Committee, having heard from several parties involved in whistleblower related cases, has determined that enforceability and relatively predictable level of payout will go a long way to motivate potential whistleblowers to come forward and help the Government identify and prosecute fraudsters. Whistleblowers who are employees of an appropriate regulatory agency, DOJ, SROs, PCAOB, accountants in certain circumstances, or a law enforcement organization are generally not eligible for an award. Also not eligible are whistleblowers who are convicted of a criminal violation related to the case at hand.

The Committee intends for this program to be used actively with ample rewards to promote the integrity of the financial markets.

The program also requires the SEC to annually report back to Congress, among other things, with details regarding the number and types of awards granted. It also provides for various protections for whistleblowers, specifically barring employers to discharge, demote, suspend, threaten, harass directly or indirectly, or in any other manner discriminate. The provision also makes it unlawful to knowingly and willfully make any false, fictitious or fraudulent statement or representation, or use any false writing or document knowing the writing or document contains any false, fictitious, or fraudulent statement or entry. Following the enactment of the Act, the SEC will have 270 days to issue final regulations implementing the provisions of the Act.

*Section 923. Conforming amendments for whistleblower protection*

*Section 923. contains conforming amendments for whistleblower protection.*

*Section 924. Implementation and transition provisions for whistleblower protection*

Section 924 contains implementation and transition provisions for whistleblower provisions. The section directs the SEC to issue final regulations implementing the provisions of section 21F of the Securities Exchange Act of 1934 within 270 days within enactment of the Act.

*Section 925. Collateral bars*

Section 925 gives the SEC the authority to bar individuals from being associated with various registered securities market participants after violating the law while associated in only one area.



U.S. Securities and Exchange Commission
# Office of Inspector General
Office of Audits

# Assessment of the SEC's Bounty Program



March 29, 2010
Report No. 474

**Results.** Although the SEC has had a bounty program in-place for more than 20 years for rewarding whistleblowers for insider trading tips and complaints, our review found that there have been very few payments made under this program. Likewise, the Commission has not received a large number of applications from individuals seeking a bounty over this 20-year period. We also found that the program is not widely recognized inside or outside the Commission. Additionally, while the Commission recently asked for expanded authority from Congress to reward whistleblowers who bring forward substantial evidence about other significant federal securities law violations, we found that the current SEC bounty program is not fundamentally well-designed to be successful.

More specifically, we found that improvements are needed to the bounty application process to make it more user-friendly and help ensure that bounty applications provide detailed information regarding the alleged securities law violations. We also found that the criteria for judging bounty applications are broad and the SEC has not put in place internal policies and procedures to assist staff in assessing contributions made by whistleblowers and making bounty award determinations. Additionally, we found that the Commission does not routinely provide status reports to whistleblowers regarding their bounty applications, even if a whistleblower's information led to an investigation. Moreover, we found that once bounty applications are received by the SEC and forwarded to appropriate staff for review and further consideration, they are not tracked to ensure they are timely and adequately reviewed. Lastly, we found that files regarding bounty referrals did not always contain complete documentation, such as a copy of the bounty application, a memorandum sent to the whistleblower to acknowledge receipt of the application, and a referral memorandum showing the office or division and official to whom the bounty application was referred for further consideration.

We wish to note that the SEC has begun to take steps to correct the deficiencies identified in its whistleblower/bounty program. The SEC has had consultations with the Department of Justice (DOJ), Internal Revenue Service (IRS), and other agencies, as well as the Financial Industry Regulatory Authority, to identify best practices from existing well-defined whistleblower programs. The SEC has also attempted to incorporate some of these best practices into legislation which it is seeking from Congress to include expanded authority to reward whistleblowers for securities law violations. The proposed legislation also takes into account some issues identified in this report in connection with the existing insider trading bounty program.

We believe that it is critical for the SEC to implement the following recommendations to ensure that it has a fully-functioning and successful whistleblower program in place as its authority is potentially expanded.

# Findings and Recommendations

We found that while a bounty program has been in place at the SEC for more than 20 years, there have been very few payments made by the Commission under the program. Likewise, the Commission has not received a large number of applications from individuals seeking a bounty. The program is also not widely recognized inside or outside the Commission. We also found that the SEC bounty program is limited to insider trading cases and the stated criteria for judging bounty applications are broad, somewhat vague and not subject to judicial review.

In addition, we generally found that bounty applications the Commission received were acknowledged in writing and were then forwarded to appropriate senior-level staff in headquarters and the regional offices for further consideration. However, bounty applications were not adequately tracked to ensure timely and adequate handling of the information. We did find that the Commission made formal determinations and notified bounty claimants, accordingly, with respect to all persons the Commission deemed eligible for award in accordance with the statute. We also found that on the few occasions when the Commission has made an award, it has paid the maximum allowed by the statute.

We further identified areas that need increased management controls with regard to the bounty application process, maintenance of files pertaining to bounty applications, and correspondence with whistleblowers regarding the status of their bounty applications.

Lastly, we identified several best practices utilized by agencies with similar programs that should be adopted by the SEC in developing a successful bounty program.

## Finding 1: SEC Bounty Program Has Made Very Few Payments and Received a Relatively Small Number of Bounty Applications

The SEC bounty program has made very few payments to whistleblowers since its inception and received a relatively small number of bounty applications. As a result, the program's success has been minimal and its existence is practically unknown.

Since the inception of the SEC bounty program in 1989, the SEC has paid a total of $159,537 to five claimants as detailed in Table 1 below.

Table 1: Bounty Payments to Whistleblowers

| Bounty Claimant | Year | Bounty Amount |
|---|---|---|
| 1) Claimant 1 | 1989 | $3,500 |
| 2) Claimant 2 | 2001 | $18,152 |
| 3) Claimant 3 | 2002 | $29,079 |
| 4) Claimant 4 | 2005 | $17,500 |
| 4) Claimant 4 | 2006 | $29,920 |
| 4) Claimant 4 | 2009 | $55,220 |
| 5) Claimant 5 | 2007 | $6,166 |
| Total | | $159,537 |

Source: OIG Generated

As Table 1 illustrates, Claimant 4 received three payments because the information provided by the claimant led to the filing of three separate insider trading cases. All payments were for the 10 percent maximum amount permitted by statute.

The Commission also formally denied five bounty applications since the inception of the program as summarized below.

- In 1990, the Commission denied a bounty request to Claimant 6 on the grounds that the statute did not authorize payment for information provided prior to its effective date.

- In 1990, the Commission denied a bounty request to Claimant 7 on the same ground asserted in the aforementioned bounty request for Claimant 6.

- In 1996, the Commission denied a bounty request to Claimant 8 because, as with the aforementioned two bounty requests, Claimant 8 had provided information prior to the effective date of the statute. However, Claimant 8 also provided additional information after the effective date of the statute. SEC staff recommended denial of the bounty request on the grounds that the latter information did not result in the addition of any defendants, securities transactions or violations to the complaint.

# U.S. Securities and Exchange Commission

## Annual Report on the Dodd-Frank Whistleblower Program

## Fiscal Year 2011



This is a Report of the Staff of the
U.S. Securities and Exchange Commission.
The Commission has expressed no view regarding
the analysis, findings, or conclusions contained herein.

November 2011

## VI.   Securities and Exchange Commission Investor Protection Fund

Section 922 of the Dodd-Frank Act established the Securities and Exchange Commission Investor Protection Fund ("Fund") to provide funding for the Commission's whistleblower award program, including the payment of awards in related actions.[16]  In addition, the Fund is used to finance the operations of the SEC Office of the Inspector General's suggestion program.[17]  The suggestion program is intended for the receipt of suggestions from Commission employees for improvements in the work efficiency, effectiveness, and productivity, and use of resources at the Commission, as well as allegations by Commission employees of waste, abuse, misconduct, or mismanagement within the Commission.[18]

As of September 30, 2011, the Fund was fully funded, with an ending balance of $452,788,043.74.

|  | FY 2011 | FY 2010 |
|---|---|---|
| Balance of Fund at beginning of preceding fiscal year | $451,909,854.07 | $0.00 |
| Amounts deposited into or credited to Fund during preceding fiscal year | $0.00 | $451,909,854.07 |
| Amount of earnings on investments during preceding fiscal year | $990,562.11 | $0.00 |
| Amount paid from Fund during preceding fiscal year to whistleblowers | $0.00 | $0.00 |
| Amount disbursed to Office of the Inspector General during preceding fiscal year | ($112,372.44) | $0.00 |
| Balance of Fund at end of the preceding fiscal year | $452,788,043.74 | $451,909,854.07 |

---

[16] See Exchange Act §21F(g)(2)(A)

[17] See Exchange Act §21F(g)(2)(B), which provides that the Fund shall be available to the Commission for "funding the activities of the Inspector General of the Commission under section 4(i)."  The Office of the General Counsel has interpreted section 21F(G)(2)(B) to refer to Section 4D of the Exchange Act, which establishes the Inspector General's suggestion program.  Subsection (e) of that section provides that the "activities of the Inspector General under this subsection shall be funded by the Securities and Exchange Commission Investor Protection Fund established under section 21F."

[18] See Exchange Act §4D(a).

9

# U.S. Securities and Exchange Commission

## Annual Report on the Dodd-Frank Whistleblower Program

## Fiscal Year 2012



This is a Report of the Staff of the
U.S. Securities and Exchange Commission.
The Commission has expressed no view regarding
the analysis, findings, or conclusions contained herein.

November 2012

September 30, 2012, the Fund was fully funded, with an ending balance of $453,429,825.58.

|  | FY 2012 |
|---|---|
| Balance of Fund at beginning of fiscal year | $452,788,043.74 |
| Amounts deposited into or credited to Fund during fiscal year | $0.00[19] |
| Amount of earnings on investments during fiscal year | $757,248.07 |
| Amount paid from Fund during fiscal year to whistleblowers | ($45,739.16) |
| Amount disbursed to Office of the Inspector General during fiscal year | ($69,727.07) |
| Balance of Fund at end of the fiscal year | $453,429,825.58 |

The audited financial statements for the Fund, including a balance sheet, income statement, and cash flow analysis are included in the Commission's Agency Financial Report, separately submitted to Congress and accessible at http://www.sec.gov/about/secafr2012.shtml.

---

[19] Pursuant to Exchange Act § 21F(g)(3), no monetary sanctions are deposited into or credited to the Fund if the balance of the Fund exceeds certain thresholds at the time the monetary sanctions are collected.

10

Add.    54

U.S. SECURITIES AND EXCHANGE COMMISSION

**2013 ANNUAL REPORT TO CONGRESS ON THE**

# Dodd-Frank Whistleblower Program



## SECURITIES AND EXCHANGE COMMISSION INVESTOR PROTECTION FUND

Section 922 of the Dodd-Frank Act established the Fund to provide funding for the Commission's whistleblower award program, including the payment of awards in related actions.[23] In addition, the Fund is used to finance the operations of the SEC's OIG's suggestion program.[24] The suggestion program is intended for the receipt of suggestions from Commission employees for improvements in work efficiency, effectiveness, productivity, and the use of resources at the Commission, as well as allegations by Commission employees of waste, abuse, misconduct, or mismanagement within the Commission.[25]

Section 21F(g)(5) of the Exchange Act requires certain Fund information to be reported to Congress on an annual basis. Below is a chart containing Fund-related information for Fiscal Year 2013[26]:

| | |
|---|---|
| Balance of Fund at beginning of fiscal year | $453,429,825.58 |
| Amounts deposited into or credited to Fund during fiscal year | $0.00[27] |
| Amount of earnings on investments during fiscal year | $650,206.56 |
| Amount paid from Fund during fiscal year to whistleblowers | ($14,831,965.64) |
| Amount disbursed to Office of the Inspector General during fiscal year | ($51,457.14) |
| Balance of Fund at end of the fiscal year | $439,196,609.36 |

In addition, Section 21F(g)(5) of the Exchange Act requires a complete set of audited financial statements for the Fund, including a balance sheet, income sheet, income statement, and cash flow analysis. That information is included in the Commission's Agency Financial Report, which is being submitted separately to Congress.

---

[23] Section 21F(g)(2)(A) of the Exchange Act, 15 U.S.C. § 78u-6(g)(2)(A).

[24] Section 21F(g)(2)(B) of the Exchange Act provides that the Fund shall be available to the Commission for "funding the activities of the Inspector General of the Commission under section 4(i)." 15 U.S.C. § 78u-6(g)(2)(B). The Office of the General Counsel has interpreted Section 21F(g)(2)(B) to refer to Section 4D of the Exchange Act, which establishes the Inspector General's suggestion program. Subsection (e) of that section provides that the "activities of the Inspector General under this subsection shall be funded by the Securities and Exchange Commission Investor Protection Fund established under Section 21F." 15 U.S.C. § 78d-4(e).

[25] Section 4D(a) of the Exchange Act, 15 U.S.C. § 78d-4(a).

[26] As referenced above, the financial information on the Fund contained in this report is unaudited, and Congress will receive the audited financial information on the Fund when the Commission submits its 2013 Agency Financial Report.

[27] Pursuant to Section 21F(g)(3) of the Exchange Act, no monetary sanctions are deposited into or credited to the Fund if the balance of the Fund exceeds certain thresholds at the time the monetary sanctions are collected.



I

111TH CONGRESS
1ST SESSION **H. R. 3817**

To provide the Securities and Exchange Commission with additional authorities to protect investors from violations of the securities laws, and for other purposes.

_____

## IN THE HOUSE OF REPRESENTATIVES

OCTOBER 15, 2009

Mr. KANJORSKI introduced the following bill; which was referred to the Committee on Financial Services

_____

# A BILL

To provide the Securities and Exchange Commission with additional authorities to protect investors from violations of the securities laws, and for other purposes.

1     *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 **SECTION 1. SHORT TITLE.**

4     This Act may be cited as the "Investor Protection

5 Act of 2009.".

6 **SEC. 2. TABLE OF CONTENTS.**

7     The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.

TITLE I—DISCLOSURE

18

1 **SEC. 202. WHISTLEBLOWER PROTECTION.**

2 The Securities Exchange Act of 1934 (15 U.S.C. 78a

3 et seq.) is amended by adding after section 21E the fol-

4 lowing new section:

5 **"SEC. 21F. SECURITIES WHISTLEBLOWER INCENTIVES AND**

6 **PROTECTION.**

7 "(a) IN GENERAL.—In any judicial or administrative

8 action brought by the Commission under the securities

9 laws that results in monetary sanctions exceeding

10 $1,000,000, the Commission, under regulations prescribed

11 by the Commission and subject to subsection (b), may pay

12 an award or awards not exceeding an amount equal to 30

13 percent, in total, of the monetary sanctions imposed in the

14 action or related actions to one or more whistleblowers

15 who voluntarily provided original information to the Com-

16 mission that led to the successful enforcement of the ac-

17 tion. Any amount payable under the preceding sentence

18 shall be paid from the fund described in subsection (f).

19 "(b) DETERMINATION OF AMOUNT OF AWARD; DE-

20 NIAL OF AWARD.—

21 "(1) DETERMINATION OF AMOUNT OF

22 AWARD.—The determination of the amount of an

23 award, within the limit specified in subsection (a),

24 shall be in the sole discretion of the Commission.

25 The Commission may take into account the signifi-

26 cance of the whistleblower's information to the suc-

•HR 3817 IH

Add. 58

20

1          "(C) to any whistleblower who fails to sub-

2         mit information to the Commission in such

3         form as the Commission may, by rule, require.

4   "(c) REPRESENTATION.—

5       "(1) PERMITTED REPRESENTATION.—Any

6   whistleblower who makes a claim for an award under

7   subsection (a) may be represented by counsel.

8       "(2) REQUIRED REPRESENTATION.—Any whis-

9   tleblower who makes a claim for an award under

10   subsection (a) must be represented by counsel if the

11   whistleblower submits the information upon which

12   the claim is based anonymously. Prior to the pay-

13   ment of an award, the whistleblower must disclose

14   his or her identity and provide such other informa-

15   tion as the Commission may require.

16   "(d) NO CONTRACT NECESSARY.—No contract with

17 the Commission is necessary for any whistleblower to re-

18 ceive an award under subsection (a), unless the Commis-

19 sion, by rule or regulation, so requires.

20   "(e) APPEALS.—Any determinations under this sec-

21 tion, including whether, to whom, or in what amounts to

22 make awards, shall be in the sole discretion of the Com-

23 mission, and any such determinations shall be final and

24 not subject to judicial review.

25   "(f) INVESTOR PROTECTION FUND.—

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

IIB

111TH CONGRESS
2D SESSION

# H. R. 4173

## IN THE SENATE OF THE UNITED STATES

JANUARY 20, 2010

Received; read twice and referred to the Committee on Banking, Housing, and Urban Affairs

# AN ACT

To provide for financial regulatory reform, to protect consumers and investors, to enhance Federal understanding of insurance issues, to regulate the over-the-counter derivatives markets, and for other purposes.

1       *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

1294

1   (3) other additional issues as may be raised

2  during the course of the study conducted under this

3  subsection.

4  (b) REPORT.—Not later than 1 year after the date

5 of enactment of this subtitle, the Comptroller General of

6 the United States shall submit to the Committee on Fi-

7 nancial Services of the House of Representatives and the

8 Committee on Banking, Housing, and Urban Affairs of

9 the Senate a report on the results of the study required

10 by subsection (a), including in such report recommenda-

11 tions for improvements to the arbitration system ref-

12 erenced in such subsection.

13 **SEC. 7203. WHISTLEBLOWER PROTECTION.**

14  (a) IN GENERAL.—The Securities Exchange Act of

15 1934 (15 U.S.C. 78a et seq.) is amended by adding after

16 section 21E the following new section:

17 **"SEC. 21F. SECURITIES WHISTLEBLOWER INCENTIVES AND**

18    **PROTECTION.**

19  "(a) IN GENERAL.—In any judicial or administrative

20 action brought by the Commission under the securities

21 laws that results in monetary sanctions exceeding

22 $1,000,000, the Commission, under regulations prescribed

23 by the Commission and subject to subsection (b), may pay

24 an award or awards not exceeding an amount equal to 30

25 percent, in total, of the monetary sanctions imposed in the

1297

1     "(2) REQUIRED REPRESENTATION.—Any whis-
2     tleblower who makes a claim for an award under
3     subsection (a) must be represented by counsel if the
4     whistleblower submits the information upon which
5     the claim is based anonymously. Prior to the pay-
6     ment of an award, the whistleblower must disclose
7     his or her identity and provide such other informa-
8     tion as the Commission may require.

9     "(d) NO CONTRACT NECESSARY.—No contract with
10   the Commission is necessary for any whistleblower to re-
11   ceive an award under subsection (a), unless the Commis-
12   sion, by rule or regulation, so requires.

13   "(e) APPEALS.—Any determinations under this sec-
14   tion, including whether, to whom, or in what amounts to
15   make awards, shall be in the sole discretion of the Com-
16   mission, and any such determinations shall be final and
17   not subject to judicial review.

18   "(f) INVESTOR PROTECTION FUND.—

19       "(1) FUND ESTABLISHED.—There is estab-
20       lished in the Treasury of the United States a fund
21       to be known as the 'Securities and Exchange Com-
22       mission Investor Protection Fund' (referred to in
23       this section as the 'Fund').

24       "(2) USE OF FUND.—The Fund shall be avail-
25       able to the Commission, without further appropria-

HR 4173 RFS

Add.    62



LAW LIBRARIANS' SOCIETY
OF WASHINGTON, DC

Search the site...

ABOUT LLSDC | MEMBERSHIP | EVENTS CALENDAR

Member Login

Home

LLSDC Membership

About LLSDC

Executive Board

Committees & Groups

Special Interest Sections

General Legal Publications
Union List

Law Library Lights

Legislative Source Book

LLSDC Jobline

LLSDC Listserv

LLSDC News

Feedback

Our Tweets

Tweets          Follow

· ☆ · LLSDC
LLSDC

ABA-American Bar
Foundation's Study 'After the
JD' Offers Weak Evidence of
JD's Value
americanlawyer.com/id=120264
#ABA #lawschools

Follow

# Dodd-Frank Wall Street Reform and Consumer Financial Protection Act: A Brief Legislative History with Links, Reports and Summaries

Public Law 111-203, July 21, 2010, 124 Stat. 1326 (H.R. 4173)
Part of LLSDC's Legislative Source Book

First, determine when a particular provision got into the bill (see text versions below) and how different it may be from that enacted or in other versions. Then look for related comments regarding it by performing word/phrase searches in the Congressional Record and in Bill Texts or Both for the 111th Congress. See also related reports, hearings and other documents.

## Text of Bill Versions on Financial Regulatory Reform

(when and how certain provision got into bill)

07/21/2010 - H.R. 4173 as enrolled (w bookmarks) & enacted as P.L. 111-203 (848 p.) (Remarks)
07/15/2010 - Senate closed debate and agreed to conf. report on H.R. 4173 (156 CR S5870-S5933)
06/30/2010 - House agreed to conference report on H.R. 4173 (156 CR H5223-H5261)
06/29/2010 - H.R. 4173 conference report filed (H. Rept. 111-517) - Joint Explanatory Statement
06/10/2010 - H.R. 4173 as a conference base text (1974 p.) before conferee deliberations
05/20/2010 - H.R. 4173 as passed the Senate (1616 p.) - "Restoring American Financial Stability Act"
04/30/2010 - 05/19/2010 - Text of Senate amendments to Amdt No. 3739 to S. 3217 from Cong. Rec.
04/29/2010 - S. 3217 as base amendment (1566 p.) for Senate Floor action (Amendment No. 3739)
04/22/2010 - 05/20/2010 - Senate floor consideration of S. 3217; see Actions & Links to Cong. Rec.
04/15/2010 - S. 3217 as introduced/reported (1410 p.) by Sen. Dodd (S. Rept. 111-176)
03/15/2010 - Dodd committee print (1336 p.) - "Restoring Financial Stability Act" - Mang. Amdt to Print
12/11/2009 - H.R. 4173 as passed by the House (1705 p.) (referred to Senate; see Actions & Links
12/02/2009 - H.R. 4173 as introduced (1279 p.) by Rep. Frank - Wall Street Reform & Cons. Prot. Act
✓ 11/10/2009 - Dodd discussion draft (1136 p.) - "Restoring Financial Stability Act of 2009"
11/03/2009 - H.R. 3996 (380 p.) by Rep. Frank - Financial Stability Improvement Act (Titles I, III, VI, VIII)
10/27/2009 - Frank-Treasury discussion draft (253 p.) - Financial Stability Improvement Act - Pr. Rel.
07/23/2009 - H.R. 3310 (101 p.) intrd by Rep. Bachus, Consumer Protection & Reg. Enhancement Act
07/22/2009 - Administration's combined draft (674 p.) legislation for Financial Regulatory Reform
06/17/2009 - Release, Fact Sheets & White Paper to Obama Fin Reg Reform (Remarks; Summary)

## Text of Proposed Legislation of Titles now in the Dodd-Frank Act

12/10/2009 - (Titles I-XVI) - Rules Cmte Amdt (add H.R. 1728) / Amdt Summaries/Text on H.R. 4173
12/02/2009 - (Titles I-III, V) - Fin. Serv. Committee Markup on H.R. 2609, H.R. 3996
11/03/2009 - H.R. 3996 introduced by Rep. Frank, Financial Stability Improvement Act
10/27/2009 - (Title IV) - 11/04/2009 Markup and approval by House Fin. Svcs Cmte of H.R. 3818
10/15/2009 - (Title III) - H.R. 3818 intrd by Rep. Kanjorski, Private Fund Investment Advisers Registration Act
05/21/2009 - (Title V) - H.R. 2609 intrd by Rep. Kanjorski - Insurance Office Information Act of 2009
09/09/2009 - (Title V) - H.R. 2571 passed House, Nonadmitted & Reinsurance Reform Act
05/21/2009 - H.R. 2571 intrd by Rep. Moore, Nonadmitted and Reinsurance Reform Act of 2009
06/25/2009 - S. 1363 intrd by Sen. Martinez, Nonadmiteed & Reinsurance Reform Act of 2009
06/26/2007 - H.R. 1065 passed House, Nonadmitted & Reinsurance Reform Act of 2007

O:\AYO\AYO09D44.xml [file **DISCUSSION DRAFT**   S.L.C.

111TH CONGRESS
1ST SESSION

# S.  _____

To identify and address risks to the stability of the United States financial
system through the establishment of the Agency for Financial Stability,
to ensure the orderly resolution of failing complex financial institutions
in order to minimize economic turmoil and protect the interest of tax-
payers, to provide for effective bank supervision through the establish-
ment of the Financial Institutions Regulatory Administration, to enhance
the regulation of consumer financial products and services through the
establishment of the Consumer Financial Protection Agency, to allow
the Federal government to better coordinate and monitor insurance mat-
ters through the establishment of the Office of National Insurance in
the Department of Treasury, to improve the regulation of derivatives,
securities, securities products, credit rating agencies, and hedge funds,
to increase investor protections, and for other purposes.

---

## IN THE SENATE OF THE UNITED STATES

Mr. DODD introduced the following bill; which was read twice and referred to
the Committee on _____  _____

---

# A BILL

To identify and address risks to the stability of the United
States financial system through the establishment of the
Agency for Financial Stability, to ensure the orderly
resolution of failing complex financial institutions in
order to minimize economic turmoil and protect the inter-
est of taxpayers, to provide for effective bank supervision
through the establishment of the Financial Institutions
Regulatory Administration, to enhance the regulation of
consumer financial products and services through the

665

1    section 308(b) of the Sarbanes-Oxley Act of
2    2002 (15 U.S.C. 7246(b)), as a result of such
3    action or any settlement of such action.

4    "(5) RELATED ACTION.—The term 'related ac-
5    tion', when used with respect to any judicial or ad-
6    ministrative action brought by the Commission
7    under the securities laws, means any judicial or ad-
8    ministrative action brought by an entity described in
9    subclauses (I) through (IV) of subsection
10   (h)(2)(D)(i) that is based upon the original informa-
11   tion provided by a whistleblower pursuant to sub-
12   section (a) that led to the successful enforcement of
13   the Commission action.

14   "(6) WHISTLEBLOWER.—The term 'whistle-
15   blower' means any individual, or 2 or more individ-
16   uals acting jointly, that provides information relat-
17   ing to a violation of the securities laws to the Com-
18   mission, in a manner established, by rule or regula-
19   tion, by the Commission.

20   "(b) AWARDS.—

21   "(1) IN GENERAL.—In any covered judicial or
22   administrative action, the Commission, under regula-
23   tions prescribed by the Commission and subject to
24   subsection (c), may pay an award or awards to 1 or
25   more whistleblowers who voluntarily provided origi-

1    nal information to the Commission that led to the

2    successful enforcement of the covered judicial or ad-

3    ministrative action in an amount—

4          ''(A) not less than an amount equal to 10

5          percent, in total, of what has been collected of

6          the monetary sanctions imposed in the action or

7          related actions; and

8          ''(B) not exceeding an amount equal to 30

9          percent, in total, of what has been collected of

10         the monetary sanctions imposed in the action or

11         related actions.

12    ''(2) PAYMENT OF AWARDS.—Any amount paid

13    under paragraph (1) shall be paid from the Fund.

14    ''(c) DETERMINATION OF AMOUNT OF AWARD; DE-

15  NIAL OF AWARD.—

16        ''(1)  DETERMINATION  OF  AMOUNT  OF

17        AWARD.—

18          ''(A) DISCRETION.—The determination of

19          the amount of an award made under subsection

20          (b) shall be in the sole discretion of the Com-

21          mission.

22          ''(B)  CRITERIA.—In  determining  the

23          amount of an award made under subsection (b),

24          the Commission shall take into account—

O:\ALB\ALB09122.xml [file **DISCUSSION DRAFT**        S.L.C.

669

1        the identity of the whistleblower and provide

2        such other information as the Commission may

3        require.

4        "(e) NO CONTRACT NECESSARY.—No contract with

5    the Commission is necessary for any whistleblower to re-

6    ceive an award under subsection (b), unless otherwise re-

7    quired by the Commission by rule or regulation.

8        "(f) APPEALS.—Any determination made under this

9    section, including whether, to whom, or in what amount

10   to make awards, shall be in the sole discretion of the Com-

11   mission, and any such determination may be appealed to

12   the appropriate district court of the United States not

13   more than 30 days after the determination is issued by

14   the Commission.

15       "(g) INVESTOR PROTECTION FUND.—

16          "(1) FUND ESTABLISHED.—There is estab-

17       lished in the Treasury of the United States a fund

18       to be known as the 'Securities and Exchange Com-

19       mission Investor Protection Fund'.

20          "(2) USE OF FUND.—The Fund shall be avail-

21       able to the Commission, without further appropria-

22       tion or fiscal year limitation, for—

23             "(A) paying awards to whistleblowers as

24          provided in subsection (b); and

Add.    67